## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MEIJER, INC. and MEIJER DISTRIBUTION, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ASTRAZENECA PHARMACEUTICALS LP, ASTRAZENECA LP, ASTRAZENECA AB, and AKTIEBOLAGET HASSLE,<br><br>Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, on behalf of themselves and the class defined below, bring this antitrust action against Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle, (collectively "Astra" or "Defendants") and allege as follows based upon personal knowledge as to matters relating to themselves and upon the investigation of their counsel and information and belief as to all other matters:

### NATURE OF THE CASE

1.     This case arises from Defendants' unlawful scheme to maintain illegally their monopoly power in the United States for the pharmaceutical drug sold under the brand name Toprol-XL and its AB-rated generic equivalents and to thereby charge supracompetitive prices to direct purchasers.

2.     Defendants market metoprolol succinate products under the brand name Toprol-XL. Toprol-XL is an extended-release drug approved by the U.S. Food & Drug Administration ("FDA")

for treating hypertension, angina, and congestive heart failure (together, herein referred to as "heart disease"). It is sold by Astra in 25 mg, 50 mg, 100 mg, and 200 mg dosages.

3.      As alleged in greater detail herein, Defendants engaged in a scheme involving the commission of fraud and/or inequitable conduct before the United States Patent and Trademark Office ("PTO") in order to obtain two patents – U.S. Patent No. 5,001,161 (the "'161 patent") and U.S. Patent No. 5,081,154 (the "'154 patent") (collectively, the "Patents") – which, in the absence of such conduct, would not have issued. Defendants then proceeded improperly to procure the listing of the Patents with the FDA in order to assert patent infringement claims against and to block the market entry of any potential competitor seeking FDA approval to manufacture and sell a competing, generic version of Toprol-XL.

4.      In July and August of 2003 and April and December of 2004, Defendants did, in fact, institute litigation against companies seeking approval from the FDA to market generic forms of Toprol-XL, even though Defendants knew that their Patents had been improperly procured and were invalid. Defendants instituted these suits not for any legitimate purpose, but because they knew that merely filing such litigation would delay the FDA's granting of approval to the generic manufacturers.

5.      Defendants illegally and intentionally manipulated certain provisions of the 1984 amendments to the Food, Drug, and Cosmetic Act added by the Drug Price Competition and Patent Term Restoration Act of 1984, commonly referred to as the Hatch-Waxman Act or Amendments. *See* Pub.L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271(e)). As many courts have recognized, these amendments were principally designed to streamline the process by which generic drugs are brought to market.

2

6.      Defendants knew and intended that under the Hatch-Waxman Amendments the *mere filing* of patent litigation would automatically bar the FDA from granting marketing approval to any of the competing generic companies for up to thirty months, even though the Patents were fraudulently obtained and their patent infringement suits were baseless. Thus, although Defendants' Patents were ultimately found to be invalid and unenforceable in Federal District Court, Defendants were able to block generic competition for an extended period of time and unlawfully maintain their monopoly simply by listing their Patents in the Orange Book and then filing and pursuing baseless patent litigation in the federal courts.

7.      By their unlawful acts, Defendants have willfully and unlawfully maintained their monopoly power over Toprol-XL and its AB-rated generic equivalents.

8.      Absent Defendants' unlawful conduct, less expensive, bioequivalent generic versions of Toprol-XL would have been on the market much earlier. Through their unlawful conduct, Defendants illegally deprived Plaintiffs (and the other direct purchasers who comprise the class defined below) of access to substantially lower-priced generic versions of Toprol-XL, thereby causing Plaintiffs and the Class to overpay for metoprolol succinate by at least hundreds of millions of dollars.

9.      The overcharges that purchasers of Toprol-XL were forced to pay by Defendants' unlawful conduct inflicted antitrust injury upon those purchasers.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 and 1337.

11.     Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15(a) and/or 22 because Defendants transact business, committed an illegal or tortious act, have an agent, and/or

3

are found within this District, and/or a substantial portion of the events described below have been carried out in this District.

## PARTIES

12.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer") are corporations organized under the laws of the State of Michigan, with their principal place of business in Grands Rapids, Michigan. Meijer is the assignee of the claims of the Frank W. Kerr Co., which, during the Class Period, as defined below, purchased Toprol-XL directly from one or more Defendants.

13.     Defendant AstraZeneca Pharmaceuticals LP is a company organized and existing under the laws of Delaware, which distributes, markets, sells, and/or profits from pharmaceutical products including Toprol-XL throughout the United States. Its U.S. corporate headquarters is located at 1800 Concord Pike, Wilmington, DE. AstraZeneca Pharmaceuticals LP is a U.S. subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after the 1999 merger.

14.     Defendant AstraZeneca LP is a company organized and existing under the laws of Delaware, with its principal place of business at Wilmington, Delaware. AstraZeneca LP holds an approved New Drug Application from the United States Food and Drug Administration ("FDA") for metoprolol succinate preparations with extended release, which it sells under the brand name Toprol-XL. AstraZeneca LP is a U.S. subsidiary of AstraZeneca PLC.

15.     Defendant AstraZeneca AB is a company organized and existing under the laws of Sweden, having its principal place of business at S 151 85 Sodertalje, Sweden.

4

16.     Defendant Aktiebolaget Hassle is a company organized and existing under the laws of Sweden, having its principal place of business at Molndal, Sweden. Aktiebolaget Hassle is a wholly-owned subsidiary of AstraZeneca AB.

## INTERSTATE TRADE AND COMMERCE

17.     During all or part of the Class period (defined below), one or more Defendants manufactured and sold substantial amounts of Toprol-XL in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

18.     At all material times, Toprol-XL manufactured and sold by one or more Defendants was shipped across state lines and sold to customers located outside its state of manufacture.

19.     During all or part of the Class period, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Toprol-XL.

20.     In furtherance of their efforts willfully to obtain and/or maintain monopoly power over Toprol-XL its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

21.     Defendants' efforts willfully to obtain and/or maintain monopoly power over Toprol-XL and its generic equivalents, as alleged herein, has substantially affected interstate and foreign commerce.

## CLASS ALLEGATIONS

22.     Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following class:

5

> All persons and entities in the United States who purchased Toprol-
> XL directly from Defendants at any time from May 5, 2005 through
> the present and continuing until the effects of Defendants'
> anticompetitive conduct ceases (the "Class Period"). Excluded from
> the class are Defendants and their parents, employees, subsidiaries,
> and affiliates (the "Class").

23.    The Class is so numerous that joinder of all members is impracticable. Plaintiffs believe that the Class numbers one hundred or more.

24.    There are questions of law or fact common to the Class, including:

    a.    whether Defendants willfully obtained and/or maintained monopoly power over Toprol-XL and its generic equivalents;

    b.    whether Defendants' Patents were obtained through fraud and/or inequitable conduct;

    c.    whether Defendants' suits asserting infringement of their Patents were baseless;

    d.    whether Defendants' conduct caused direct purchasers of Toprol-XL to be overcharged and therefore injured.

25.    These and other questions of law and fact are common to the members of Class and predominate over any questions affecting only individual members.

26.    Plaintiffs' claims are typical of the claims of the Class because all Class members suffered antitrust injury in the same way as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same nucleus of operative facts and are based on the same legal theories.

6

27.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel experienced in class action and pharmaceutical antitrust litigation, and Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

28.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs know of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

## BACKGROUND

## Federal Regulation of Prescription Drugs

### A.     New Drug Applications

29.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301, *et seq*. (the "FD&C Act") regulates the manufacture and distribution of drugs and medical devices in the United States. Under the FD&C Act, approval by the FDA (the governmental body charged with the regulation of the pharmaceutical industry) is required before a company may begin selling a new drug in interstate commerce in the United States.  21 U.S.C. § 355(a).  Premarket approval for a new drug must be sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FD&C Act demonstrating that the drug is safe and effective for its intended use.

30.     New drugs that are approved for sale in the United States by the FDA are typically covered by patents, which provide the patent owner with the ability to seek to exclude others from making, using, and/or selling (depending on the scope of the patent) that new drug in the United States for the duration of the patents, plus any extension of the original patent granted pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, 21 U.S.C. § 355 ("Hatch-Waxman Act").

31.    Pursuant to 21 U.S.C. § 355(b), in its NDA the pioneer drug manufacturer must list those patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug. Once the NDA is approved by the FDA, any such patents are listed with the NDA in a publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book."

32.    Federal regulations impose strict limitations on the types of patents that an NDA holder can submit to the FDA for listing in the Orange Book. *See generally* 21 C.F.R. § 314.53. One such limitation is imposed by 21 C.F.R. § 314.53(b), which explicitly prohibits NDA holders from listing any patent in the Orange Book unless a claim of infringement could reasonably be asserted on the basis of such a patent.

33.    Despite the FDA regulations that limit the types of patents that NDA holders can list in the Orange Book, it has regrettably become common for brand-name pharmaceutical companies to list in the Orange Book any and every patent they can obtain, so as to force generic manufacturers to file what, as described below, is commonly known as a Paragraph IV certification.

34.    The FDA does not police the listing of patents. The FDA employs no adjudicatory or other process to determine whether a patent submitted by an NDA holder qualifies for listing in the Orange Book. The FDA has stated that it lacks the resources and expertise to review the patents submitted in connection with NDAs. *See* 59 Fed. Reg. 50338, 50343 (Oct. 3, 1994) ("FDA does not have the expertise to review patent information . . . .").

35.    As a result, as numerous courts have recognized, the FDA's role in the patent listing process is purely ministerial, and it relies entirely upon the good faith of the NDA holder submitting the patent for listing.

8

**B.    Generic Drugs**

36.    Generic drugs are drugs that the FDA has found to be bioequivalent to their corresponding brand name drugs. A generic drug provides identical therapeutic benefits and has the same side effects and safety profile as its corresponding brand name drug.

37.    Generic drugs invariably cost substantially less than the branded drugs to which they are bioequivalent. Typically, the first generic version of a brand name drug is sold at a substantial discount to the brand, followed by increasingly steeper discounts as more generics of that molecule enter the market.

38.    Under the Hatch-Waxman Act, a generic drug manufacturer may seek expedited FDA approval to market a generic version of a brand name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA"), pursuant to 21 U.S.C. § 355(j). An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand name drug.

39.    After an applicant has submitted its ANDA to the FDA it must file a patent certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii). Four types of certifications are available:

> I.    The brand name manufacturer has not filed patent information with the FDA (a "Paragraph I Certification");
>
> II.    The patent or patents listed in the Orange Book have expired (a "Paragraph II Certification");
>
> III.    The patent will expire on a date in the future, and the generic manufacturer does not seek to market its generic version of the drug prior to the date of expiration (a "Paragraph III Certification"); or

9

IV. The patent is invalid or not infringed by the generic manufacturer's product (a "Paragraph IV Certification").

21 U.S.C. § 355(j)(2)(A)(vii).

40. A generic drug applicant must serve the brand-name drug company with a copy of any certification under paragraph IV. The Paragraph IV Certification constitutes a "technical act of infringement" under Hatch Waxman which creates jurisdiction in the federal courts to entertain a patent infringement action, and gives the NDA holder forty-five days from the date of the notice to institute such an action against the generic manufacturer under 35 U.S.C. § 271(e)(2). *See* 21 U.S.C. § 355(j)(5)(B)(iii). If such a suit is initiated, the FDA's approval of the ANDA is automatically stayed for up to thirty months. 21 U.S.C. § 355(j)(5)(B)(iii).

41. Because of this thirty-month stay, the mere filing of an infringement action in response to a Paragraph IV certification, regardless of the action's underlying merit, gives the brand-name company the functional equivalent of a self-effectuating preliminary injunction blocking the entry of a generic competitor, without the brand company's ever having to establish likelihood of success on the merits, irreparable harm, that the balance of hardships tips in its favor, or that the public good is served by the blocking of entry. Indeed, as a practical matter the brand name company wins the lawsuit simply by filing it, as it automatically protects its monopoly for up to two-and-a-half years, and possibly longer, while the infringement action winds its way through the court system. (And the brand name company has an incentive to stall the progress of this action.) There are no disgorgement provisions for profits earned during the thirty-month period of exclusivity if a court eventually determines that the suit was without merit.

42. An improper Orange Book listing also has additional anticompetitive effects, because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval,

10

granted a 180-day period of marketing exclusivity in relation to other generic manufacturers. 21 U.S.C. § 355(j)(5)(B)(iv). This 180-day exclusivity period is awarded to the first Paragraph IV filer regardless of whether or not the brand company institutes pre-approval patent infringement litigation in response to the Paragraph IV certification. Absent an improper Orange Book listing, no Paragraph IV certification would be required and, thus, no generic company would receive 180-day exclusivity; rather, multiple generic competitors would enter the market simultaneously.

43.    Defendants were at all times fully familiar with their ability to delay the entry of generic competition by the improper manipulation of the patent listing and pre-approval litigation provisions of the Hatch-Waxman Amendments.

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

44.    Defendants have successfully forestalled generic competition to Toprol-XL from entering the market – thereby delaying purchasers the benefits of cheaper, generic extended-release metoprolol succinate products – by obtaining patents they did not deserve from the United States Patent & Trademark Office ("PTO") through intentional misrepresentations and omissions, fraudulently listing these patents in the Orange Book, and bringing and maintaining sham patent infringement suits based on these patents.

### A.    Defendants' Fraudulent Procurement of Patents

45.    Defendants have falsely asserted that two patents cover Toprol-XL and bar generic competition: U.S. Patent No. 5,001,161 (the "'161 patent") and U.S. Patent No. 5,081,154 (the "'154 patent") (collectively, the "Patents").

46.    The '161 patent issued on March 19, 1991, with a single claim: "A pharmaceutical composition comprising metoprolol succinate together with a sustained release pharmaceutically acceptable carrier."

11

47.     The '154 patent issued on January 14, 1992, with a single claim:  "Metoprolol succinate."

48.     The named inventors on both the '161 and '154 patents are Curt H. Appelgren and Eva C. Eskilson. However, Appelgren and Eskilson were not the inventors of metoprolol succinate, which had been first made at Astra before either of them joined the company and more than ten years before patent applications claiming the compound were filed in the PTO naming them as inventors.

49.     As explained in detail below, when Appelgren and Eskilson tried to claim formulations of metoprolol succinate for their new employer after leaving the employ of Astra, Astra contested their right to do so and asserted its ownership to rights to metoprolol succinate in a complaint filed in the Swedish Patent Office that alleged that metoprolol succinate had been invented by its employee Toivo Nitenberg and disclosed in confidence to Appelgren and Eskilson.  Several months later, Appelgren and Eskilson agreed to drop metoprolol succinate from their application, assign rights to Astra, and file a new application directed to metoprolol succinate and assign the new application to Astra.

50.     In the early 1980s, Appelgren and Eskilson were employed at Astra's AB Hassle division in Molndal, Sweden. Among their duties, Appelgren and Eskilson participated in a project to develop new controlled release formulations of metoprolol. Their duties, however, had nothing to do with the identification, synthesis, or invention of different salts of metoprolol.

51.     Under the organization and procedures within the Astra organization at the time, responsibility for sythesis of alternative compounds rested with a group employed by Astra Pharmaceutical Production AB, located in Sodertalje, Sweden.  Neither Appelgren nor Eskilson conceived of or synthesized metoprolol succinate. Rather, that compound was supplied to the group

12

of which Appelgren and Eskilson were members by chemists employed by Astra in Sodertalje, including Lars Lilljequist.

52.    In his deposition taken in Astra's patent litigation against potential generic competitors, Appelgren admitted that metoprolol succinate was not a newly developed product at Astra, but was an "old," known compound supplied to the product development group.

53.    The other inventor, Ms. Eskilson, could not recall at her deposition why she was named an inventor of metoprolol succinate.

54.    At the end of 1982, Appelgren resigned from Hassle to form his own company, Lejus Medical AB ("Lejus"). Appelgren was a founder and 25% owner of Lejus.

55.    Several months later, Eskilson joined Appelgren at Lejus, and Appelgren and Eskilson began to work on developing a sustained release formulation of quinidine sulphate for a U.S. company unrelated to Astra.

56.    On January 10, 1984, Lejus filed a Swedish patent application (SE8400085, the "Swedish Application") naming Appelgren and Eskilson as the inventors based on the sustained release formulation they had developed for quinidine sulphate at Lejus. When listing potentially useful pharmaceutical agents for their sustained release formulation, Appelgren and Eskilson included metoprolol succinate. Although Appelgren and Eskilson knew of metoprolol succinate from their work at Hassle, they did not believe they were violating any duty of confidentiality by disclosing it in the Swedish Application, because they did not believe it was a new compound and certainly did not believe they were its inventors.

57.    The Lejus application was published in July, 1985 and came to the attention of Hassle and its parent, Astra AB, which on October 21, 1985, filed a complaint with the Swedish Patent Office asserting that Appelgren and Eskilson were not the inventors of metoprolol succinate and that

13

the compound was invented by Toivo Nitenberg, a Hassle employee. At this point, Lejus had already filed a corresponding U.S. patent application (U.S. Serial No. 690,197 (the "'197 application"), which ultimately issued as U.S. Patent No. 4,780,318 (the " '318 patent")).

58.    To settle Hassle's complaint, Lejus, Appelgren, and Eskilson agreed to assign Hassle any rights to metoprolol succinate in an agreement dated April 21, 1986 (the "Lejus/Hassle agreement"). The Lejus/Hassle agreement was negotiated on behalf of Hassle and Astra at least by employees of Astra's patent department, including Bengt Wurm.

59.    In March, 1988, Lejus filed the U.S. patent application (U.S. Serial No. 172,897, the "'897 application") that eventually issued as the '161 patent, tracking almost exactly the agreed-upon language from the Lejus/Hassle agreement. Thereafter, Lejus assigned this application to Hassle.

60.    By the time this application was filed in March of 1988, more than one year had passed since publication of Lejus's Swedish Application naming metoprolol succinate and claiming sustained-release pharmaceutical formulations containing metoprolol succinate. Thus, Hassle knew that unless the applications issuing as the '161 and '154 patents could rely on the filing date of the Swedish Application, any new claims in the '161 and '154 patents to metoprolol succinate or sustained-release formulations of it would be unpatentable, *inter alia*, as anticipated by the Swedish Application, pursuant to 35 U.S.C. §§ 102(b), 119(a). They would have been unpatentable as anticipated because of other prior art as well, including an article published in 1987 and two other patent applications filed by Hassle.

61.    Thus, Hassle knew that if it identified Nitenberg as the inventor of the '161 and '154 patents, then because Nitenberg is not an inventor on the '897 application and the Swedish Application, that Hassle would not be able to rely on the filing date of the Swedish Application for the '161 and '154 patents and those patents would be rejected by the PTO or invalidated in litigation.

14

62.    Hassle knew that in order to obtain U.S. patents directed to metoprolol succinate and avoid the bar of the published Swedish Application, it had to file fraudulently in the names of Appelgren and Eskilson in order to make a (fraudulent) claim of priority. Hassle did just this.

63.    Appelgren, Eskilson, the representatives prosecuting the applications, employees of Hassle and Astra, and others involved in the prosecution of the '161 and '154 patents knew that Appelgren and Eskilson were not the joint inventors of metoprolol succinate or the subject matter claimed in the patents.

64.    During the prosecution of the '161 and '154 patents, Defendants did not disclose to the PTO its complaint to the Swedish Patent Office dated October 21, 1985, the Lejus/Hassle Agreement, the facts leading to these documents, or that Toivo Nitenberg had made metoprolol succinate in 1971.

65.    During the prosecution of the '161 and '154 patents, Defendants intentionally made other material misrepresentations and omissions, including in submitting a declaration of an employee, John Anders Sandberg (the "Sandberg Declaration"). Among other things, although the Sandberg Declaration extols the virtue of metoprolol succinate for use in once-daily, controlled-release preparations, Defendants did not explain that its alleged virtues were unique to a particular formulation developed by Sandberg, unrelated to any work done by Appelgren and Eskilson. The Sandberg Declaration also omits material information known to Dr. Sandberg and Defendants about prior art and the performance of other metoprolol salts.

66.    Because the facts and information that Defendants failed to disclose and/or misrepresented to the PTO directly relate to proper inventorship and derivation and would have precluded patentability under, at least, 35 U.S.C. § 102(f), they were of the highest materiality.

15

67.     These omissions and/or misrepresentations were purposeful. They were made with an intent to deceive and did, in fact, deceive the PTO, resulting in the issuance of the '161 and '154 patents.

**B.     Defendants' Sham Disclaimer**

68.     Claim 8 of Defendants' '318 patent, which issued on October 25, 1988 (expiring on October 25, 2005), claims, among other compounds, "metoprolol succinate."

69.     The claims of the '161 and '154 patents also claim "metoprolol succinate," but are due to expire on March 18, 2008, which is more than 17 years after the issuance of the '318 patent.

70.     Defendants knew that the Patent Act (as it existed when the '318 patent was filed) entitled them only to 17 years of patent protection for metoprolol succinate and that the Patent Act prohibited them from "double patenting" metoprolol succinate in order to obtain more than 17 years of patent protection. However, Defendants did not file any terminal disclaimers limiting the patent monopoly for metoprolol succinate to 17 years.

71.     Because Plaintiffs did not file terminal disclaimers for the '161 and '154 patents, the patents are invalid for obviousness-type double patenting due to claim 8 of the '318 patent, and Defendants knew this.

72.     On November 21, 2003, Defendants filed a statutory disclaimer of claim 8 of the '318 patent, effectively canceling the claim. By filing the statutory disclaimer of claim 8 of the '318 patent, instead of filing terminal disclaimers of the '161 and '154 patents, Defendants wrongfully and in bad faith attempted to circumvent double-patenting invalidity of the '161 and '154 patents and obtain more than 17 years of patent protection for metoprolol succinate.

16

73.     Defendants' filing of the statutory disclaimer of claim 8 to overcome the obviousness-type double patenting invalidity of the '161 and '154 patents is objectively baseless and was not done for any legitimate purpose. This filing was, thus, a sham.

## C.     Defendants' Sham Orange Book Listings

74.     Despite Defendants' knowledge that the '161 and '154 patents were invalid, Defendants caused the patents to be listed in the Orange Book as covering Toprol-XL and reasonably giving rise to a claim of infringement, and Defendants did not withdraw these Orange Book listings even after being provided with clear proof that they were improper. In fact, the Orange Book listings were objectively baseless.

75.     Defendants knew that under the Hatch-Waxman Act, if they sued to enforce patents listed in the Orange Book, they would receive effectively an automatic injunction that would last up to thirty months, would bar generic competitors from marketing metoprolol succinate products without any proof of likelihood of success and regardless of the invalidity of the listed patents or the baselessness of the suit, and would delay FDA approval of ANDAs filed by generic competitors.

76.     Defendants' decisions to cause the patents to be listed, not to inform the FDA that the '161 and '154 patents are invalid, and not to withdraw the Orange Book listings, were intentionally deceptive.

## D.     Defendants' Sham Litigations

77.     Despite Defendants' knowledge that the '161 and '154 patents were invalid, Defendants commenced multiple patent-infringement suits based on these patents against the following companies seeking to market generic, bioequivalent versions of Toprol-XL:  KV Pharmaceutical Co., Andrx Pharmaceuticals, LLC, Andrx Corp., and Eon Labs, Inc. (collectively, the

17

"generic manufacturers"). These litigations were ultimately transferred to the Eastern District of Missouri for pre-trial proceedings.

78.    Knowing that the litigations are objectively baseless, Defendants nonetheless commenced and maintained them deceptively, in bad faith, and with the specific intent and subjective motivation to prevent the generic manufacturers from selling competing metoprolol succinate products.

79.    Defendants knew that even though ultimately they could not expect success on the merits of their litigations, the process itself of commencing the sham litigations would nonetheless enable them automatically to bar the generic manufacturers from coming to market for up to thirty months or more, under 21 U.S.C. § 355(j)(5)(b)(iii).

80.    Defendants' lawsuits were shown to be a sham. On January 17, 2006, Judge Rodney W. Sippel granted summary judgment for the generic manufacturers, determining, *inter alia*, that (1) the '161 and '154 patents were invalid for double-patenting based on claim 8 of the '318 patent, and (2) the '161 and '154 patents were unenforceable because of Astra's misconduct in not informing the patent examiner about the dispute regarding inventorship while prosecuting the patents. On the latter point, Judge Sippel found that the inventorship issue was "highly material" to patentability and that Astra's intent to deceive was "clearly present."

81.    Defendants' conduct during the patent litigation further evinces their anticompetitive intent. For example, Judge Sippel noted that, during the litigation, Defendants "maintained a pattern of submitting witness declarations that contradict their own prior deposition testimony."

## EFFECTS ON COMPETITION

82.    Defendants' exclusionary conduct has delayed generic competition and unlawfully enabled Defendants to sell Toprol-XL without being subject to generic competition. But for

18

Defendants' illegal conduct, one or more competitors would have begun marketing AB-rated generic versions of Toprol-XL products much sooner.

83.    The generic manufacturers seeking to sell generic Toprol-XL have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products. Eon Labs, Inc. ("Eon"), for example, has a history of achieving high approval rates for its ANDAs, usually within twelve to thirteen months of filing an ANDA.

84.    Eon has publicly affirmed its intention and ability to begin selling generic Toprol-XL upon approval of its ANDA. However, Defendants' unlawful conduct has caused the ANDA approval process to be delayed by the FDA and caused the generic manufacturers to divert resources from their applications and to expend unnecessary resources on litigation. Another potential generic manufacturer, Andrx, has recently had its pending drug applications placed on hold, which would not have affected its metoprolol succinate ANDA absent delay.

85.    If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendants, direct purchasers, such as Plaintiffs, would have (a) substituted a lower-priced generic version instead of purchasing Toprol-XL, (b) paid less for some or all of their remaining Toprol-XL purchases, and/or (c) would have paid less for their generic purchases, and consequently would have paid in any event substantially less for extended-release metoprolol succinate products.

86.    Moreover, because of Defendants' objectively baseless Orange Book listings, once the generic manufacturer that filed first for a particular dosage strength begins to sell its generic version of Toprol-XL, it will be entitled to 180-days of generic marketing exclusivity for that dosage

19

strength, which will delay the entry of other generic competitors into the market and forestall further price competition.

87.    Defendants' unlawful conduct deprived Plaintiffs of the benefits of competition that the antitrust laws were designed to ensure.

88.    Defendants have monopoly power over Toprol-XL and its generic equivalents, since they have had the power to maintain the price of Toprol-XL at supracompetitive levels without losing substantial sales. When generic competition arrives, Defendants will not be able to maintain their current prices of Toprol-XL without losing substantial sales.

89.    Defendants sold Toprol-XL at prices well in excess of marginal costs and enjoyed high profit margins. Defendants have had the power to exclude competition.

90.    To the extent that defining a relevant product market is necessary in this case, the relevant product market is Toprol-XL and its AB-rated generic equivalents. The relevant geographic market is the United States. Defendants currently hold a 100% share in the relevant product and geographic markets. Accordingly, Plaintiffs and members of the Class continue to pay higher prices for their extended-release metoprolol succinate purchases than they would otherwise have paid, as a result of Defendants unlawful and willful extension of their monopoly power through the conduct alleged herein.

## **Violations of Section 2 of the Sherman Antitrust Act**

91.    Plaintiffs incorporate by reference the preceding allegations.

92.    Defendants knowingly and intentionally engaged in a course of conduct designed fraudulently to obtain the '161 and '154 patents and willfully to extend and maintain their monopoly power. This course of conduct included procuring the '161 and '154 patents by committing fraud and/or inequitable conduct before the PTO, improperly listing the '161 and '154 patents in the

20

Orange Book, and improperly filing and prosecuting objectively baseless patent infringement actions against companies seeking to market competing versions of Toprol-XL. Defendants' conduct was designed to delay the introduction of generic formulations of Toprol-XL into the market.

93.    Defendants intentionally and wrongfully maintained their monopoly power with respect to Toprol-XL in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiffs and members of the Class paid artificially inflated prices for their extended-release metoprolol succinate purchases.

94.    Plaintiffs and members of the Class have been injured in their business or property by Defendants' antitrust violations. Their injury consists of having paid and continuing to pay higher prices for their extended-release metoprolol succinate purchases than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Defendants' conduct unlawful, and Plaintiffs are the proper entities to bring a case concerning this conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following:

A.    Judgment in their favor and against Defendants for damages representing the overcharges paid by Plaintiffs and the other members of the Class, trebled;

B.    Pre- and post-judgment interest;

C.    Costs of suit, including reasonable attorneys' fees; and

D.    Such other and further relief as the Court deems just and proper.

21

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims

asserted in this Complaint so triable.

Dated: January 27, 2006

Respectfully submitted,

Jeffrey S. Goddess, Esq., Del. Bar No. 630
**Rosenthal, Monhait, Gross**
**& Goddess, P.A.**
919 N. Market Street, Suite 1401
Wilmington, DE 19899
jgoddess@rmgglaw.com
(302) 656-4433


Linda P. Nussbaum
Steig D. Olson
**COHEN, MILSTEIN, HAUSFELD**
**& TOLL, P.L.L.C.**
150 East 52nd Street, 30th Floor
New York, NY 10022-6017
(212) 838-7797

Michael D. Hausfeld
**COHEN, MILSTEIN, HAUSFELD**
**& TOLL, P.L.L.C.**
1100 New York Avenue, N.W.
Washington, DC 20005-3964
(202) 408-4600

Robert N. Kaplan
Richard J. Kilsheimer
**KAPLAN FOX & KILSHEIMER LLP**
805 Third Avenue
New York, NY 10002
(212) 687-1980

22

Joseph M. Vanek
**DAAR & VANEK, P.C.**
225 W. Washington, 18th Floor
Chicago, IL 60606
(312) 224-1500

Paul E. Slater
**SPERLING & SLATER, P.C.**
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312) 641-3200

*Attorneys for Plaintiffs*

23

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS  ASTRAZENECA PHARMACEUTICALS, LP; |
|---|---|
| MEIJER, INC. and | ASTRAZENECA LP, ASTRAZENECA AB, and |
| MEIJER DISTRIBUTION, INC. | AKTIEBOLAGET HASSLE |

(b) County of Residence of First Listed Plaintiff  **Kent County,**
(EXCEPT IN U.S. PLAINTIFF CASES) **Michigan**

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
**Jeffrey S. Goddess, Rosenthal, Monhait
Gross & Goddess, PA, PO Box 1070,
Wilmington, DE 19899 (302) 656-4433**

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | | |
|---|---|---|
| ☐ 1  U.S. Government  Plaintiff | ☒ 3  Federal Question  (U.S. Government Not a Party) | |
| ☐ 2  U.S. Government  Defendant | ☐ 4  Diversity  (Indicate Citizenship of Parties in Item III) | |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☒☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
**Sherman Act, 15 U.S.C. §2.  Civil antitrust action in connection with**
Brief description of cause: **monopolization of market for the drug metoprolol succinate
(sold as "Toprol".)**

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| *Jun 27, 06* | *[signature]*  **Jeffrey S. Goddess (No. 630)  (302) 656-4433** |

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____0 6 -_____5 2_____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____3_____ COPIES OF AO FORM 85.

JAN 2 7 2006

_____
(Date forms issued)

*Carol Wetty*
_____
(Signature of Party or their Representative)

CAROL WETTY
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action