## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE: METOPROLOL SUCCINATE DIRECT PURCHASER ANTITRUST LITIGATION** | **Civil Action No. 06-52 GMS** |
| | **JURY TRIAL DEMANDED** |
| **THIS DOCUMENT RELATES TO:** **All Actions** | |

### CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Co-Operative, Inc., and American Sales Company, on behalf of themselves and the class defined below, bring this antitrust action against Defendants AstraZeneca Pharmaceuticals LP, AstraZeneca LP, AstraZeneca AB, and Aktiebolaget Hassle (collectively "Astra" or "Defendants"), and allege as follows based upon personal knowledge as to matters relating to themselves, and upon the investigation of counsel and information and belief as to all other matters:

### NATURE OF THE CASE

1. This case arises from Defendants' anticompetitive scheme to block the entry of generic competition in order to maintain their monopoly power in the United States market for pharmaceutical drugs composed of extended-release metoprolol succinate. Defendants' scheme allowed them to charge supracompetitive prices for extended-release metoprolol succinate, causing Plaintiffs and members of the Class to pay overcharges on their purchases.

2. Defendants sell extended-release metoprolol succinate in the United States under the brand name Toprol-XL, in 25 mg, 50 mg, 100 mg, and 200 mg dosages. Toprol-XL is a drug

1

approved by the U.S. Food & Drug Administration ("FDA") for treating hypertension, angina, and congestive heart failure (collectively referred to herein as "heart disease"). Toprol-XL had U.S. sales of approximately $1.29 billion in 2005.

3.     Defendants engaged in a scheme involving misconduct before the United States Patent and Trademark Office ("PTO") in order to obtain two patents – U.S. Patent No. 5,001,161 (the "'161 Patent") and U.S. Patent No. 5,081,154 (the "'154 Patent") (collectively, the "Patents") – which, in the absence of such conduct, would not have issued. Defendants proceeded improperly to procure the listing of the Patents with the FDA, in order to position themselves to assert patent infringement claims against, and to block the market entry of, any potential competitor seeking FDA approval to manufacture and sell a competing, generic version of Toprol-XL.

4.     Defendants then instituted a series of baseless lawsuits against potential competitors, for the purpose of forestalling generic competition. In 2003 and 2004, Defendants filed multiple lawsuits against companies seeking approval from the FDA to market generic forms of Toprol-XL, asserting infringement of the Patents, even though Defendants knew that the Patents had been improperly procured and were invalid, and that no reasonable claim of infringement could be asserted based upon them.

5.     Defendants instituted these lawsuits not for any legitimate purpose, but because they knew the mere filing of such litigation would raise barriers to the entry of generic competition, including by automatically delaying the FDA's granting of final marketing approval to the generic manufacturers. Without FDA approval, generic manufacturers cannot bring their products to market.

2

6.      By their unlawful acts, Defendants have willfully maintained their monopoly power over Toprol-XL and generic, bioequivalent forms of the drug, *i.e.* the extended-release metoprolol succinate "molecule," and thereby benefited from hundreds of millions of dollars in ill-gotten revenues.

7.      Absent Defendants' unlawful conduct, less expensive generic versions of Toprol-XL would be on the market. Through their unlawful conduct, Defendants deprived Plaintiffs (and the other direct purchasers of Toprol-XL who comprise the Class defined below) of access to substantially lower-priced extended-release metoprolol succinate. Defendants have caused Plaintiffs and the Class to overpay for extended-release metoprolol succinate by at least hundreds of millions of dollars.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 and 1337.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391 and 15 U.S.C. § 15(a) and/or 15 U.S.C. § 22, because Defendants transact business, committed an illegal or tortious act, have an agent, and/or are found within this District, and/or because a substantial portion of the events described below have been carried out in this District.

## PARTIES

10.     Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. (collectively, "Meijer") are corporations organized under the laws of Michigan, with their principal place of business in Grand Rapids, Michigan. Meijer is the assignee of the claims of the Frank W. Kerr Co., which, during the Class Period, as defined below, purchased Toprol-XL directly from one or more Defendants.

3

11.    Plaintiff Rochester Drug Co-operative, Inc. ("RDC") is a stock corporation organized and existing under the New York Cooperative Corporations Law, with a principal place of business in Rochester, New York. During the Class Period, RDC purchased Toprol-XL directly from one or more Defendants.

12.    Plaintiff American Sales Company ("ASC") is a corporation organized and existing under the laws of New York, with its principal place of business in Lancaster, New York. During the Class Period, ASC purchased Toprol-XL directly from one or more of the Defendants.

13.    Defendant AstraZeneca Pharmaceuticals LP is a limited partnership organized and existing under the laws of Delaware, which distributes, markets, sells, and/or profits from pharmaceutical products, including Toprol-XL, throughout the United States. Its United States corporate headquarters is located at 1800 Concord Pike, Wilmington, DE.    AstraZeneca Pharmaceuticals LP is a U.S. subsidiary of AstraZeneca PLC, and was created as a result of the union of Zeneca Pharmaceuticals and Astra Pharmaceuticals LP in the U.S. after a 1999 merger.

14.    Defendant AstraZeneca LP is a limited partnership organized and existing under the laws of Delaware, with its principal place of business in Wilmington, Delaware. AstraZeneca LP holds an approved New Drug Application from the FDA for extended-release metoprolol succinate preparations, which it sells under the brand name Toprol-XL. AstraZeneca LP is a U.S. subsidiary of AstraZeneca PLC.

15.    Defendant AstraZeneca AB is a corporation organized and existing under the laws of Sweden, having its principal place of business at S 151 85 Sodertalje, Sweden. AstraZeneca AB was formerly known as Astra Aktiebolaget.

4

16.     Defendant Aktiebolaget Hassle is a corporation organized and existing under the laws of Sweden, having its principal place of business in Molndal, Sweden. Aktiebolaget Hassle is a wholly-owned subsidiary of AstraZeneca AB.

17.     Defendants' actions as part of, and in furtherance of, the illegal conduct alleged herein, were authorized, ordered, and/or done by Defendants' officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

18.     During all or part of the Class Period, one or more Defendants manufactured and sold substantial amounts of Toprol-XL in a continuous and uninterrupted flow of commerce across state and national lines throughout the United States.

19.     At all material times, Toprol-XL manufactured and sold by one or more Defendants was shipped across state lines and sold to customers located outside its state of manufacture.

20.     During all or part of the Class period, Defendants transmitted funds as well as contracts, invoices, and other forms of business communications and transactions in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of Toprol-XL.

21.     In furtherance of their efforts willfully to maintain monopoly power over Toprol-XL and its generic equivalents, Defendants employed the United States mails and interstate and international telephone lines, as well as means of interstate and international travel.

22.     Defendants' efforts willfully to maintain monopoly power over Toprol-XL and its generic equivalents have substantially affected interstate and foreign commerce.

5

## CLASS ALLEGATIONS

23.    Plaintiffs bring this action under Rule 23(b)(3) of the Federal Rules of Civil

Procedure, on behalf of themselves and the following class (the "Class"):

> All persons and entities in the United States who purchased
> Toprol-XL directly from any of the Defendants at any time from
> May 5, 2005 through the present and continuing until the effects of
> Defendants' anticompetitive conduct cease (the "Class Period").
> Excluded from the Class are Defendants and their parents,
> employees, subsidiaries, and affiliates, and federal government
> entities.

24.    Joinder of all members of the Class, who number one hundred or more, is

impracticable.

25.    Numerous questions of law and fact are common to the Class, including:

a.    whether Defendants willfully obtained and/or maintained monopoly power

over Toprol-XL and its generic equivalents;

b.    whether Defendants' Patents (*i.e.* the '161 and '154 Patents) were obtained

through misconduct;

c.    whether Defendants' Patents are invalid for double patenting or because of

prior art;

d.    whether the lawsuits Defendants filed asserting infringement of the

Patents were objectively baseless;

e.    whether Defendants filed such lawsuits for the purpose of preventing or

delaying competition;

f.    whether the acts of Defendants alleged herein have substantially affected

interstate commerce; and

g.    whether, and to what extent, Defendants' conduct caused antitrust injury

6

in the nature of overcharges to Plaintiffs and the members of the Class, and if so, the appropriate measure of damages.

26.     These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting only individual members.

27.     Plaintiffs' claims are typical of the claims of the Class because all Class members paid overcharges, and thus suffered antitrust injury, as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same nucleus of operative facts and are based on the same legal theories.

28.     Plaintiffs will fairly and adequately represent the Class and will protect the Class's interests. Plaintiffs have retained counsel experienced in class action and pharmaceutical antitrust litigation, and Plaintiffs have no interest in this litigation that is adverse to, or in conflict with, the interests of the other members of the Class.

29.     A class action is superior to any other available method for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty that will be encountered in the management of the claims advanced by the Class that would preclude class certification.

## BACKGROUND

### A.     Brand-Name Drugs vs. Generic Drugs

30.     The sale of brand-name prescription drugs is one of the most profitable industries in the United States. Over $250 billion was spent on pharmaceutical drugs in the U.S. in 2005, with $229.5 billion spent on brand-name drugs. The cost of prescription drugs has been rising at a rate of 14% to 18% per year.

31.     Securing the availability of generic drugs is one of the most effective means of lowering the cost of prescription drugs. Generic drugs, which must be approved by the FDA, by

7

law have the same active chemical composition and provide the same therapeutic effects as the brand-name drugs to which they correspond.

32.    Generic drugs are priced substantially below the brand-name drugs to which they are bioequivalent.  A 1998 study conducted by the Congressional Budget Office ("CBO") concluded that generic drugs save purchasers between $8 billion and $10 billion a year.

33.    The Federal Trade Commission ("FTC") estimates that the first generic manufacturer to enter the market typically charges between 70% and 80% of the price of the brand-name drug.  As additional manufacturers bring generic versions of the drug to market, the price continues to drop.

34.    A brand-name drug loses a significant portion of its market share to generic competitors soon after the introduction of generic competition.  The 1998 CBO study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale.

**B.      Federal Scheme For Approval Of Pioneer Drugs**

35.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FD&C Act"), as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement and Modernization Act of 2003, codified at 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e) (2005), regulates the manufacture and distribution of drugs and medical devices in the United States.  Under the FD&C Act, approval by the FDA (the governmental body charged with the regulation of the pharmaceutical industry) is required before a company may begin selling a new drug in interstate commerce in the United States.  21 U.S.C. § 355(a).  Premarket approval for a new drug must be

8

sought by filing a new drug application ("NDA") with the FDA under § 355(b) of the FD&C Act, demonstrating that the drug is safe and effective for its intended use.

36.    New drugs that are approved for sale in the United States by the FDA are often covered by patents, which provide the patent owner with the ability to seek to exclude others from making, using, and/or selling (depending on the scope of the patent) that new drug in the United States for the duration of the patent, plus any extension of the patent granted pursuant to the Hatch-Waxman Act.

37.    Pursuant to 21 U.S.C. § 355(b), in its NDA, the pioneer drug manufacturer must provide a list of those patents that claim the drug for which FDA approval is being sought or that claim a method of using the drug and with respect to which a claim of patent infringement could reasonably be asserted against an unlicensed manufacturer or seller of the drug. Once the NDA is approved by the FDA, any such patents are listed with the NDA in an FDA publication known as the Approved Drug Products With Therapeutic Equivalence Evaluations, commonly referred to as the "Orange Book."

38.    Federal regulations impose strict limitations on the types of patents that an NDA holder can submit to the FDA for listing in the Orange Book. One such limitation is imposed by 21 C.F.R. § 314.53(b), which explicitly prohibits NDA holders from listing any patent in the Orange Book unless a claim of infringement could reasonably be asserted on the basis of such a patent.

39.    Despite the FDA regulations that limit the types of patents that NDA holders can list in the Orange Book, it has regrettably become common for brand-name pharmaceutical companies to list in the Orange Book any and every patent they can obtain, in order to force

9

generic manufacturers to file what, as described below, is commonly known as a Paragraph IV Certification.

40.     The FDA does not police the listing of patents.   The FDA employs no adjudicatory or other process to determine whether a patent submitted by an NDA holder qualifies for listing in the Orange Book.  The FDA has stated that it lacks the resources and expertise to review the patents submitted in connection with NDAs.  *See* 59 Fed. Reg. 50338, 50343 (Oct. 3, 1994) ("FDA does not have the expertise to review patent information.").

41.     The FDA's role in the patent listing process is purely ministerial, and it relies entirely upon the good faith of the NDA holder submitting the patent for listing.

### C.     Approval of Generic Drugs

42.     Generic drugs are drugs that the FDA has found to be bioequivalent to their corresponding brand name drugs.  A generic drug provides identical therapeutic benefits and has the same side effects and safety profile as its corresponding brand name drug.  The FDA assigns an "AB" rating to generic drugs that are bioequivalent to pioneer or brand-name drugs.

43.     Congress enacted the Hatch-Waxman Act in 1984.  The Hatch-Waxman Act was principally designed to streamline the process by which generic drugs are brought to market. The Hatch-Waxman Act, among other things, simplified the regulatory hurdles faced by prospective generic drug manufacturers by eliminating the need for such manufacturers to file lengthy and costly NDAs.  Under the Hatch-Waxman Act, a generic drug manufacturer may seek expedited FDA approval to market a generic version of a brand-name drug with an approved NDA by filing an Abbreviated New Drug Application ("ANDA"), pursuant to 21 U.S.C. § 355(j).  An ANDA relies on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand-name drug.

10

44.     Under the Hatch-Waxman Act, a generic manufacturer's ANDA must contain one of four certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii), addressing the patents, if any, listed in the Orange Book as applying to the brand-name or pioneer drug.  Four types of certifications are available:

I.      The brand name manufacturer has not filed patent information with the FDA (a "Paragraph I Certification");

II.     The patent or patents listed in the Orange Book have expired (a "Paragraph II Certification");

III.    The patent or patents listed in the Orange Book will expire on a date in the future, and the generic manufacturer does not seek to market its generic version of the drug prior to the date of expiration (a "Paragraph III Certification"); or

IV.     The patent or patents listed in the Orange Book are invalid or not infringed by the generic manufacturer's product (a "Paragraph IV Certification").

45.     If a generic manufacturer files a Paragraph IV Certification, asserting that a listed patent is invalid or will not be infringed, the brand-name manufacturer has the opportunity to delay the generic manufacturer's receipt of final FDA approval, and, thus, its ability to come to market.  This is because a generic manufacturer filing a Paragraph IV Certification must promptly give notice of this fact to both the NDA owner and the owner of the patent(s) at issue, and this certification constitutes a "technical act of infringement" under the Hatch-Waxman Act.

46.     The filing of a Paragraph IV Certification thus creates jurisdiction in the federal courts to entertain a patent infringement action, and gives the NDA holder forty-five days from the date of the notice to institute such an action against the generic manufacturer under 35 U.S.C.

11

§ 271(e)(2). *See* 21 U.S.C. § 355(j)(5)(B)(iii). If such a suit is initiated, the FDA's approval of the ANDA is automatically stayed for up to thirty months. 21 U.S.C. § 355(j)(5)(B)(iii).

47.    Because of this thirty-month stay of ANDA approval, the mere filing of an infringement action in response to a Paragraph IV Certification, regardless of the action's underlying merit, gives the brand-name drug company the equivalent of a self-effectuating preliminary injunction blocking the entry of a generic competitor, without requiring the brand-name drug company to establish a likelihood of success on the merits, irreparable harm, that the balance of hardships tips in its favor, or that the public good is served by the blocking of entry. As a practical matter the brand-name drug company wins the lawsuit simply by filing it, as it automatically protects its monopoly for up to two-and-a-half years, and potentially longer, while the infringement action winds its way through the court system. Moreover, the brand name company has an incentive to stall the progress of this action. There are no disgorgement provisions for profits earned during the thirty-month period of exclusivity if a court eventually determines that the suit was without merit.

48.    An improper Orange Book listing also has additional anticompetitive effects, because the first generic company to file an ANDA with a Paragraph IV Certification is, upon FDA approval, granted a 180-day period of marketing exclusivity in relation to other generic manufacturers. 21 U.S.C. § 355(j)(5)(B)(iv). Absent an improper Orange Book listing, no Paragraph IV Certification would be required and, thus, no generic company would receive any 180-day exclusivity; rather, multiple generic competitors would enter the market simultaneously.

49.    Defendants were at all times fully familiar with their ability to delay the entry of generic competition by the improper manipulation of the patent listing and pre-approval litigation provisions of the Hatch-Waxman Act.

12

## DEFENDANTS' ANTICOMPETITIVE CONDUCT

50.     Defendants have successfully forestalled generic competition to Toprol-XL from entering the market – thereby depriving purchasers of the benefits of cheaper extended-release metoprolol succinate products – by obtaining patents they did not deserve through misconduct before the PTO, listing these patents in the Orange Book, and bringing and maintaining a series of patent infringement lawsuits asserting these invalid and/or unenforceable patents.

### A.     Defendants' Improper Procurement of Patents

51.     Defendants have asserted that two patents cover Toprol-XL and bar generic competition: U.S. Patent No. 5,001,161 ("the '161 Patent") and U.S. Patent No. 5,081,154 ("the '154 Patent") (collectively referred to herein as the "Patents").

52.     The '161 Patent issued on March 19, 1991, with a single claim:     "A pharmaceutical composition comprising metoprolol succinate together with a sustained release pharmaceutically acceptable carrier."

53.     The '154 Patent issued on January 14, 1992, with a single claim: "Metoprolol succinate."

54.     The inventors named on both the '161 and '154 Patents are Curt H. Appelgren and Eva C. Eskilson. However, Appelgren and Eskilson were not the inventors of metoprolol succinate, which had been first made at Astra before either of them joined the company and more than ten years before patent applications claiming the compound were filed in the PTO naming them as inventors.

55.     As explained in detail below, when Appelgren and Eskilson tried to claim formulations of metoprolol succinate for their new employer after leaving the employ of Astra, Astra contested their right to do so and asserted its ownership to rights to metoprolol succinate in

13

a complaint filed in the Swedish Patent Office, which alleged that metoprolol succinate had been invented by its employee, Toivo Nitenberg, and disclosed in confidence to Appelgren and Eskilson. Several months later, Appelgren and Eskilson agreed to drop metoprolol succinate from their application, assign rights to Astra, file a new application directed to metoprolol succinate, and assign the new application to Astra.

56.     In the early 1980s, Appelgren and Eskilson were employed at Astra's AB Hassle division in Molndal, Sweden, where they participated in a project to develop new controlled-release formulations of metoprolol. Their duties, however, had nothing to do with the identification, synthesis, or invention of different salts of metoprolol.

57.     Under the organization and procedures within the Astra organization at the time, responsibility for synthesis of alternative compounds rested with a group employed by Astra Pharmaceutical Production AB, located in Sodertalje, Sweden. Neither Appelgren nor Eskilson conceived of or synthesized metoprolol succinate. Rather, that compound was supplied to the group of which Appelgren and Eskilson were members by chemists employed by Astra in Sodertalje, including Lars Lilljequist.

58.     In his deposition taken in Astra's patent litigation against potential generic competitors, Appelgren admitted that metoprolol succinate was not a newly developed product at Astra, but was an "old," known compound supplied to the product development group.

59.     The other named inventor, Eskilson, could not recall at her deposition why she was named an inventor of metoprolol succinate. Eskilson testified that she had never made metoprolol succinate, nor could she recall ever telling anyone else to make metoprolol succinate.

60.     At the end of 1982, Appelgren resigned from Hassle to form his own company, Lejus Medical AB ("Lejus"). Appelgren was a founder and 25% owner of Lejus.

61.    Several months later, Eskilson joined Appelgren at Lejus, and Appelgren and Eskilson began to work on developing a sustained release formulation of quinidine sulphate for a U.S. company unrelated to Astra.

62.    On January 10, 1984, Lejus filed a Swedish patent application (SE8400085, the "Swedish Application") naming Appelgren and Eskilson as the inventors based on the sustained release formulation they had developed for quinidine sulphate at Lejus. When listing potentially useful pharmaceutical agents for their sustained release formulation, Appelgren and Eskilson included metoprolol succinate. Although Appelgren and Eskilson knew of metoprolol succinate from their work at Hassle, they did not believe they were violating any duty of confidentiality by disclosing it in the Swedish Application because they did not believe that it was a new compound or that they were its inventors.

63.    The Lejus application was published in July of 1985 and came to the attention of Hassle and its parent, Astra AB, which on October 21, 1985, filed a complaint with the Swedish Patent Office asserting that Appelgren and Eskilson were not the inventors of metoprolol succinate and that the compound was invented by Toivo Nitenberg, a Hassle employee. At this point, Lejus had already filed a corresponding U.S. patent application (U.S. Serial No. 690,197 (the "'197 Application")), which ultimately issued as U.S. Patent No. 4,780,318 (the "'318 Patent").

64.    To settle Hassle's complaint, Lejus, Appelgren, and Eskilson agreed to assign Hassle any rights to metoprolol succinate in an agreement dated April 21, 1986 (the "Lejus/Hassle Agreement"). The Lejus/Hassle Agreement was negotiated on behalf of Hassle and Astra at least by employees of Astra's patent department, including Bengt Wurm.

15

65.    In March of 1988, Lejus filed the U.S. patent application (U.S. Serial No. 172,897 (the "'897 Application")) that eventually issued as the '161 Patent, tracking almost exactly the agreed-upon language from the Lejus/Hassle agreement.    Thereafter, Lejus assigned this application to Hassle.

66.    By the time this application was filed in March of 1988, more than one year had passed since publication of Lejus's Swedish Application naming metoprolol succinate and claiming sustained-release pharmaceutical formulations containing metoprolol succinate. Thus, Hassle knew that unless the applications issuing as the '161 and '154 Patents could rely on the filing date of the Swedish Application, any new claims in the '161 and '154 Patents to metoprolol succinate or sustained-release formulations of it would be unpatentable, *inter alia*, as anticipated by the Swedish Application, pursuant to 35 U.S.C. §§ 102(b) and 119(a).  They would have been unpatentable as anticipated because of other prior art as well, including an article published in 1987 and two other patent applications filed by Hassle.

67.    Thus, Hassle knew that if it identified Nitenberg as the inventor of the '161 and '154 Patents, then because Nitenberg is not an inventor on the '897 application and the Swedish Application, Hassle would not be able to rely on the filing date of the Swedish Application for the '161 and '154 Patents and those patents would be rejected by the PTO or invalidated in litigation.

68.    Hassle knew that in order to obtain U.S. patents directed to metoprolol succinate and avoid the bar of the published Swedish Application, it had to file deceptively in the names of Appelgren and Eskilson in order to make a claim of priority.  Hassle did just this.

69.    Appelgren, Eskilson, the representatives prosecuting the applications, employees of Hassle and Astra, and others involved in the prosecution of the '161 and '154 Patents knew

16

that Appelgren and Eskilson were not the joint inventors of metoprolol succinate or the subject matter claimed in the Patents.

70.    During the prosecution of the '161 and '154 Patents, Defendants did not disclose to the PTO their complaint to the Swedish Patent Office dated October 21, 1985, the Lejus/Hassle Agreement, the facts leading to these documents, or that Toivo Nitenberg had made metoprolol succinate in 1971.

71.    During the prosecution of the '161 and '154 Patents, Defendants intentionally made other material misrepresentations and omissions, including in submitting a declaration of an employee, John Anders Sandberg (the "Sandberg Declaration"). Among other things, although the Sandberg Declaration extols the virtue of metoprolol succinate for use in once-daily, controlled-release preparations, Defendants did not explain that its alleged virtues were unique to a particular formulation developed by Sandberg, unrelated to any work done by Appelgren and Eskilson. The Sandberg Declaration also omits material information known to Dr. Sandberg and Defendants about prior art and the performance of other metoprolol salts.

72.    Defendants' omissions and/or misrepresentations were purposeful. They were made with intent to deceive and did, in fact, deceive the PTO, resulting in the issuance of the '161 and '154 Patents.

## B.    Defendants' Sham Orange Book Listings

73.    Despite Defendants' knowledge that the '161 and '154 Patents were invalid and/or unenforceable, Defendants caused the Patents to be listed in the Orange Book as covering Toprol-XL and as reasonably giving rise to a claim of infringement. Defendants did not withdraw these Orange Book listings even after being provided with proof that they were improper.

17

74.     Defendants knew that the listing of patents in the Orange Book as applying to Toprol-XL would raise entry barriers, including increased costs, for drug manufacturers who market generic versions of brand-name drugs.

75.     Defendants knew that, under the Hatch-Waxman Act, if they sued to enforce patents listed in the Orange Book, they would (a) receive effectively an automatic injunction that would last up to thirty months, or more, (b) bar generic competitors from marketing extended-release metoprolol succinate products without having to show a likelihood of success on the merits and regardless of the invalidity or unenforceability of the listed patents or the baselessness of the suit, and (c) delay FDA action, attention to, and approval of ANDAs filed by generic competitors.

76.     Defendants' decisions to cause the Patents to be listed, not to inform the FDA that the '161 and '154 Patents were invalid, and not to withdraw the Orange Book listings, were intentionally deceptive.

## C.     Defendants' Sham Patent Infringement Lawsuits

77.     Despite Defendants' knowledge that the '161 and '154 Patents were invalid and/or unenforceable, Defendants instituted a series of lawsuits asserting infringement of these Patents against the following companies seeking to market bioequivalent, generic versions of Toprol-XL: KV Pharmaceutical Co., Andrx Pharmaceuticals, LLC, Andrx Corp., and Eon Labs, Inc. (collectively, the "Generic Manufacturers"). These lawsuits were ultimately transferred to the United States District Court for the Eastern District of Missouri for pretrial proceedings (the "Patent Lawsuits").

78.     Defendants knew that the Patent Lawsuits were baseless because, among other reasons, they were based on invalid and/or unenforceable patents. Defendants nonetheless

18

commenced and maintained them deceptively, in bad faith, and for the purpose of preventing the Generic Manufacturers from selling competing extended-release metoprolol succinate products.

79.     Defendants knew that even though ultimately they could not expect success on the merits of the Patent Lawsuits, filing the lawsuits would enable them automatically to bar the generic manufacturers from coming to market for up to thirty months or more, under 21 U.S.C. § 355(j)(5)(b)(iii), and would otherwise dissuade and forestall potential generic competition from entering the market.

80.     On January 17, 2006, United States District Court Judge Rodney W. Sippel granted summary judgment to the Generic Manufacturers, determining, *inter alia*, that (1) the '161 and '154 Patents were invalid for double-patenting and anticipation based on Claim 8 of the '318 Patent, and (2) the '161 and '154 Patents were unenforceable because of Astra's misconduct in not informing the patent examiner about the dispute regarding inventorship while prosecuting the Patents.

81.     Defendants' conduct during the Patent Lawsuits further evinces their anticompetitive intent. Judge Sippel observed, for example, that, during the lawsuits, Defendants "maintained a pattern of submitting witness declarations that contradict their own prior deposition testimony."

## EFFECTS ON COMPETITION

82.     Defendants' exclusionary conduct has delayed entry of generic competition to Toprol-XL and enabled Defendants to continue to sell Toprol-XL without generic competition. But for Defendants' conduct, one or more generic competitors would have begun marketing AB-rated generic versions of Toprol-XL much sooner than they actually will be marketed.

83.    The Generic Manufacturers seeking to sell generic Toprol-XL have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products. Eon Labs, Inc. ("Eon"), for example, has a history of achieving high approval rates for its ANDAs, usually within twelve to thirteen months of filing an ANDA.

84.    Eon has publicly affirmed its intention and ability to begin selling generic Toprol-XL upon approval of its ANDA. However, Defendants' unlawful conduct has caused the ANDA approval process to be delayed by the FDA, and caused the Generic Manufacturers to divert resources from their ANDA applications and to expend substantial resources on litigation. Another potential generic manufacturer, Andrx, has had its pending drug applications placed on hold, which would not have affected its extended-release metoprolol succinate ANDA absent delay.

85.    Absent the Patent Lawsuits, the Generic Manufacturers and the FDA would have had reason to, and would have, focused and directed resources into the ANDA approval process for generic extended-release metoprolol succinate. Such focus and resources would have brought earlier FDA approval and marketing of generic Toprol-XL.

86.    The FDA expeditiously approves ANDAs when the generic product that is the subject of the ANDA is not the subject of a patent infringement litigation under the Hatch-Waxman Act. For example, when an ANDA filer makes a Paragraph III Certification, certifying that it will only market the drug at issue upon expiration of a patent listed as applying to the drug in the Orange Book, FDA approval typically occurs on the very same day the patent expires.

87.    In essentially every instance since the year 2000 involving a brand-name drug coming off patent for which an ANDA filer certified that it would market a generic version of

20

the brand-name drug only upon expiration of the relevant patent (*i.e.* a Paragraph III Certification), the FDA approved the generic applicant the very day (and in a few instances, within one or two days) of the expiration date of the patent. The ANDAs were consistently timely filed and approved regardless of the magnitude of the brand-name drug's annual sales. The relative size of the annual Toprol-XL sales in the U.S. – approximately $900 million in 2003 – would only have made this market an even more attractive target for generic companies in the absence of the costs and delays of patent litigation. Accordingly, absent Defendants' conduct here, generic drug manufacturers would have expeditiously filed ANDAs, and the FDA would have promptly and timely approved these ANDAs, permitting entry at the first legally available time, and substantially before the present.

88.     Absent Defendants' improper procurement of the '154 and '161 Patents, and their wrongful listing in the Orange Book, companies considering whether to submit an ANDA for extended-release metoprolol succinate would not have had to weigh the potential for, and costs of, litigation over the '154 and '161 Patents or the possibility that Defendants would be able to obtain an automatic stay for up to thirty months.

89.     Due to Defendants' conduct, additional generic manufacturers other than those that actually filed ANDAs were discouraged from and/or delayed in developing generic versions of Toprol-XL. Absent Defendants' improper procurement of the '154 and '161 Patents, and their wrongful listing in the Orange Book, the cost/benefit and return-on-investment calculations facing potential generic entrants would have been far more favorable toward investigating and developing a generic Toprol-XL product. Absent the challenged conduct, therefore, there would have been several other drug companies readying generic Toprol-XL products for market, and the Generic Manufacturers may not have been the first ANDA filers.

21

90.     Defendants' acts to delay the introduction into the U.S. marketplace of any generic version of Toprol-XL caused Plaintiffs and the Class to pay more than they otherwise would have paid for extended-release metoprolol succinate.

91.     As noted, generic versions of a brand-name drug are initially priced significantly below the brand-name drug. As a result, upon generic entry, direct purchasers rapidly substitute generic versions of the drug for some or all of their brand purchases. As more generic manufacturers enter the market, prices for generic versions of a drug decrease further because of competition among the generic manufacturers. This price competition enables all direct purchasers of the drugs to: (a) purchase generic versions of a drug at a substantially lower price, and/or (b) purchase the brand-name drug at a reduced price. Consequently, brand-name drug manufacturers have a keen financial interest in delaying the onset of generic competition, and purchasers experience substantial overcharges from that delay.

## ANTITRUST IMPACT UPON PLAINTIFFS AND MEMBERS OF THE CLASS

92.     During the relevant period, Plaintiffs and members of the Class purchased substantial amounts of Toprol-XL from Defendants. As a result of Defendants' illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for their extended-release metoprolol succinate purchases. If generic competitors had not been unlawfully prevented from earlier entering the market and competing with Defendants, direct purchasers, such as Plaintiffs, would have paid less for extended-release metoprolol succinate by (a) substituting purchases of less-expensive, generic extended-release metoprolol succinate for their purchases of more-expensive branded Toprol-XL, (b) receiving discounts on their remaining branded Toprol-XL purchases, and (c) purchasing generic, extended-release metoprolol succinate at lower prices sooner.

22

93.     As a consequence, Plaintiffs and members of the Class have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount of such damages will be calculated after discovery and upon proof at trial.

## MONOPOLY POWER

94.     Defendants have monopoly power over Toprol-XL and its generic equivalents; they have had the power to maintain the price of Toprol-XL at supracompetitive levels profitably, without losing substantial sales.

95.     A small but significant, non-transitory price increase by Defendants to Toprol-XL would not have caused a significant loss of sales to other products.

96.     Defendants sold Toprol-XL at prices well in excess of marginal costs and enjoyed high profit margins.

97.     Defendants have had, and have exercised, the power to exclude competition.

98.     To the extent that defining a relevant product market is necessary in this case, the relevant product market is Toprol-XL and its AB-rated generic equivalents.

99.     The relevant geographic market is the United States.

100.    Defendants currently hold a 100% share in the relevant product market in the United States.

## CLAIM FOR RELIEF

## Anticompetitive Scheme Under Section 2 of the Sherman Antitrust Act

101.    Plaintiffs incorporate by reference the preceding allegations.

102.    Defendants knowingly and intentionally engaged in an anticompetitive scheme designed to obtain the '161 and '154 Patents and to maintain their monopoly power. This scheme included procuring the '161 and '154 Patents by deceptive conduct before the PTO,

improperly listing the '161 and '154 Patents in the Orange Book, and improperly filing and prosecuting the baseless Patent Lawsuits against the Generic Manufacturers. Defendants' scheme was designed to delay the introduction of AB-rated, generic versions of Toprol-XL into the market.

103.    By their scheme, Defendants intentionally and wrongfully maintained their monopoly power with respect to Toprol-XL in violation of Section 2 of the Sherman Act. As a result of this unlawful maintenance of monopoly power, Plaintiffs and members of the Class paid artificially inflated prices for their extended-release metoprolol succinate requirements.

104.    Plaintiffs and members of the Class have been injured in their business or property by Defendants' antitrust violations. Their injury consists of paying higher prices for their extended-release metoprolol succinate purchases than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type antitrust laws were designed to prevent, flows from that which makes Defendants' conduct unlawful, and Plaintiffs and the Class are the proper entities to bring a case concerning this conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following:

A.    Judgment in favor of Plaintiffs and the Class they seek to represent and against Defendants, jointly and/or severally, for damages representing the overcharges paid by Plaintiffs and the other members of the Class, trebled;

B.    Pre- and post-judgment interest; and

C.    Costs of suit, including reasonable attorneys' fees.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims

asserted in this Complaint so triable.

Respectfully submitted,

Date: *June 5, 06*

Jeffrey S. Goddess (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com
Tel: (302) 656-4433
Fax: (302) 658-7567

### *Liaison Counsel for Plaintiffs*

Linda P. Nussbaum
Steig D. Olson
COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Tel: (212) 838-7797
Fax: (212) 838-7445

Michael D. Hausfeld
1100 New York Avenue, N.W.
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

Daniel Berger
Eric L. Cramer
Peter Kohn
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3500
Fax: (215) 875-4604

Thomas M. Sobol
Edward Notargiacomo
HAGENS BERMAN SOBOL SHAPIRO, LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003

***Co-Lead Counsel for Plaintiffs***

Joseph M. Vanek
VANEK, VICKERS & MASINI.
225 W. Washington, 18th Floor
Chicago, IL 60606
Tel: (312) 224-1500

Paul E. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (212) 641-3200

Joshua P. Davis
LAW OFFICES OF JOSHUA P. DAVIS
436 Valley Street
San Francisco, CA 94131
Tel: (415) 422-6223

Joseph C. Kohn
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700

Jeffery L. Kodroff
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300

***Additional Counsel for Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2006, I electronically filed the CONSOLIDATED

CLASS ACTION COMPLAINT using CM/ECF, which will send notification of such filing

to all registered participants.

Jeffrey S. Goddess (Del. Bar No. 630)
Rosenthal, Monhait & Goddess, P.A.
Suite 1401, 919 Market Street
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com