# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **IN RE: METOPROLOL SUCCINATE DIRECT PURCHASER ANTITRUST LITIGATION**<br><br>**THIS DOCUMENT RELATES TO:**<br>**All Actions** | Civil Action No.  06-52 GMS |

## ANSWERING BRIEF OF DIRECT PURCHASER CLASS PLAINTIFFS IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jeffrey S. Goddess, Esq. (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19899
(302) 656-4433
jgoddess@rmgglaw.com
*Liaison Counsel for Plaintiffs*

August 25, 2006

**TABLE OF CONTENTS**

                                                                                                    **Page**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.      STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . 1

II.     STATEMENT OF FACTUAL ALLEGATIONS   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      History and Purpose of the Hatch-Waxman Act   . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.      AztraZeneca Fraudulently Procured the '161 and '154 Patents And Improperly
                Listed them in the FDA's Orange Book   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.      Defendants Filed Sham Patent Infringement Lawsuits against Generic
                Manufacturers   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        D.      Defendants' Misconduct Delayed FDA Approval and Thwarted the Entry of
                Generic Competition   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III.    ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.      Standard of Review   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        B.      Plaintiffs Adequately Plead Causation and Antitrust Injury   . . . . . . . . . . . . . . . 13

        C.      Defendants Misstate the Requirements of Alleging Causation   . . . . . . . . . . . . . . 14

        D.      Defendants' Assertion that the FDA Approval Process is an Independent
                Bar to Generic Competition is Flatly Contradicted by the Complaint . . . . . . . . . 18

                1.      Plaintiffs Allege that Defendants' Conduct Caused the FDA to Prioritize
                        Products Other Than Metoprolol-Succinate Whose Regulatory Approval
                        Would Likely Bring More Immediate Market Entry . . . . . . . . . . . . . . . . 21

2.    Plaintiffs Allege that Defendants' Conduct Caused the ANDA
Applicants to Prioritize Activities Other Than Metoprolol-Succinate
Approval Because Those Activities Were More Likely to Bring Faster
Return on Investment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.    Plaintiffs Allege that Defendants' Conduct Prevented or
Delayed Additional Potential Generic Manufacturers from Developing and
Seeking Approval of Generic Versions of Metoprolol-Succinate  . . . . . . 28

E.    Applicable Law Does Not Support Defendants' Proposed Rule
Requiring Tentative FDA Approval as a Necessary Prerequisite for Alleging
Antitrust Injury in the Hatch-Waxman Context . . . . . . . . . . . . . . . . . . . . . . . . . 29

F.    Defendants' Proposed Rule is Contrary to the Purposes of Antitrust
Law and the Hatch-Waxman Regime  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IV.    THE COURT SHOULD NOT STAY THIS ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

V.    CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## TABLE OF AUTHORITIES

### CASES

Page

American Health Sys., Inc. v. Liberty Health
    No. 90-3112, 1990 U.S. Dist. LEXIS 12858 (E.D. Pa. Sept. 28, 1990) . . . . . . . . . . . . . 15

Andrx Pharm., Inc. v. Biovail Corp. Int'l.
    256 F.3d 799 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.
    270 F. Supp. 2d 633 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Bechtel Corp. v. Local 215, Laborers' Int'l Union of North America, AFL-CIO
    544 F.2d 1207 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Bigelow v. RKO Radio Pictures,
    327 U.S. 251 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Brader v. Allegheny Gen. Hosp.
    64 F.3d 869 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Bristol-Myers Squibb v. Ben Venue Labs.
    90 F. Supp. 2d 540 (D.N.J. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Bristol-Myers Squibb Co. v. Copley Pharm., Inc.
    144 F. Supp. 2d 21 (D. Mass 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.
    429 U.S. 477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 39

Buck v. Hampton Twp. Sch. Dist
    452 F.3d 256 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

City of Pittsburgh v. West Penn Power Co.
    147 F.3d 256 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Conley v. Gibson
    355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iii

Ford v. Schering-Plough Corp.
    145 F.3d 601 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

FTC v. Mylan Labs., Inc.
    62 F. Supp. 2d 25 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

Gold v. Johns-Manville Sales Corp.
    723 F.2d 1068 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

H.J. Inc. v. Nw. Bell Tel. Co.
    492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Hospital Building Co. v. Trustees of Rex Hospital
    425 U.S. 738 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Cardizem CD Antitrust Litig.
    332 F.3d 896 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re K-Dur Antitrust Litig
    338 F. Supp. 2d 517 (D.N.J. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

In re Metroprolol Succinate Patent Litig.
    MDL No. 1620, 2006 U.S. Dist. LEXIS 1328 (E.D. Mo. Jan. 17, 2006) . . . . . . . . . . . . . 1

In re Pharmastem Therapeutics, Inc.
    No. 05-MD-1660 GMS (D. Del. Oct. 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

In re Relafen Antitrust Litig.
    286 F. Supp. 2d 56 (D. Mass. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

In re Terazosin Hydrochloride Antitrust Litigation
    No. 99-MD-1317 (S.D. Fla. Feb. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

In re Terazosin Hydrochloride Antitrust Litig.
    335 F. Supp. 2d 1336 (S.D. Fla. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 36, 37

In re Warfarin Sodium Antitrust Litig.
    214 F.3d 395 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Wellbutrin SR/Zyban Antitrust Litig.
    281 F. Supp. 2d 751 (E.D. Pa. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

J. Truett Payne Co., Inc. v. Chrysler Motors Corp.
    451 U.S.557 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Knuth v. Erie-Crawford Dairy Coop. Ass'n
    395 F.2d 420 (3d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Ieradi v. Mylan Labs., Inc.
    230 F.3d 594 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Landis V. North American Co.
    299 U.S. 248 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Lum v. Bank of Am.
    361 F.3d 217 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.
    998 F.2d 1192 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Poller v. Columbia Broadcasting
    368 U.S. 464 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rocks v. City of Philadelphia
    868 F.2d 644 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Scheuer v. Rhodes
    416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Schuylkill Energy Res. v. Pennsylvania Power & Light Co.
    113 F.3d 405 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Smithkline Beecham Corp. v. Geneva Pharms.
    210 F.R.D. 547 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Sturm v. Clark
    835 F.2d 1009 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Teva Pharm. USA, Inc. v. Pfizer Inc.
    395 F.3d 1324 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.
    140 F.3d 478 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

v

U.S. Horticultural Supply, Inc. v. Scotts Co.
No. 04-5182, 2006 U.S. Dist. LEXIS 36015 (E.D. Pa. June 1, 2006) . . . . . . . . . . . . 12, 15

Warner Lambert Co. v. Purepac Pharm. Co.
No. 98-2749, 2000 U.S. Dist. LEXIS 22559 (D.N.J. Dec. 22, 2000) . . . . . . . . . . . *passim*

Xechem, Inc. v. Bristol-Myers Squibb Co.
372 F.3d 899 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 29, 30

Zenith Radio Corp. v. Hazeltine Research, Inc.
395 U.S. 100 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## STATUTES AND FEDERAL RULES

21 U.S.C. § 355(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq* . . . . . . . . . . . . . . . . . . . . . . 4

H.R. Rep. No. 98-857(I) (1984), reprinted in 1984 U.S.C.C.A.N. . . . . . . . . . . . . . . . . . . . . 4, 8

## OTHER AUTHORITIES

Alfred B. Engelberg, *Special Patent Provisions for Pharmaceuticals: Have They Outlived
Their Usefulness?*, IDEA, Vol. 39 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Elizabeth Powell-Bullock, *Gaming the Hatch-Waxman System: How Pioneer Drug Makers
Exploit the Law to Maintain Monopoly Power in the Prescription Drug
Market*, 29 J. Legis. 21, Vol 29, Part I (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## I.    STAGE OF PROCEEDINGS AND SUMMARY OF ARGUMENT

This case arises from an alleged anticompetitive scheme by AstraZeneca Pharmaceuticals LP, AstraZeneca AB, and Aktiebolaget Hassle ("Defendants" or "AstraZeneca") to block and delay generic competition to AstraZeneca's blockbuster drug Toprol-XL.    Toprol-XL is AstraZeneca's brand name for a drug, known as metoprolol-succinate in extended-release form ("metoprolol-succinate"), approved by the U.S. Food & Drug Administration ("FDA") for use in the treatment of hypertension, angina, and congestive heart failure. Toprol-XL is one of the most widely prescribed drugs in the United States and had sales of approximately $1.3 billion in 2005.

Plaintiffs are direct purchasers of Toprol-XL,[1] who allege that Defendants engaged in a scheme involving the fraudulent procurement and prosecution of patents and the filing of sham litigation in defense of those invalid patents to block and delay the market entry of generic versions of Toprol XL.    A federal court recently found by clear and convincing evidence that AstraZeneca obtained its Toprol-XL patents through misconduct, and that the patents are invalid as a matter of law.    *See In re Metroprolol Succinate Patent Litig.*, MDL No. 1620, 2006 U.S. Dist. LEXIS 1328, at *76 (E.D. Mo. Jan. 17, 2006).

Plaintiffs allege that Defendants' anticompetitive scheme, among other things, raised the costs of generic approval and entry, slowed and corrupted the regulatory approval process for potential generic competitors, and otherwise impeded and delayed the market entry of generic versions of Toprol XL.    This scheme allowed Defendants to

---

[1]Plaintiffs Meijer, Inc., Meijer Distribution, Inc., Rochester Drug Co-Operative, Inc. and American Sales Company ("Plaintiffs" or "Direct Purchaser Plaintiffs") filed three separate class action complaints on behalf of direct purchasers of Toprol-XL against Defendants, which this Court consolidated on April 5, 2006. Plaintiffs filed a Consolidated Class Action Complaint ("Complaint" or "Direct Purchaser Complaint") on June 5, 2006.    (Dkt. # 15.)

maintain, unlawfully, their metoprolol-succinate monopoly because the only version on the market in the United States was Defendants' Toprol XL brand, and caused Plaintiffs to overpay for metoprolol-succinate by potentially hundreds of millions of dollars. Plaintiffs seek damages in the form of overcharges (trebled) under the antitrust laws.

Despite the detailed nature of Plaintiffs' causation allegations, and in the face of the Complaint, which specifically alleges and addresses the precise causal link (between Defendants' conduct and Plaintiffs' injuries) whose supposed absence is the basis of Defendants' motion, Defendants, nonetheless, have moved to dismiss under Fed. R. Civ. P. 12(b)(6) solely on the issue of causation. Moreover, in light of *two directly applicable recent decisions in the Third Circuit expressly rejecting the very premise of Defendants' motion to dismiss,*[2] Defendants also move, in the alternative, for a stay of discovery in the (anticipated) event that their motion to dismiss is denied. Both of Defendants' requests are without merit.

Defendants' premise is that the absence of an allegation in the Complaint that the FDA tentatively approved a generic metoprolol-succinate product during the Hatch-Waxman Act's automatic 30-month stay period necessarily breaks the link, as a matter of law, between the challenged conduct (fraudulently obtaining and wielding an invalid patent to exclude competition and maintain monopoly power) and Plaintiffs' alleged injury (paying higher prices due to impeded generic competition). AstraZeneca's asserted premise is that: "Plaintiffs' allegations . . . do not state a valid claim because, *for reasons unrelated to any conduct by AstraZeneca [i.e.,* due to the absence of regulatory

---

[2] *See In re Wellbutrin SR/Zyban Antitrust Litig.,* 281 F. Supp. 2d 751, 757 (E.D. Pa. 2003) (denying motion to dismiss antitrust claims while specifically rejecting same argument Defendants raise here) ("*Wellbutrin*"); *Bristol-Myers Squibb v. Ben Venue Labs.,* 90 F. Supp. 2d 540, 545 (D.N.J. 2000) (rejecting argument in context of a summary judgment motion) ("*Ben Venue*").

approval], Plaintiffs have never been able to purchase [generic] metoprolol succinate."[3] The fatal flaw in AstraZeneca's argument, however, is that Plaintiffs in fact *specifically allege*, and those allegations must be accepted as true in deciding this motion,[4] that AstraZeneca's anticompetitive scheme was a material cause of the FDA's delay in approving a generic metoprolol-succinate product.

Indeed, here, unlike in all of the inapposite cases that Defendants rely upon, Plaintiffs allege *both* that (a) one purpose and effect of Defendants' anticompetitive scheme was the direct corruption of the regulatory approval process itself, *and* (b) but for Defendants' conduct, regulatory approval, and market entry, would have occurred earlier. (*See, e.g.,* Compl. ¶¶ 82-91.) Thus, Plaintiffs allege that the absence of tentative approval during the 30-months stay period *was a direct and proximate result of Defendants' own conduct.* Plaintiffs specifically allege facts demonstrating that, absent AstraZeneca's scheme, there would have been earlier FDA approval–and earlier market entry–and therefore earlier lower prices. Accordingly, Defendants' supposed "wholly independent cause" does not "fully account[] for the alleged injury."[5] Indeed, the Complaint alleges that delayed regulatory approval cannot fairly be said to be "independent" at all.

As detailed in the Complaint, Defendants' anticompetitive scheme intentionally targeted and successfully disrupted the regulatory process implemented in the 1984

---

[3] *See* Opening Brief in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint or, If That Motion Is Denied, to Stay This Action (Dkt. #17) ("AZ Br.") at 1 (emphasis added).

[4] *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989) (noting that, in the context of a motion to dismiss, allegations in complaint must be read in light most favorable to plaintiff and dismissal is appropriate only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations"); *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989).

[5] *Wellbutrin*, 281 F. Supp. at 756.

Hatch-Waxman Act to encourage the market entry of generic drugs.[6]  Plaintiffs allege that Defendants' anticompetitive scheme impeded and delayed the approval process of generic forms of Toprol-XL, and further deterred generic manufacturers from coming to market with their versions of the drug even after FDA approval.  (*Id.* ¶¶ 4-7, 50, 77-91.)

Specifically, Plaintiffs allege—and this must be construed in the light most favorable to Plaintiffs—that Defendants' anticompetitive scheme: (1) caused the FDA to shift resources away from the pending generic applications for metoprolol-succinate because, *e.g.*, Defendants' scheme improperly invoked regulations that blocked generic entry, and thus changed FDA priorities; (2) forced the metoprolol-succinate generic manufacturers that had applied for FDA approval  (the "Generic Manufacturers")[7] to redirect their attention and resources to defending against Defendants' patent infringement claims instead of actively pursuing approval, and otherwise altered their business priorities; and (3) deterred or delayed other potential generic competitors from seeking FDA approval given the additional costs of defending against Defendants' patent infringement claims and associated delays.  (Compl. ¶¶ 78-91.)

Thus, Plaintiffs have alleged facts that directly undermine the very foundation of Defendants' motion.  Logically, if Plaintiffs' allegations—that absent the impediments to regulatory approval that were the direct result of Defendants' scheme, FDA approval would have occurred far earlier *and* market entry would have already occurred—are

---

[6]The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") amended the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, to, *inter alia*, "make available more low cost generic drugs."  *See* H.R. Rep. No. 98-857(I), at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647-48; *see also* Statement on Signing S. 1538 into Law, 20 Weekly Comp. Pres. Doc. 1359, 1360 (Sept. 24, 1984).

[7] This group included KV Pharmaceutical Co., Andrx Pharmaceuticals, LLC, Andrx Corp., and Eon Labs, Inc. (collectively, the "Generic Manufacturers").  (Compl. ¶ 77.)

4

accepted as true, causation is established. In their brief, Defendants finally grapple with Plaintiffs' *actual allegations* in a short section tucked away toward the very end (*see* AZ Br. at 18-23). In that section, AstraZeneca asserts, in effect, that the Court should accept AstraZeneca's wholly unsupported "facts" in place of those Plaintiffs set out in the Complaint. AstraZeneca deems all of Plaintiffs' causation allegations "speculation" (*see* AZ Br. at 22), at the same time that it, a brand-name drug manufacturer defendant, asks the Court to take its self-serving and wholly unsupported assertions about the incentives and motivations facing *generic* companies at face value.

Yet, even if Defendants' proposed standards were not *the exact opposite* of those applicable to a motion to dismiss, the idea that Plaintiffs' allegations amount to mere "abstract speculation" (*see* AZ Br. at 22), is belied by the fact that at least two federal district courts recently have accepted similar allegations, while rejecting arguments substantively identical to those made by AstraZeneca here. *See Wellbutrin*, 281 F. Supp. 2d at 757 (E.D. Pa. 2003) (crediting allegations that sham lawsuits caused generic companies to "direct[] resources away from FDA approval and toward the defense of the infringement actions and, furthermore, that this reallocation of funds resulted in a delay of FDA approval"); *Bristol-Myers Squibb v. Ben Venue Labs*, 90 F. Supp. 2d 540, 546 (D.N.J. 2000) (same).

Recent events provide further support for the validity of Plaintiffs' allegations. Since Defendants filed their motion, and following the district court's ruling in the patent infringement case, a generic competitor has received final approval from the FDA to

market one dosage form of metoprolol-succinate (and tentative approval on several other dosage forms),[8] a fact of which this Court may take judicial notice.[9]

Like the losing brand-name companies before them in both *Wellbutrin* and *Ben Venue*, AstraZeneca, too, cites an inapposite Third Circuit decision—*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)—in purported support of dismissal of a Hatch-Waxman Act case. Yet, in *West Penn Power*, the Third Circuit granted a motion to dismiss for failure to plead the causation prong of antitrust injury because there were "no facts averred in the complaint which even permit us to speculate as to the likelihood of" regulatory approval absent the anticompetitive conduct. *West Penn Power*, 147 F.3d at 268. In other words, in *West Penn Power*, *the plaintiff did not allege facts that would support the conclusion that in the absence of the defendant's conduct, the allegedly excluded competitor would have come to market.*

Of course, in this case, unlike *West Penn Power*, Plaintiffs allege, in detail, that (a) AstraZeneca's conduct corrupted the regulatory approval process, *and* (b) absent the anticompetitive scheme, there *would have been earlier approval* and market entry. Here, the Court need not guess or speculate as to the effect of the Defendants' conduct on

---

[8] On July 31, 2006, the FDA approved a generic manufacturer's application to market a generic version of Metoprolol-succinate. *See* Ex. A (FDA letter granting approval of generic Metoprolol-succinate). This approval, which occurred following summary judgment for plaintiffs in the patent litigation case, supports Plaintiffs' allegations that Defendants' anticompetitive behavior, including the sham patent litigation, delayed the FDA approval process. (*See* Compl. ¶ 85.)

[9] "[M]atters of public record may . . . be considered without converting the motion to dismiss into a motion for summary judgment." *Wellbutrin*, 281 F. Supp. 2d at 754 n.2 (citing *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). In *Wellbutrin*, the court classified the FDA's listing of newly-approved generic drugs as a "matter of public record" and took judicial notice of the document on a motion to dismiss. *Id. See also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider . . . items subject to judicial notice [and] matters of public record . . . .") (citations omitted); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000) ("[W]e may take judicial notice at any stage of the proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready determination by resort to a source whose accuracy cannot be reasonably questioned.").

the regulatory process and in impeding actual market entry. The Court, rather, must only do what it is required to do on a motion to dismiss: accept Plaintiffs' allegations as true.

Accordingly, as Plaintiffs have pled facts supporting all elements of their claims, Defendants' motion should be denied. Defendants' motion for a stay should likewise be denied: Plaintiffs are entitled to prove their case, and it is time for this case that was filed on January 27, 2006 (Dkt. # 1) to proceed into discovery.

## II.    STATEMENT OF FACTUAL ALLEGATIONS

### A.    History and Purpose of the Hatch-Waxman Act

Congress enacted the Hatch-Waxman Act in 1984 to facilitate market entry of generic drugs that the FDA certifies as bioequivalent to corresponding brand-name drugs. (Compl. ¶¶ 42-43.) Among other innovations, the Hatch-Waxman Act eliminated the requirement that a generic manufacturer file a costly and time-consuming New Drug Application ("NDA") in support of its proposed product. (*Id.* ¶ 43.) Under the Hatch-Waxman Act, a generic drug manufacturer can seek expedited FDA approval to market a generic version of a brand-name drug by filing an Abbreviated New Drug Application ("ANDA"), pursuant to 21 U.S.C. § 355(j), that relies on the earlier safety and efficacy data reported to the FDA in the initial brand-name NDA. (*Id.*)

In its ANDA, the generic manufacturer must certify to the FDA that the proposed generic product does not infringe upon any valid patents associated with the brand-name product in the FDA publication "Approved Drug Products with Therapeutic Equivalence Limitations," known as the Orange Book. (*Id.* ¶¶ 37-44.) Generic ANDA filers must certify that (1) the brand-name manufacturer has not filed any patent information with the FDA (a "Paragraph I Certification"); (2) any patent or patents listed in the Orange Book

7

have expired (a "Paragraph II Certification"); (3) the generic manufacturer will not market its product until brand-name patent expiration on a future date (a "Paragraph III Certification"); or that (4) the patent or patents listed in the Orange Book are invalid or the generic product will not infringe upon the brand-name product patents (a "Paragraph IV Certification"). (*Id.* ¶ 44.) A Paragraph IV Certification creates a forty-five day window of federal jurisdiction for the brand-name manufacturer to initiate a patent infringement action against the generic manufacturer. (*Id.* ¶¶ 45-46.) If the brand-name manufacturer elects to sue the generic manufacturer during this period, as Defendants did here, Hatch-Waxman automatically stays FDA approval of the generic ANDA for up to thirty months (the "Thirty Months Stay"). (*Id.* ¶ 46.)

The principal purposes of the Hatch-Waxman Act are "to make available more low cost generic drugs [and] to create a new incentive for increased expenditures for research and development of certain products which are subject to premarket approval." *See* H.R. Rep. No. 98-857(I), at 14-15 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2647, 2647-48; *see also* Statement on Signing S. 1538 into Law, 20 Weekly Comp. Pres. Doc. 1359, 1360 (Sept. 24, 1984) (President's statement that Hatch-Waxman Act "will provide regulatory relief, increase competition, economy in government, and best of all, the American people will save money, and yet receive the best medicine that pharmaceutical science can provide."). Put another way, unlike the vast majority of regulatory regimes that are typically neutral to the promotion of competition, the Hatch-Waxman Act "is in fact intended to *promote* competition between brand name and generic manufacturers." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004).

Courts and commentators, however, have frequently noted the potential for brand-name manufacturers, like AstraZeneca, to abuse and manipulate the Hatch-Waxman regulatory system.[10] The Thirty Months Stay of generic marketing approval that a brand manufacturer obtains by merely for filing a lawsuit under Hatch-Waxman, regardless of the merits of the suit, is particularly prone to abuse. This aspect of the regulatory scheme provides a powerful incentive for brand-name manufacturers to file even meritless Hatch-Waxman suits while they continue to reap huge monopoly profits, and thus deny purchasers the benefits of competition.[11] As detailed below, Plaintiffs have plead a classic example of anticompetitive Hatch-Waxman Act abuse by Defendants.

## B.    AstraZeneca Fraudulently Procured the '161 and '154 Patents And Improperly Listed them in the FDA's Orange Book

During the prosecution of the relevant Toprol-XL patents, U.S. Patent No. 5,001,161 ("the '161 Patent") and U.S. Patent No. 5,081,154 ("the '154 Patent"), Defendants deliberately misrepresented and omitted material information in their applications to the PTO. (Compl. ¶¶ 51-70.) Defendants' misconduct before the PTO included omitting an earlier inventor of metoprolol-succinate; evading a published Swedish patent application that precluded the U.S. patents; and other intentionally deceptive acts that misled the PTO and resulted in the issuance of the '161 and '154

---

[10]*See, e.g.*, Elizabeth Powell-Bullock, *Gaming the Hatch-Waxman System: How Pioneer Drug Makers Exploit the Law to Maintain Monopoly Power in the Prescription Drug Market*, 29 J. Legis. 21, 29-35 (2002) (listing numerous examples of brand-name drug manufacturers foreclosing generic competition through baseless patent infringement lawsuits and explaining that such action is contrary to the legislative purpose of the Act).

[11]*See Smithkline Beecham Corp. v. Geneva Pharm.*, 210 F.R.D. 547, 554 n.15 (E.D. Pa. 2002) (citing Alfred B. Engelberg, *Special Patent Provisions for Pharmaceuticals: Have They Outlived Their Usefulness?*, 39 IDEA: J.L. & Tech. 389, 415 (1999) ("The automatic thirty-month stay injunction inadvertently created a powerful incentive for the [pioneer drug maker] to list any and every patent related to a drug product irrespective of whether such patent was a significant barrier to legitimate competition. Thus [the Act] automatically enables a patent owner to prevent competition irrespective of the merits of the patent being asserted[.]")).

9

patents in 1991 and 1992, respectively. (*Id.*) Although Defendants knew that the '161 and '154 patents were invalid and/or unenforceable, Defendants improperly caused the patents to be listed in the FDA's Orange Book following their issuance. (*Id.* ¶ 73.)

Defendants' exclusionary scheme delayed the FDA's action on, attention to, and approval—both tentative and final—of generic competitors' metoprolol-succinate products. (*Id.* ¶¶ 82, 85.) AstraZeneca, and its would-be generic competitors, knew that once AstraZeneca listed the relevant patents in the Orange Book, pursuant to the Hatch-Waxman Act, AstraZeneca could sue any generic manufacturer that posed a competitive threat, and invoke the automatic thirty month stay regardless of the merits of the patents or possible patent suits. (*Id.* ¶ 75.) Furthermore, as AstraZeneca knew, the fact (and/or merely the threat) of patent infringement suits and the attendant costs and delays force generic manufacturers who do file ANDAs to allocate resources away from the approval process, and deter and delay would-be generic competitors from filing ANDAs, regardless of the merits of the suits. (*Id.*) AstraZeneca's fraudulent listing of invalid patents discouraged, delayed, and raised the costs of generic rivals. (*Id.*)

## C.    Defendants Filed Sham Patent Infringement Lawsuits against Generic Manufacturers

Despite Defendants' knowledge that the '161 and '154 patents were invalid and/or unenforceable, and thus any patent infringement lawsuit would be baseless, the Complaint alleges that, in 2004, Defendants instituted a series of lawsuits against the Generic Manufacturers, which had sought to market bioequivalent generic versions of Toprol-XL. (*Id.* ¶ 77.) By filing these patent infringement lawsuits, Defendants improperly availed themselves of the automatic stay of generic FDA approval, and improperly conferred upon themselves other anticompetitive benefits of a scheme

10

involving sham litigation, including, *inter alia*, raising rivals' costs, making entry more expensive, and slowing the process of regulatory approval of the generics. On January 17, 2006, a court granted summary judgment for the Generic Manufacturers, finding that the '161 and '154 patents were invalid on the basis of double patenting, and unenforceable due to Defendants' inequitable conduct in the prosecution of its patents before the PTO. (*Id.*)

### D. Defendants' Misconduct Delayed FDA Approval and Thwarted the Entry of Generic Competition

Plaintiffs specifically allege that absent Defendants' misconduct, Defendants would have already faced competition from generic metoprolol-succinate manufacturers in the marketplace. (*Id.* ¶¶ 82-87.) First, Defendants' unlawful conduct deterred would-be generic competitors from seeking FDA approval in the first place because, *inter alia*, it created a less favorable cost/benefit and return-on-investment analysis for potential competitors. (*Id.* ¶ 89.) Thus, absent Defendants' anticompetitive behavior, additional generic manufacturers would have attempted to enter the market for metoprolol-succinate, and would have sought and earlier received FDA approval, and entered the market. (*Id.*)

Second, the few generic companies that were not deterred by Defendants' misconduct, and filed ANDAs were incentivized to, and did, divert resources away from aggressively pursuing tentative approval of their ANDAs due to the sham lawsuits. (*Id.* ¶¶ 87-89.) Moreover, given the sham suits and presence of the Thirty Months Stay, granting of tentative approval during this period could not legally result in market entry. (*Id.* ¶¶ 77-87.) Thus, the FDA itself, which does not have unlimited resources, prioritized other more urgent ANDA applications (whose granting would result in more certain and

11

quicker market entry). (*Id.* ¶ 84.) Defendants' conduct, therefore, delayed FDA tentative and final approval of generic metoprolol-succinate, and thereby impeded market entry, forcing all direct purchasers to pay artificially inflated prices. (*Id.* ¶¶ 84-85.)

## III.    ARGUMENT

### A.    Standard of Review

Defendants' motion effectively asks this Court to impose standards *exactly the opposite* of those that are actually applicable. When deciding a motion to dismiss, this Court "must accept as true all the allegations set forth in the complaint, and [] must draw all reasonable inferences in the plaintiff's favor." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 604 (3d Cir. 1998). Because"[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims," *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), courts grant a 12(b)(6) motion only if "no relief could be granted under any set of facts consistent with the allegations of the complaint." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Because assessment of antitrust injury usually requires a fact-intensive inquiry, its "existence . . . is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995); *accord Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 902 (7th Cir. 2004). Allegations of antitrust injury "are held to the pleading standard laid out in Federal Rule of Civil Procedure 8(a) which requires a short and plain statement of the claim." *U.S. Horticultural Supply, Inc. v. Scotts Co.*, No. 04-5182, 2006 U.S. Dist. LEXIS 36015, at *6 (E.D. Pa. June 1, 2006) (citing *Lum v. Bank of Am.*, 361 F.3d 217, 228 (3d Cir. 2004)). "Courts 'should be extremely liberal in

12

construing antitrust complaints[.]'" *Id.* (quoting *Knuth v. Erie-Crawford Dairy Coop. Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968)). *See also Hosp. Bldg. Co. v. Trs. of Rex Hospital*, 425 U.S. 738, 746 (1976) (quoting *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)).

**B.      Plaintiffs Adequately Plead Causation and Antitrust Injury**

Plaintiffs allege that Defendants' exclusionary conduct impeded generic entry, inflated prices for metoprolol-succinate and caused Plaintiffs to pay supracompetitive prices for the drug. Defendants' motion does *not* take issue with the notion that paying artificially inflated prices for a drug, resulting from conduct that impedes generic entry, constitutes cognizable antitrust injury. Indeed, the Third Circuit has held in the pharmaceutical context that "it is difficult to imagine a more formidable demonstration of antitrust injury" than purchasers' paying artificially inflated prices for drugs due to unlawful exclusion of a competitor. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (2000).[12]

Defendants challenge only the sufficiency of the allegations linking the alleged anticompetitive scheme to the alleged injury, *i.e.*, causation. Yet, Plaintiffs' allegations directly link Defendants' conduct to Plaintiffs' alleged injury. Plaintiffs allege, in detail, that Defendants knowingly asserted invalid and/or unenforceable patents procured

---

[12]*See also In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 910 (6th Cir. 2003) ("The plaintiffs are consumers of the patented drug Cardizem CD, who allege that they were deprived of a less expensive generic product, forcing them to purchase the higher-priced brand name product, because of a *per se* illegal horizontal market restraint. Preventing that kind of injury was undoubtedly a *raison d'etre* of the Sherman Act when it was enacted in 1890."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004) ("Accepting the facts alleged by Plaintiffs as true and drawing all reasonable inferences in the light most favorable to Plaintiffs, this Court finds that a reasonable trier of fact could conclude that but for the allegedly anti-competitive agreements, generic drugs may have entered the market sooner. . . Plaintiffs have pled sufficiently the anti-competitive behavior (an agreement in restraint of trade) and injury (higher prices) required to state a *Sherman Act* violation.").

through misconduct before the PTO for the purpose and with the effect of delaying generic competition in the metoprolol-succinate market. (Compl. ¶¶ 50-91.)

The Complaint specifically alleges that Defendants' anticompetitive conduct was a material cause of Plaintiffs' injury—an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). (Compl. ¶¶ 50-82.)   Indeed, Plaintiffs allege that absent Defendants' antitrust violations, generic manufacturers would have been tentatively and finally approved earlier, and entered the market already, and Plaintiffs would now be paying far less for metoprolol-succinate. (*Id.* ¶¶ 92-93.) Plaintiffs need allege nothing further on this point.

Once this Court accepts Plaintiffs' allegations as true and draws all reasonable inferences in Plaintiffs' favor, as it must at this stage, the Complaint properly alleges an unbroken chain of causation and satisfies the antitrust injury prong of the standing inquiry.

### C.  Defendants Misstate the Requirements of Alleging Causation

Defendants' challenge to Plaintiffs' causation allegations is premised entirely upon two supposed "requirements" that do not exist in the law.  They seek, first, to force Plaintiffs to "*prove* antitrust injury" at the motion to dismiss stage (*see* AZ Br. at 11 (emphasis added)), and, second, to have their wholly unsupported, alternate version of the facts accepted at face value *in place of* Plaintiffs' allegations.   Yet, as Defendants' own cited cases reveal, a plaintiff must merely *allege*—not prove—a legally cognizable antitrust injury to survive a motion to dismiss, and Plaintiffs' allegations, *not* Defendants' assertions, are to be taken as true.

14

First, the purpose of a 12(b)(6) motion to dismiss is to test the *legal* sufficiency of the allegations contained in the complaint, not the facts or underlying evidence. *See, e.g., Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir. 1987), *cited in American Health Systems, Inc. v. Liberty Health System*, No. 90-31121990 U.S. Dist. LEXIS 12858 (E.D. Pa. 1990); *Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633, 664 (E.D. Pa. 2003) (denying motion to dismiss and explaining that "[t]he accepted standard of review when considering a motion to dismiss is one that considers 'all reasonable inferences in the plaintiffs' favor,' . . . and Defendants' arguments refuting Plaintiffs' allegations are based on disputed matters of fact") (citation omitted); *see also Horticultural Supply*, 2006 U.S. Dist. LEXIS 36015, at *2 n.1.

Thus, Plaintiffs must merely allege injury "that flows from that which makes the Defendants' acts unlawful." *Brunswick Corp.*, 429 U.S. at 489; *West Penn Power*, 147 F.3d at 264-65.

Furthermore, courts have imposed a relaxed burden for proving (and thus for alleging) causation in antitrust cases. Plaintiffs' burden of proving the causation prong of antitrust injury requires only "proof of *some* damage flowing from the unlawful [misconduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. V. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n.9 (1969) (citations omitted) (emphasis in original). This relaxed standard is necessary because "to require proof that the illegal conduct was the exclusive cause of the plaintiff's injury would effectively deny private remedies, because multiple causes always affect everyone." *Id.* As Plaintiffs here have clearly alleged at least a causal

15

nexus between the alleged anticompetitive scheme and some damage to themselves, the motion to dismiss must be denied.

Second, Defendants' assertion that Plaintiffs' allegations should not be taken as true, but instead be completely disregarded (on the supposed ground that they amount to "abstract speculation") borders on the frivolous. Defendants' argument is essentially a plea for this Court to ignore Plaintiffs' allegations and instead adopt Defendants' own—wholly unsupported—causation theory, *and their own supposed "facts."* (*See* AZ Br. at 10-18.) But this Court cannot now accept Defendants' purported causation "facts." Defendants contend, ironically, that Plaintiffs' claims stand on "unsupported conclusions and unwarranted references," (AZ Br. at 10). Yet, Defendants provide no factual support for their assertions concerning the incentives driving generic companies (AZ Br. at 20-21), and ignore two recent federal district courts that endorse Plaintiffs' rendition of the facts as reasonable and rational. *See Wellbutrin*, 281 F. Supp. 2d at 757 (E.D. Pa. 2003) (crediting argument that sham lawsuits caused generic companies to "direct[] resources away from FDA approval and toward the defense of the infringement actions and, furthermore, that this reallocation of funds resulted in a delay of FDA approval"); *Bristol-Myers Squibb v. Ben Venue Labs*, 90 F. Supp. 2d 540, 546 (D.N.J. 2000) (same).

This legal principle is especially salient here where the issue is antitrust causation, where courts have lowered the substantive burden even at trial. Indeed, the law is clear that Defendants are not allowed to use the uncertainty created by their own unlawful conduct as a basis for evading responsibility for their antitrust violations. Any doubt with regard to a causal inference in antitrust cases "should be resolved against the person

whose behavior created the problem." 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 651f (2d ed. 2002).[13]

Courts recognize that antitrust plaintiffs should be given substantial leeway in proving what the world would be like "but for" a defendant's conduct to prevent a defendant from benefitting from the very uncertainty created by its misconduct. *See, e.g., J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elemental conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."). In the antitrust context, "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne*, 451 U.S. at 566-67 (quotation omitted).[14]

Courts in the Third Circuit agree with Plaintiffs, having already considered similar causation allegations to those at issue here in three recent cases, and having concluded that such allegations adequately plead antitrust injury. *See Wellbutrin*, 281 F.

---

[13]Sound policy reasons compel this rule because "no government seriously concerned about the evil of monopoly would condition its intervention solely on a clear and genuine chain of causation from exclusionary act to the presence of monopoly . . . . [A]ccordingly, the defendant must bear the risk of the ignorance created by its own misconduct . . . [and] it may be fitting to presume the exclusionary act . . . 'causally' related to the monopoly power being challenged." *Id.*

[14]After an appropriate opportunity for discovery, Plaintiffs will provide admissible evidence of what would have occurred but for Defendants' antitrust violations. Though unnecessary, Plaintiffs, for example, may find it useful to proffer expert testimony to establish earlier FDA approval in the but-for world. In the *Terazosin* litigation, the court allowed an expert to testify with reference to the Section I Sherman Act claim that the FDA would have approved a generic version of Hytrin by a certain date but for the defendants' allegedly anticompetitive conduct. Ex. B at 6 (*In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317, Order Granting in Part and Denying in Part Defendants' Motion to Exclude the Expert Testimony of Jill B. Deal (S.D. Fla. Feb. 1, 2005)). The expert was also allowed to testify as to what a generic manufacturer *could* have done but for the defendant's conduct, while question of what the manufacturer *would* have done was a question preserved for the trier of fact. *See id.* at 5-6. The direct purchaser class settled *Terazosin* on the eve of trial for nearly $75 million.

Supp. 2d at 756-757 (denying defendant manufacturer's motion to dismiss "because Plaintiffs may be able to prove that the allegedly frivolous lawsuits 'materially caused' their alleged injuries"); *Warner Lambert Co. v. Purepac Pharm. Co.*, No. 98-2749, 2000 U.S. Dist. LEXIS 22559, at *22-23 (D.N.J. Dec. 22, 2000) (finding a "sufficient causal connection" between brand-name manufacturer's alleged unlawful conduct and generic manufacturer's alleged injuries to withstand a motion to dismiss); *Ben Venue*, 90 F. Supp. 2d at 545 (seeing "definite, causative link" between defendant's allegedly sham litigation and alleged antitrust injuries).

## D. Defendants' Assertion that the FDA Approval Process is an Independent Bar to Generic Competition is Flatly Contradicted by the Complaint

Defendants' argument is premised on the following false syllogism: (a) because a generic version of metoprolol-succinate cannot enter the market without FDA approval, and (b) because the FDA did not grant tentative approval for a generic version of metoprolol-succinate during the stay period, Defendants' unlawful conduct could not possibly have caused Plaintiffs' injuries.[15] Defendants' position, however, flatly ignores Plaintiffs' causation allegations, relies on Defendants' wholly unsupported causation

---

[15] Defendants also argue that, in order to state a claim, Plaintiffs "have to show that an ANDA had received tentative approval *while the 30-month [Hatch-Waxman Act] stay was in effect.*" (AZ Br. at 8 ("Plaintiffs could not state a claim even if the FDA had approved (or approves in the future) an ANDA *after the entry of judgment* in the patent litigation.") (emphases added).) This argument presupposes that Plaintiffs allege that the stay was the *sole and complete cause* delaying ANDA approval. As such, the argument is nothing more than a transparent attempt to recast and limit Plaintiffs' allegations. Plaintiffs allege that Defendants' entire scheme—which as Defendants acknowledge (AZ Br. at 9) includes, *inter alia*, misconduct before the PTO (Compl. ¶ 3), improper listing in the Orange Book (*id.*), and sham litigation (*id.* ¶ 4)—delayed the FDA approval process by, *inter alia*, decreasing the incentives: for the Generic Manufacturers with pending applications to pursue those applications vigorously; for other generic manufacturers to submit ANDAs; and for the FDA to act on those applications in a timely manner. Defendants' argument improperly limits Plaintiffs' allegations to a small subset (*i.e.*, the 30-month stay) of only one of those factors contributing to the delay (*i.e.*, sham litigation). This argument must be rejected because it fails even to consider all of Plaintiffs' allegations, much less draw all reasonable inferences in Plaintiffs' favor, as is required when deciding this motion.

theory that is directly contrary to the allegations of this case, and is premised on a purported pleading rule (pleading tentative FDA approval during the period of the Thirty Months Stay) that is not supported by law or logic.

An offending party cannot simply hide behind a government regulation when its conduct did, in fact, substantially contribute to the plaintiff's injury. Thus, "[w]hen a defendant relies upon the existence of an independent cause . . . such cause 'must be examined closely to make sure that it is the independent cause, rather than the illegal antitrust action, that gives rise to the plaintiff's injury.'" *Wellbutrin*, 281 F. Supp. 2d at 756 (quoting 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 363b). Accepting all of Plaintiffs' well-pleaded allegations as true, and drawing all reasonable inferences in Plaintiffs' favor, it is clear that the lack of FDA approval was *not* an independent bar to generic entry because, as Plaintiffs allege, the absence of timely FDA approval itself directly resulted from Defendants' alleged misconduct.

Plaintiffs allege that Defendants' anticompetitive conduct "delayed entry of generic competition to Toprol-XL and enabled Defendants to sell Toprol-XL without generic competition." (Compl. ¶ 82.) Plaintiffs support this general allegation with several specific allegations that describe ways in which Defendants' alleged misconduct specifically *delayed the FDA approval process itself.* For instance, Plaintiffs allege that Defendants' misconduct: (1) caused the FDA to shift its limited resources away from the pending generic metoprolol-succinate applications because of its knowledge of the stay; (2) forced the Generic Manufacturers to redirect their attention and resources to defending against Defendants' patent infringement claims while investing in other more immediately profitable business opportunities; and (3) deterred or delayed other potential

19

generic competitors from seeking FDA approval after weighing the additional costs of defending against Defendants' patent infringement claims. (*Id.* ¶¶ 78-91.)

If these allegations are true, as must be accepted at this stage in the litigation, then the FDA's failure to provide tentative approval could not be an independent cause that "fully accounts" for the absence of a generic version of metoprolol-succinate from the market. *This is because Plaintiffs allege that the delay in the approval process itself was materially caused by Defendants' unlawful conduct.* Absent Defendants' conduct, there would have been earlier FDA approval and earlier market entry.

Thus, absence of FDA approval cannot be a wholly independent cause of the lack of generic competition when the approval process itself is allegedly corrupted, and Plaintiffs plead that there would have been earlier approval absent Defendants' conduct. *See* 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b (2d ed. 2002) (explaining that government regulation may be independent bar to antitrust injury only where the regulation "fully accounts" for plaintiff's injury). *See also Wellbutrin*, 281 F. Supp 2d at 756 ("On occasion . . . an independent cause *fully accounts* for the plaintiff's alleged injury and breaks the causal connection between the alleged antitrust violation and the plaintiff's injury.") (emphasis added); *Ben Venue*, 90 F. Supp. 2d at 545 (holding that the argument that the absence of FDA approval breaks the causal chain "ignores the reality of Hatch-Waxman[; for defendant] to insist that its generic competitors have no standing because they are not in the market, when [the defendant] itself foreclosed their access to it, is meritless"); *West Penn Power*, 147 F.3d at 268-69.

20

1.    **Plaintiffs Allege that Defendants' Conduct Caused the FDA to Prioritize Products Other Than Metoprolol-Succinate Whose Regulatory Approval Would Likely Bring More Immediate Market Entry**

Plaintiffs allege that Defendants' prosecution of sham patent litigation delayed the entire FDA approval process, and that absent Defendants' conduct, FDA approval and market entry of competing generics would have occurred earlier. Absent the sham suits, and the improper invocation of the Thirty Months Stay, the FDA "would have had reason to, and would have focused and directed resources into the ANDA approval process for generic extended-release metoprolol succinate" and "[s]uch focus and resources would have brought earlier FDA approval and marketing of generic Toprol-XL." (Compl. ¶ 85). These allegations, standing alone, are sufficient to defeat Defendants' motion because they directly refute Defendants' assertion that the FDA approval process serves as an "independent bar" to regulatory approval.

The FDA is an agency with limited time and resources, and it is inevitable that it would choose to devote its energies to approving those drugs that are able to enter the market promptly upon receiving FDA approval. It should not be surprising that the FDA would be more willing and able to devote its limited resources to those products for which final approval would mean *actual* entry into the marketplace. Plaintiffs allege, therefore, that the FDA has a reduced incentive to move forward rapidly with approval processes when pending patent litigation, such as Defendants' sham suits here, would bar final approval and market entry regardless. To this effect, Plaintiffs allege that:

- "The FDA expeditiously approves ANDAs when the generic product that is the subject of the ANDA is not the subject of a patent infringement litigation under the Hatch-Waxman Act" (Compl. ¶ 86);

21

- "In essentially every instance since the year 2000 involving a brand-name drug coming off patent for which an ANDA filer certified that it would market a generic version of the brand-name drug only upon expiration of the relevant patent . . . the FDA approved the generic patent the very day (and in a few instances within one or two days) of the expiration date of the patent." (Compl. ¶ 87); and

- "Defendants' unlawful conduct has caused the ANDA approval process to be delayed by the FDA" (Compl. ¶ 84).

Thus, Plaintiffs allege that where there is no patent litigation, and the generic manufacturer is able to certify that it would come to market on or about a date certain, the FDA acts swiftly to approve the product. This is consistent with the purpose of the Hatch-Waxman regulatory process, which was designed to facilitate generic competition. (Compl. ¶ 43.) However, where, as here, patent litigation is present, and no date certain for market entry can be forthcoming from a generic company (even upon the expiration of the Thirty Months Stay in light of the presence of ongoing litigation that could deter or delay generic entry even where the litigation is frivolous), the FDA approval process grinds along slowly. It is hardly surprising, therefore, that no tentative approval occurred during the Thirty Months Stay.

Accepting as true Plaintiffs' allegations that the FDA would have granted timely approval of a generic version of metoprolol-succinate but for Defendants' conduct (Compl. ¶¶ 82-91)—as must be done at this stage of the litigation—it cannot be said that the lack of FDA approval is an independent cause that "fully accounts" for Plaintiffs' injuries.

22

2.    **Plaintiffs Allege that Defendants' Conduct Caused the ANDA Applicants to Prioritize Activities Other Than Metoprolol-Succinate Approval Because Those Activities Were More Likely to Bring Faster Return on Investment**

Plaintiffs allege that Defendants' unlawful conduct also delayed the FDA approval process by causing the Generic Manufacturers, as rational profit-maximizing businesses, to shift their finite resources away from the approval process for generic metoprolol-succinate in favor of the patent litigation, and other matters that would likely result in more immediate sources of revenue and profit. (Compl. ¶ 79.)

Plaintiffs specifically allege that Defendants took advantage of the automatic stay, and that Defendants' conduct reduced the incentives of the Generic Manufacturers to vigorously pursue the FDA approval process. As the Complaint sets out:

- "Defendants knew that even though ultimately they could not expect success on the merits of the Patent Lawsuits, filing the lawsuits would enable them automatically to bar the [G]eneric [M]anufacturers from coming to market for up to thirty months or more" (Compl. ¶ 79);

- "Absent the Patent Lawsuits, the Generic Manufacturers . . . would have had reason to, and would have, focused and directed resources into the ANDA approval process for generic extended-release metroprolol succinate." (Compl. ¶ 85); and,

- "The Generic Manufacturers seeking to sell generic Toprol-XL have extensive experience in the pharmaceutical industry, including in obtaining approval for ANDAs and marketing generic pharmaceutical products." (Compl. ¶ 83)

These allegations reflect and support Plaintiffs' claim that Defendants' conduct caused the actual ANDA filers—generic companies experienced at successfully obtaining FDA approval—to de-prioritize the FDA approval process.[16] Plaintiffs allege,

---

[16] The FDA's approval letter for generic metoprolol-succinate makes clear that the approval process is iterative and responsive to the amount of effort devoted to it. *See* Ex. A at 1. The letter references four amendments to the ANDA and five other sets of correspondence between the filer and the FDA. *Id.* A lack of vigor in
(continued...)

23

thus, that Defendants' filing of sham patent suits causes generic manufacturers to concentrate their business efforts on defeating that litigation—and on other matters that would more immediately bring economic returns, such as other ANDAs or research and development efforts—instead of on a tentative approval process that would have been of no immediate benefit even if immediate approval could have been obtained. (Compl. ¶¶ 79, 85.) In sum, Plaintiffs allege that had Defendants not improperly availed themselves of a Thirty Months Stay and brought sham litigation, the ANDA applications would have proceeded far more speedily, and approval and market entry would already have occurred. (Compl. ¶ 79, 84-87.)

Two district courts in the Third Circuit recently endorsed Plaintiffs' view of the implications of patent litigation on generic manufacturer incentives:

- *Ben Venue*, 90 F. Supp. 2d at 545 (emphasis added) (once the Thirty Months Stay is in place, "*generic manufacturers . . . ha[ve] little practical incentive to pursue even conditional agency approval*" because they are unable to obtain final approval for their products until they prevail in the patent infringement litigation or until thirty months expire from the time of filing of that lawsuit);

- *Wellbutrin*, 281 F. Supp. 2d at 757 ("In the face of these patent lawsuits, it is reasonable to infer that . . . [the] generic companies directed resources away from FDA approval and toward the defense of the infringement actions and, furthermore, that this reallocation of funds resulted in a delay of FDA approval.").[17]

---

[16](...continued)

pursuing the ANDA by either the filer or the FDA—and Plaintiffs here allege both—slows response times and delays processing of the application. Plaintiffs allegations of delay also help explain why this ANDA approval *took nearly twice as long* as the typical ANDA approval. *Compare* Ex. A at 1 (approval dated July 31, 2006, more than 31 months after the filing of the ANDA on December 18, 2003), *with* Ex. C at 3 (*Improving Access to Generic Drugs: Hearing Before the Senate Special Comm. on Aging*, 109th Congress (July 20, 2006) (testimony of Gary Buehler, R.Ph., Director, Office of Generic Drugs, FDA, that ANDA "median approval times have decreased from 18.4 months in FY 2001 to 16.3 months in FY 2005"), *available at* http://www.hhs.gov/asl/testify/t060720.html); *FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 33 (D.D.C. 1999) (noting that "FDA approval of an ANDA takes an average of about 18 months").

[17]*See also Purepac*, 2000 U.S. Dist. LEXIS 22559, at *22 (noting brand manufacturer's power to delay generic manufacturer's ability to come to market) (citing *Ben Venue*, 90 F. Supp. 2d at 544).

Accordingly, Plaintiffs have alleged, consistent with the logic endorsed and adopted by two district courts, that Defendants' anticompetitive scheme delayed and corrupted the regulatory approval process. Absent Defendants' conduct, at least one (and possibly more) generics would have been approved earlier, and marketed presently. If the Court accepts Plaintiffs' above-stated allegations as true, which it must for purposes of Defendants' motion to dismiss, then the lack of tentative FDA approval cannot be a fully independent cause of Plaintiffs' injury, and Defendants' motion must therefore be denied.

Defendants' principal argument, contrary to the facts alleged in the Complaint, and without a single supporting citation, is that their sham suits had no effect on the potential generic metoprolol-succinate competitors because generic ANDA applicants "would prefer to obtain approval expeditiously so that [they] will be in a position to maximize sales of [their] product[s] and not potentially lose any portion of the 180-day period of generic exclusivity that Hatch-Waxman provides." AZ. Br. at 20. However, in addition to being procedurally improper, Defendants' "factual" assertions are simply wrong. In fact, it is the first generic *applicant*, and not the first to receive FDA approval, that has the right to a period of exclusivity upon obtaining final FDA approval. 21 U.S.C. at § 355(j)(5)(B)(iv)(II). As the first filers for their respective dosage forms of metoprolol-succinate, the ANDA applicants already had the right of exclusivity regardless of whether they were actually the first to be approved. In other words, each of the generics had an incentive *to file* the first ANDA for a particular dosage strength, but because they had regulatory exclusivity regardless of the order in which they received FDA approval, Defendants are incorrect to say that obtaining regulatory exclusivity was

a motivation for vigorous pursuit of ANDAs even in the face of Defendants' sham suits.[18] In other words, Plaintiffs, and the *Wellbutrin* and *Ben Venue* courts, are correct that Defendants' sham suits would cause generic manufacturers to de-emphasize the FDA approval process, and thus delayed approval (and market entry) can reasonably be caused, as Plaintiffs allege, by Defendants' anticompetitive scheme.

Defendants' argument that Plaintiffs' logic is suspect because "the lifting of . . .[the] stay upon the entry of the district court's ruling in the patent litigation in February 2006 should have immediately ushered in generic competition" (AZ Br. at 18) misapprehends Plaintiffs' allegations. Plaintiffs claim that the presence of the stay, as well as the sham lawsuits based on unenforceable and/or invalid patents, among other things, corrupted the regulatory process itself, and distorted the incentives of the participants. In a world without the sham suits and the Thirty Months Stay, in addition to shedding the costs and distractions and disincentives of the sham suits, the parties would have had a date certain (*i.e.*, patent expiration) as a goal for regulatory approval and near simultaneous market entry. (Compl. ¶ 87.) But, with the Thirty Months Stay in place (which was cut short in this case due to the district court's order invalidating the patents), and the sham lawsuits continuing on appeal, the generics and the FDA have had no date certain for market entry.

---

[18] The possibility of success in the patent infringement litigation at the district court level also did not affect the incentives for the Generic Manufacturers to focus their resources on obtaining tentative approval. Under Congress's 2003 amendments to Hatch-Waxman, only when "a court enters a final decision from which no appeal . . . has been or can be taken that the patent is invalid or not infringed" does that decision trigger the start of the 180-day period of exclusivity. *See* 21 U.S.C. at § 355(j)(5)(D)(i)(I)(bb)(AA). Because Eon, the first ANDA filer in this case for one of the dosages at issue, filed after the amendments to the HWA came into effect, those amendments apply. *See Teva Pharm. USA, Inc. v. Pfizer Inc.*, 395 F.3d 1324, 1329 (Fed. Cir. 2005) (stating that the 2003 amendments apply to new ANDA filings made on or after December 8, 2003).

Moreover, the FDA approval process takes a considerable amount of time, averaging sixteen months. *See* Ex. C at 3 (*Improving Access to Generic Drugs: Hearing Before the Senate Special Comm. on Aging*, 109th Congress (July 20, 2006) (testimony of Gary Buehler, R.Ph., Director, Office of Generic Drugs, FDA, that ANDA "median approval times have decreased from 18.4 months in FY 2001 to 16.3 months in FY 2005"), *available at* http://www.hhs.gov/asl/testify/t060720.html). *See also FTC v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 33 (D.D.C. 1999) (noting that in 1999 "FDA approval of an ANDA t[ook] an average of about 18 months"). It is, therefore, not at all surprising that several months passed after the resolution of the patent infringement litigation before any Generic Manufacturer obtained approval. The delay in approval even after the resolution of the litigation is fully consistent with (and indeed is explained by) Plaintiffs' allegations that Defendants' unlawful conduct was a material cause of delay.

Finally, one of the generic manufacturers *did* obtain FDA approval relatively soon—within seven months—after the resolution of the patent infringement litigation. *See* Ex. A (July 31, 2006 generic approval letter for Sandoz (Eon's parent)). Thus, the period of FDA approval for Sandoz spanned 31 months, which is nearly twice as long as generic approvals typically take (16 months). These facts further confirm Plaintiffs' allegations that it was Defendants' conduct, and not a problem with any generic manufacturer's ANDA, that caused the delay in generic approval, and blocked generic entry.

> **3.      Plaintiffs Allege that Defendants' Conduct Prevented or Delayed Additional Potential Generic Manufacturers from Developing and Seeking Approval of Generic Versions of Metoprolol-Succinate**

Plaintiffs further allege that Defendants' anticompetitive conduct "discouraged and/or delayed" potential "generic manufacturers other than those that actually filed ANDAs" from developing their own generic versions of metoprolol-succinate. (Compl. ¶ 89). Plaintiffs specifically allege that:

- "Absent Defendants' improper procurement of the '154 and '161 Patents, and their wrongful listing in the Orange Book, companies considering whether to submit an ANDA for extended-release metoprolol succinate would not have had to weigh the potential for, and costs of, litigation over the '154 and '161 Patents or the possibility that Defendants would be able to obtain an automatic stay for up to thirty months" (Compl. ¶ 88);

- "Absent Defendants' improper procurement of the '154 and '161 Patents, and their wrongful listing in the Orange Book, the cost/benefit and return-on investment calculations facing potential generic entrants would have been far more favorable toward investigating and developing a generic Toprol-XL product" (Compl. ¶ 89);

- "Absent the challenged conduct . . . there would have been several other drug companies readying generic Toprol-XL products for the market, and the Generic Manufacturers may not have been the first ANDA filers" (*id.*); and,

- "[A]bsent Defendants' conduct here, generic drug manufacturers would have expeditiously filed ANDAs, and the FDA would have promptly and timely approved these ANDAs, permitting entry at the first legally available time, and substantially before the present" (Compl. ¶ 87).

Thus, Defendants' procurement, listing, and prosecution of fraudulently obtained and invalid patents, Plaintiffs allege, deterred multiple generic manufactures from vigorously pursuing FDA approval. Defendants' conduct raised the costs of market entry for all possible competitors, forcing generic companies to factor in the costs and delay of litigation concerning Defendants' patents in deciding whether to pursue their own generic versions of the product. Plaintiffs allege that the cost of that litigation and the automatic

28

delay in FDA approval that would result from it provided a substantial disincentive for these companies to rapidly develop and seek approval for their own versions of generic metoprolol-succinate.

These allegations provide a wholly independent ground to deny Defendants' motion. Neither regulatory approval (in the actual world corrupted by Defendants' alleged misconduct), nor even regulatory *filing* (in the actual world corrupted by Defendants' alleged misconduct) is a prerequisite to pleading (and proving) causation and antitrust injury. *See Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) (Easterbrook, J.) (holding that, even where generic manufacturer has not filed an ANDA, pleading requirements for antitrust standing may be satisfied). Judge Easterbrook reasoned in *Xechem* that, if the plaintiff could prove with evidence later in the case that there would have been market entry absent the anticompetitive conduct, that would be sufficient to establish antitrust injury. Accordingly, the lack of an ANDA filing (and, implicitly, ANDA approval) is not a bar to properly alleging antitrust injury or causation. Given Plaintiffs' allegations here, the motion to dismiss must therefore be denied.

**E.    Applicable Law Does Not Support Defendants' Proposed Rule Requiring Tentative FDA Approval as a Necessary Prerequisite for Alleging Antitrust Injury in the Hatch-Waxman Context**

Defendants' motion is premised on a faulty and unsupported proposed bright-line rule: "[t]o state a claim, plaintiffs would have to show that an ANDA had received tentative approval while the 30-month stay was in effect."   (AZ Br. at 8.)   Yet, as Defendants admit (*see* AZ Br. at 21-23), courts in the Third Circuit have specifically and recently rejected their proposed rule. *See Wellbutrin*, 281 F. Supp. 2d 751; *Ben Venue*, 90

F. Supp. 2d 540; *Purepac*, 2000 U.S. Dist. LEXIS 22559; *accord Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004).

Defendants' argument rests largely on their assertion that *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998), supports Defendants' proposition that the failure of a generic manufacturer to obtain tentative FDA approval requires dismissal of Plaintiffs' claim. (*See* AZ Br. at 11-12, 15-16, 21, 23.) However, as the *Wellbutrin* and *Ben Venue* courts recently held, *West Penn Power* is readily distinguishable from the facts that Plaintiffs allege in this case.

*West Penn Power* was decided within the unique context of the Pennsylvania electric utility industry, an industry whose regulations provided that any utility seeking to offer electricity in a given area was required to obtain a certificate from the state's Public Utility Commission ("PUC"). *West Penn Power*, 147 F.3d at 259. Allegheny Power had sought certification to supply electricity to a region in which Duquesne Light was the only certified utility; the City of Pittsburgh supported Allegheny Power's petition for certification, and Duquesne Light opposed it. *Id.* at 260-61. The two utilities ultimately decided to merge, and pursuant to the companies' agreement, Allegheny Power subsequently withdrew its petition for PUC certification. *Id.* The City sued both utilities, claiming that their premerger agreement violated Section 1 of the Sherman Act. *Id.* at 262.

That decision has no application here. *First*, in *West Penn Power*, the plaintiff did not allege facts supporting a direct causal link between the challenged conduct and higher prices, *i.e.*, the plaintiff did not directly aver antitrust injury other than in the most general sense. The City's complaint alleged only a "los[t] . . . *opportunity* to have lower

electric service charges," not actual lower charges. 147 F.3d at 268 (emphasis added). Indeed, the Third Circuit noted that there were *"no facts averred in the complaint which even permit us to speculate as to the likelihood of the PUC granting certification to Allegheny Power."* 147 F.3d at 268 (emphasis added). Thus, in *West Penn Power*, in stark contrast to this case, there was simply no way to determine from the complaint – *even if the causation allegations were accepted as true* – whether in the absence of the challenged conduct, there would have been regulatory approval, and thus enhanced competition. Such causation allegations are not missing here, where, as discussed above, Plaintiffs allege, in detail, that the FDA would have more rapidly approved at least one generic version of metoprolol-succinate but for Defendants' anticompetitive conduct, and that generic competitors would be on the market today.

*Second*, as the Third Circuit expressly instructed, the *West Penn Power* holding "is fact specific to the current climate in which the instant facts developed, namely, in the era of 'regulated electric utility monopolies[.]'" *West Penn Power*, 147 F.3d at 269. Indeed, the decision was confined not only to case of "regulated electric utility monopolies," but to *heavily* "regulated electric utility monopolies." The court explained that an impending partial deregulation in the electric utility industry—which would "not entirely displace the regulatory function of the PUC," 147 F.3d at 260—"will likely remove the break in the causal chain" and confer antitrust standing. *Id*. at 269.

In the Hatch-Waxman context in this case, the causal chain was never broken. Unlike the utility industry in *West Penn Power*, where the regulatory agency at the time of the decision was not charged with the responsibility of rapidly promoting competition, the Hatch-Waxman regime is, Plaintiffs allege, oriented toward increasing competition.

31

To that end, the FDA ordinarily approves ANDAs swiftly "when the generic product is not the subject of a patent infringement litigation[.]" (Compl. ¶¶ 86-87). The Complaint describes how the Hatch-Waxman Act "was principally designed to streamline the process by which generic drugs are brought to market," (*id.* ¶ 43), and alleges the near-certainty of FDA approval of ANDAs filed by established generic manufacturers (*id.* ¶ 83 (alleging Eon Labs, Inc.'s "high approval rates for its ANDAs, usually within twelve to thirteen months of filing an ANDA"), ¶ 87 (alleging that in "essentially every instance" where a generic manufacturer files a Paragraph III Certification, "the FDA approved the generic applicant the very day . . . of the expiration date of the patent")).

Accordingly, most ANDAs get approved, and do so quickly when no patent litigation is pending and there is a date certain for launch (as would have been the case absent Defendants' anticompetitive scheme). *West Penn Power* is therefore simply inapposite.[19]

Courts in the Third Circuit have considered Defendants' proposed application of *West Penn Power* to the Hatch-Waxman regime, and have refused to adopt a rule requiring tentative approval of an ANDA as a condition precedent to pleading an antitrust injury. For instance, *Wellbutrin* and *Ben Venue*, which were decided *after West Penn Power*, flatly rejected its application in this context.

---

[19] Defendants' reliance on *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997), is similarly misplaced. In *Schuylkill*—another case like *West Penn Power* that is confined to the specific facts of the heavily regulated electric utility monopoly industry—an electric power supplier, SER, brought suit against a utility, PP&L, for allegedly monopolizing energy sales within its service area. *Schuylkill*, 113 F.3d at 410. SER claimed that PP&L curtailed its purchases from SER impermissibly in order to sell PP&L's own power sources, thereby depriving consumers of access to SER's resources. *Id.* at 414. But SER was merely a power supplier, not a competitor, and it was precluded from competing with PP&L by their agreement and by state and federal regulations. *Id.* at 415. In *Schuylkill*, both market entry *and* prices were determined by the regulatory agency, 113 F.3d at 414, and plaintiffs there did not allege corruption of the regulatory process, nor could they allege higher prices due to defendant's conduct. Here, of course, Plaintiffs allege both.

32

In *Wellbutrin*, just as in this case, plaintiff purchaser classes filed antitrust claims against a brand-name manufacturer, alleging that, but for the defendant manufacturer's filing of frivolous patent infringement actions against various generic manufacturers, a generic competitor would have been on the market earlier. *Id.* at 755. The defendant manufacturer filed a motion to dismiss, arguing, like Defendants argue here, that the plaintiffs could not sufficiently allege that they had suffered any antitrust injury because no generic manufacturer had obtained tentative FDA approval. *Id.* at 756.

*Wellbutrin* squarely rejected the defendant's argument, holding that *West Penn Power* required dismissal of a plaintiff's claim *only* where "an independent cause *fully accounts* for the plaintiff's alleged injury and breaks the causal connection between the alleged antitrust violation and the plaintiff's injury." *Id.* (emphasis added). The *Wellbutrin* court cautioned that close examination was required "to make sure that it is the independent cause, rather than the illegal antitrust action, that gives rise to the plaintiff's injury." *Id.*

Ultimately, although the defendant there (unlike here) had "pos[ed] a plausible and legally permissible version of events that explains why generic manufacturers of Wellbutrin SR have not yet entered the market," the court denied the motion to dismiss, concluding:

> [A]lthough it is possible that the frivolous lawsuits did not cause Plaintiffs' harm due to the lack of FDA approval, it is also possible that these lawsuits generated circumstances which are responsible for the lack of FDA approval itself. Accordingly, *because Plaintiffs may be able to prove that the allegedly frivolous lawsuits "materially caused" their alleged injuries*, the Court will deny Defendants' Motion.

33

*Id.* (emphasis added). Similarly, Plaintiffs here have pled allegations that, if true, would establish that Defendants' unlawful conduct "materially caused" Plaintiffs' injuries. *Wellbutrin* therefore undermines Defendants' reliance on *West Penn Power*.

The court in *Bristol-Myers Squibb v. Ben Venue Laboratories*, 90 F. Supp. 2d 540 (D.N.J. 2000), also rejected the very argument now advanced by Defendants. In that case, Bristol-Myers Squibb ("Bristol") filed patent infringement claims against would-be generic manufacturers, and the generic manufacturers filed antitrust counterclaims on the basis of Bristol's allegedly fraudulent procurement and enforcement of the patents at issue. *Id.* at 541-42. Bristol moved for summary judgment on those counterclaims, relying on *West Penn Power* for its argument that the generic manufacturers' failure to secure tentative FDA approval constituted an independent bar to their entry into the market. *See id.* at 543-45.

*Ben Venue* rejected Bristol's argument, stating that the analogy of the Hatch-Waxman regime to the regulatory regime at issue in *West Penn Power* "ignores the reality of Hatch-Waxman." *Id.* at 545. After noting that it was Bristol who invoked the automatic delay of FDA approval by filing its patent infringement suits, the court said that "[f]or Bristol to insist that its generic competitors have no standing because they are not in the market, when Bristol itself foreclosed their access to it, is meritless." *Id.* Moreover, the court noted that once Bristol had filed its patent infringement suits, "the generic manufacturers . . . had little practical incentive to pursue even conditional agency approval." *Id.* Thus, the court "d[id] not accept Bristol's premise that any lessening of competition [was] caused by the FDA's refusal to approve the pending ANDAs," and

34

saw "a definite, causative link between Bristol's induced moratorium and the counterclaimants' alleged antitrust injuries." *Id.*

Similarly, in *Warner Lambert Co. v. Purepac Pharm. Co.*, No. 98-2749, 2000 U.S. Dist. LEXIS 22559 (D.N.J. Dec. 22, 2000), a brand-name manufacturer moved to dismiss the antitrust counterclaims of a generic manufacturer on the grounds that the generic manufacturer lacked antitrust standing. *Id.* at *6-7, 20. The *Purepac* court rejected this argument, stating:

> [T]he generic manufacturer's injury does not merely result from the 'structure of a regulated industry[,]' but from the decision of the pioneer manufacturer to bring suit. *See* [*Ben Venue*, 90 F. Supp. 2d] at 545. Consequently, the Supreme Court's requirement for a special 'causal connection' and 'directness' of injury must be liberally construed when dealing with regulatory conditions under the Hatch-Waxman Act.

*Id.* at *22. Because the brand-name manufacturer was able to delay the operation of the regulatory process, the court saw a "sufficient causal connection" between the brand-name manufacturer's alleged unlawful conduct and the generic manufacturer's alleged injuries to survive the motion to dismiss. *Id.* at *22-23.

Defendants are reduced to criticizing this decision for failing to address the fact that the generic manufacturer had not obtained tentative approval. (AZ Br. at 23.) However, the *Ben Venue* court had already addressed that very question, and the *Purepac* court explicitly followed *Ben Venue* regarding the inapplicability of Defendants' argument to the Hatch-Waxman regime. *See Purepac*, 2000 U.S. Dist. LEXIS 22559, at *22. *See also Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 810 (D.C. Cir. 2001) (antitrust injury properly alleged despite lack of regulatory approval as long as excluded generic plaintiff could allege that "FDA approval was probable and it was sufficiently prepared to enter the market").

Defendants' other cases are similarly inapposite. (AZ Br. at 12-15 (citing *In re Terazosin Hydrochloride Antitrust Litig.*, 335 F. Supp. 2d 1336 (S.D. Fla. 2004); *In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56 (D. Mass. 2003); *Bristol-Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp. 2d 21 (D. Mass 2000)).) None of these cases support the proposition that obtaining tentative approval of an ANDA is a prerequisite to alleging a cognizable antitrust injury.

For instance, in *Terazosin*, the court granted a brand manufacturer's partial *summary judgment* motion in a suit filed by direct and indirect purchasers and several states for violations of Section 2 of the Sherman Act. But, *Terazosin* progressed to the summary judgment stage, where the plaintiffs were permitted to attempt to prove their allegations. Thus, *Terazosin* does not support Defendants' argument that Plaintiffs' allegations are insufficient as a matter of law. That is, there would have been no need to allow discovery—as the *Terazosin* court undeniably did—if the claims were legally deficient.

Moreover, in addition to the different procedural posture, *Terazosin* is distinguishable because, plaintiffs there did not allege (or attempt to introduce admissible evidence) that defendants' actions there corrupted and delayed the approval process itself. *Terazosin*, 335 F. Supp. 2d at 1368 n.31. The *Terazosin* court contrasted the date of final FDA approval, which, it noted, "*is* delayed" pending the resolution of the patent infringement suit, with the "undisputed fact[] as to the tentative approval date." *Id.* (emphasis in original). Plaintiffs in *Terazosin* alleged that defendants' patent infringement case delayed (under the provisions of the Hatch-Waxman Act) final FDA approval *but did not allege (or attempt to prove on summary judgment) any delay in*

36

*tentative approval.* In the instant case, however, Plaintiffs allege that Defendants' anticompetitive scheme delayed the *entire* FDA approval process, including tentative and final approval. For this and the other stated reasons, *Terazosin* is inapposite.

In *Relafen*, the court *denied* a brand manufacturer's motion to dismiss plaintiff purchasers' antitrust claims, rejecting the argument that the statute of limitations had begun to run when the company filed its allegedly sham litigation. *Relafen*, 286 F. Supp. 2d at 62, 64. The court found that the claim fell within the speculative damages exception, reasoning in part that no generic manufacturer could have entered the market at the defendant's suggested date because none had yet obtained tentative FDA approval. *Id.* at 63. Unlike Plaintiffs in the instant case, the brand-name manufacturer in *Relafen* did not—for obvious reasons—assert that the lack of tentative approval was itself a result of the brand-name manufacturer's unlawful conduct. The *Relafen dicta* cited by Defendants here is thus inapposite.[20]

In sum, Defendants find no support in law or logic for their argument that gaining tentative approval is a condition precedent to filing a cognizable antitrust action in the Hatch-Waxman Act context. This is especially true, where, as here, the Complaint alleges that Defendants' anticompetitive scheme compromised the entire approval process—both tentative and final—and delayed market entry of generic metoprolol-

---

[20]Finally, *Copley* is inapposite because the causation question in that case involved the claims by a specific generic entrant that was the *second* ANDA filer, and thus its market entrance would be delayed, regardless of the defendant's conduct, by the first ANDA filer's 180-day exclusivity period. *Copley*, 144 F. Supp. 2d at 25 ("[B]ecuase [the first generic filer's] 180-day period of market exclusivity has not run, [the second filer] cannot show that the [brand manufacturer's] lawsuit is preventing it from entering the market"). In this case, on the other hand, Plaintiffs allege simply that *at least one* generic version of metoprolol-succinate would have entered the market but for Defendants' unlawful conduct.

succinate. As cases directly on point have held, Defendants cannot take advantage of their own malfeasance.

## F.    Defendants' Proposed Rule is Contrary to the Purposes of Antitrust Law and the Hatch-Waxman Regime

Finally, there are important prudential reasons underpinning courts' repeated rejection of the rule Defendants again propose here. Defendants would like to limit assertions of antitrust claims against brand manufacturers to situations where generic manufacturers have already secured tentative or final FDA approval. This rule would shift the antitrust injury inquiry from a focus on the intended and actual effects of a defendant's anticompetitive conduct to a more technical question of whether the FDA happens to have granted approval in the actual world—which world may have been thoroughly corrupted by Defendants' conduct (as alleged here).

Adopting Defendants' rule would provide brand manufacturers with an economic and legal incentive to make every effort, whether lawful or not, to delay the FDA's approval of generic versions of their drugs. This perverse reading of antitrust law would harm consumers and the public at large. If the rule implied by Defendants' motion were the law, egregious anticompetitive conduct that clearly caused antitrust injury, such as that at issue here, would be immune from liability. For example, a brand manufacturer could escape antitrust liability even where its scheme involved, for instance, bribing FDA officials to delay approval or paying generic manufacturers to impede the process of product approval.

The arbitrary rule that Defendants suggest, thus, would subvert the rationale of private antitrust litigation by preemptively precluding plaintiffs from establishing antitrust injury, even where the alleged injury stems from precisely the type of conduct

that the antitrust laws are designed to prevent, and even where there is no doubt of a causal connection between the anticompetitive conduct and the alleged injury. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). For these and other reasons, courts have repeatedly rejected Defendants' proposed rule, just as this Court should do.

## IV.    THE COURT SHOULD NOT STAY THIS ACTION

In the anticipated event their motion to dismiss is denied, Defendants ask the Court to "stay this action before significant time and resources are spent on an action that could very well be mooted by the outcome of the patent litigation." (AZ Br. at 30.) However, Defendants cannot and do not demonstrate a "clear case of hardship or inequity" that would result from moving forward promptly with discovery. *See Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1075 (3d Cir. 1983). Plaintiffs are entitled to prove their case and this action should move forward without delay.

Defendants acknowledge that Plaintiffs have an interest in moving forward with their claims, but they insist that Plaintiffs would not be "unduly prejudiced" by a stay. (AZ. Br. at 26.) However, Defendants are unable to show that any hardship or inequity would be avoided if the Court granted its motion to stay the action. Defendants have made no showing that there is any real prospect that the patent ruling against them will be overturned. Thus, it is not the case that the pending appeal "may substantially affect" this lawsuit or "be dispositive of its issues," *Bechtel Corp. v. Local 215, Laborers' Int'l*

*Union*, 544 F.2d 1207, 1215 (3d Cir. 1976), and no increase in efficiency to the Court's docket will come from staying the action.[21]

Thus, Defendants' request for a stay should be denied.[22]

## V.    CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss and, respectfully, refuse to grant a stay.

Dated: August 25, 2006

Respectfully submitted,

Jeffrey S. Goddess, Esq. (Del. Bar No. 630)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
Wilmington, DE 19899
Tel: (302) 656-4433
jgoddess@rmgglaw.com

***Liaison Counsel for Plaintiffs***

---

[21]This Court's stay order in *In re Pharmastem Therapeutics, Inc.*, No. 05-md-1660 GMS (D. Del. Oct. 6, 2005), came after a jury verdict for the plaintiff, followed by a judgment as a matter of law in favor of the defendants, various cross-appeals to the Federal Circuit, and a decision by the United States Patent and Trademark Office to reexamine some of the patents at issue. *Id.* at 2-3. In that case, the defendants who sought the stay had a real chance of prevailing in the pending litigation. Compared to *Pharmastem*, in this case there is no similarly complicated procedural history and no real possibility Defendants might prevail in their appeal of the patent litigation summary judgments. Defendants therefore have not made out, and can not make out, "a clear case of hardship" that would result if they were forced to go forward with this lawsuit prior to final resolution of the patent litigation. *See Landis v. N. Am., Co.*, 299 U.S. 248, 255 (1936).

[22]If the Court is inclined to grant a stay, it should be lifted as soon as the Federal Circuit rules on the patent appeal, and not remain in place pending rehearing petitions or petitions for *certiorari*.

Daniel Berger
Eric L. Cramer
John Radice
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Linda P. Nussbaum
Steig D. Olson
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY 10022
Tel: (212) 838-7797
Fax: (212) 838-7445

Michael D. Hausfeld
COHEN, MILSTEIN, HAUSFELD & TOLL,
P.L.L.C.
1100 New York Avenue, N.W.
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

Thomas M. Sobol
Edward Notargiacomo
HAGENS BERMAN SOBOL SHAPIRO, LLP
One Main Street, 4th Floor
Cambridge, MA 02142
Tel: (617) 482-3700
Fax: (617) 482-3003

*Co-Lead Counsel for Plaintiffs*

Joseph M. Vanek
VANEK, VICKERS & MASINI.
225 W. Washington, 18th Floor
Chicago, IL 60606
Tel: (312) 224-1500

41

Paul E. Slater
SPERLING & SLATER, P.C.
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (212) 641-3200

Joshua P. Davis
LAW OFFICES OF JOSHUA P. DAVIS
436 Valley Street
San Francisco, CA 94131
Tel: (415) 422-6223

Joseph C. Kohn
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107
Tel: (215) 238-1700

Jeffery L. Kodroff
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300

*Additional Counsel for Plaintiffs*

# EXHIBIT A



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

ANDA 76-969

Food and Drug Administration
Rockville MD 20857

JUL 3 1 2006

.

Sandoz Inc.
Attention: Dietrich Bartel, B.S.
           Director, Regulatory Affairs
4700 Sandoz Drive
Wilson, NC  27893

Dear Sir:

This is in reference to your abbreviated new drug application
(ANDA) dated December 18, 2003, submitted pursuant to section
505(j) of the Federal Food, Drug, and Cosmetic Act (the Act),
for Metoprolol Succinate Extended-Release Tablets USP, 25 mg,
50 mg, 100 mg and 200 mg.

Reference is also made to your amendments dated May 13, 2005;
March 28, June 1, and June 19, 2006.  We acknowledge receipt of
your correspondences dated February 11, and April 2, 2004;
April 20, and July 21, 2005; and January 23, 2006, addressing
the patent and exclusivity issues associated with this ANDA.

We have completed the review of this ANDA and have concluded
that the drug is safe and effective for use as recommended in
the submitted labeling.  However, because of the 180-day generic
drug exclusivity issue explained below, at this time we are
unable to grant final approval to your Metoprolol Succinate
Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg.
Therefore, only your Metoprolol Succinate Extended-Release
Tablets USP, 25 mg is approved.  Your Metoprolol Succinate
Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg strengths
are tentatively approved and will not be eligible for final
approval until the 180-day generic drug exclusivity period
associated with these strengths has expired.

The referenced listed drug (RLD) upon which you have based your
ANDA, Toprol-XL® Extended-Release Tablets of AstraZeneca LP
(AstraZeneca), is subject to periods of patent protection.  The
following patents and expiration dates are currently listed in

the Agency's publication titled <u>Approved Drug Products with Therapeutic Equivalence Evaluations</u> (the "Orange Book"):

| U.S. Patent Number | Expiration Date |
|---|---|
| 4,927,640 (the '640 patent) | May 22, 2007 |
| 4,957,745 (the '745 patent) | September 18, 2007 |
| 5,001,161 (the '161 patent) | September 18, 2007 |
| 5,081,154 (the '154 patent) | September 18, 2007 |

Your ANDA contains paragraph IV certifications to each of the patents under section 505(j)(2)(A)(vii)(IV) of the Act stating that the patents are invalid, unenforceable, or will not be infringed by your manufacture, use, or sale of Metoprolol Succinate Extended-Release Tablets USP, under this ANDA.  You have notified the agency that Sandoz complied with the requirements of section 505(j)(2)(B) of the Act, and that litigation for infringement of the '161 and '154 patents was initiated against Sandoz in the United States District Court for the District of Delaware, then transferred and consolidated in the Eastern District of Missouri [Astrazeneca AB, Aktiebolaget Hassle & AstraZeneca LP, v Eon Labs Inc., Civil Action No. 04-CV-0205].  You have also notified the agency that the court decided that '161 and '154 patents are invalid and unenforceable.  Therefore, under section 505(j)(5)(B)(iii) your ANDA is eligible for approval.

**I.   Approval of Metoprolol Succinate Extended-Release Tablets USP, 25 mg**

The Division of Bioequivalence has determined your Metoprolol Succinate Extended-Release Tablets USP, 25 mg, to be bioequivalent and, therefore, therapeutically equivalent to the referenced listed drug, Toprol-XL of AstraZeneca.

Your dissolution testing should be incorporated into the stability and quality control program using the same method proposed in your ANDA.  The "interim" dissolution specifications are as follows:

Apparatus:
Speed:
Medium:
Volume:



Specifications:

1 hr:      (b)(4)
4 hrs:
8 hrs:
20 hrs:

The "interim" dissolution test(s) and tolerances should be
finalized by submitting dissolution data for the first three
production size batches.  Data should be submitted as a Special
Supplement - Changes Being Effected when there are no revisions
to the "interim" specifications or when the final specifications
are tighter than the "interim" specifications.  In all other
instances, the information should be submitted in the form of a
Prior Approval Supplement.

With respect to 180-day generic drug exclusivity for Metoprolol
Succinate Extended-Release Tablets USP, 25 mg, Sandoz was the
first ANDA applicant to submit a substantially complete ANDA for
Metoprolol Succinate Extended-Release Tablets USP, 25 mg, with a
paragraph IV certification to the four patents listed above.
Therefore, with this approval, Sandoz may be eligible for 180
days of generic drug exclusivity for Metoprolol Succinate
Extended-Release Tablets USP, 25 mg.  Generic drug exclusivity,
which is provided for under section 505(j)(5)(B)(iv) of the Act,
begins to run from the date of commercial marketing identified
in section 505(j)(5)(B)(iv).  Please submit correspondence to
this ANDA informing the agency of the date commercial marketing
begins.  The agency notes that Sandoz failed to obtain tentative
approval of this ANDA within 30 months after the date on which
the ANDA was filed.  See section 505(j)(5)(D)(i)(IV) of the Act.
However, the agency is not making a formal determination at this
time of Sandoz's eligibility for 180-day generic drug
exclusivity.  It will do so only if another applicant becomes
eligible for approval within 180 days after Sandoz begins
commercial marketing of Metoprolol Succinate Extended-Release
Tablets USP, 25 mg.

Under section 506A of the Act, certain changes in the conditions
described in this ANDA require an approved supplemental
application before the change may be made.

Post-marketing reporting requirements for this ANDA are set
forth in 21 CFR 314.80-81 and 314.98.  The Office of Generic
Drugs should be advised of any change in the marketing status of
Metoprolol Succinate Extended-Release Tablets USP, 25 mg.

Promotional materials may be submitted to FDA for comment prior to publication or dissemination. Please note that these submissions are voluntary. If you desire comments on proposed launch promotional materials with respect to compliance with applicable regulatory requirements, we recommend you submit, in draft or mock-up form, two copies of both the promotional materials and package insert(s) directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> 5901-B Ammendale Road
> Beltsville, MD 20705

We call your attention to 21 CFR 314.81(b)(3) which requires that materials for any subsequent advertising or promotional campaign be submitted to our Division of Drug Marketing, Advertising, and Communications with a completed Form FDA 2253 at the time of their initial use.

## II.    Tentative Approval of Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg.

We are unable to grant final approval to your Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg, at this time because other ANDAs providing for the 50 mg, 100 mg, and 200 mg strengths and containing paragraph IV certifications to the patents listed in the Orange Book were submitted to the agency prior to the submission of your ANDA. Other ANDAs, therefore, are entitled to 180-day generic drug exclusivity for Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg, and 200 mg. Accordingly, your Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg will be eligible for final approval on the date that is 180 days after the agency receives notice, with respect to the other ANDAs, of the earlier of the commercial marketing or court decision dates identified in section 505(j)(5)(B)(iv) of the Act.[1]

---

[1] Because the other ANDAs, unlike yours, were filed before the date of enactment of the Medicare Prescription Drug, Improvement and Modernization Act (MMA) (Public Law 108-173) on December 8, 2003, this reference to the 180-day exclusivity provision is to the section of the Act as in effect prior to December 8, 2003. See MMA § 1102(b)(1).

Our tentative approval of your Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg, is based upon information currently available to the agency, i.e., data in your ANDA and the status of current good manufacturing practices (cGMPs) of the facilities used in the manufacture and testing of the drug product. This decision is subject to change on the basis of new information that may come to our attention.

To reactivate this ANDA to provide for final approval of the 50 mg, 100 mg and 200 mg strengths, please submit a "Supplemental Application - Expedited Review Requested" 90 days prior to the date you believe that these products will be eligible for final approval. Your supplement must provide a summary of the legal basis upon which you believe the ANDA should be approved, as well as:

1.   updated information related to final-printed labeling or chemistry, manufacturing and controls data, or any other change in the conditions outlined in this ANDA, or

2.   a statement that no such changes have been made to the ANDA since the date of tentative approval.

Any changes in the conditions outlined in this ANDA and the status of the manufacturing and testing facilities' compliance with current good manufacturing practices (cGMPs) are subject to agency review before final approval of the 50 mg, 100 mg and 200 mg strengths will be made. Such changes should be categorized as representing either "major" or "minor" changes, and they will be reviewed according to OGD policy in effect at the time of receipt.

In addition to the supplement requested above, the agency may request at any time prior to the final date of approval that you submit an additional supplement containing the requested information. Failure to submit either supplement may result in rescission of this tentative approval determination, or delay in issuance of the final approval letter.

Your Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg, may not be marketed without final agency approval under section 505 of the Act. The introduction or delivery for introduction into interstate commerce of a drug before the effective final approval date is prohibited under section 501 of the Act. Also, until the agency issues the final

approval letter, the 50 mg, 100 mg, 200 mg strengths will not be listed in the "Orange Book."

For further information on the status of this ANDA, or prior to submitting a supplement providing for the final approval of your Metoprolol Succinate Extended-Release Tablets USP, 50 mg, 100 mg and 200 mg, please contact Cheryl Wiseman, Project Manager, at 301-827-5806.

Sincerely yours,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 99-MDL-1317-(ALL CASES) SEITZ/KLEIN



IN RE: TERAZOSIN HYDROCHLORIDE
ANTITRUST LITIGATION

_____/

FILED by ___ D.C.

FEB 1 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE THE EXPERT TESTIMONY OF JILL B. DEAL

THIS CAUSE is before the Court on Defendants' Motion to Exclude the Expert Testimony of

Jill B. Deal. Plaintiffs seek to call Jill B. Deal ("Deal") to testify that absent the April 1, 1998, agreement

between Geneva Pharmaceuticals, Inc. ("Geneva") and Abbott Laboratories ("Abbott") (collectively,

"Defendants"), Mylan Pharmaceuticals, Inc. ("Mylan") could and would have entered the market with

generic terazosin approximately one year earlier. Defendants have moved to exclude this testimony,

stating, *inter alia*, that Deal is not qualified to testify about what actions Mylan would have taken in the

"but for" world, and that Deal's opinions contain inadmissible speculation. Upon review of the motion

and the relevant portions of the record, the Court grants in part and denies in part Defendant's Motion to

Exclude the Testimony of the Jill B. Deal.[1]

_____

[1] As discussed *infra*, Deal will be precluded from testifying as to the following at trial: (1) that Mylan *would* have been ready to manufacture its generic product shortly after receiving final approval; (2) that Mylan *would* have brought the *Mylan v. Shalala* lawsuit challenging the FDA's "court decision" regulations earlier than it actually did; (3) that Mylan *would* have sought emergency relief in the *Abbott v. Mylan* lawsuit seeking a favorable patent decision in the '207 patent case earlier than it actually did; and (4) that Mylan *would* have received final approval and launched its generic product by March or April of 1999.

Deal may testify as to the following at trial, including her basis for such opinions: (1) the mechanics of the Hatch-Waxman scheme, including the regulatory options available to Mylan in the "but for" world; (2) her opinion that the FDA *would* have adopted its current definition of a "court decision" earlier than it actually did; (3) her opinion that Mylan *could* have brought the *Mylan v. Shalala* lawsuit challenging the FDA's "court decision" regulations earlier than it actually did; (4) her opinion that Mylan *could* have sought emergency relief in the *Abbott v. Mylan* lawsuit seeking a favorable patent decision in the '207 patent case earlier than it actually did; and (5) her opinion that Mylan *could* have received final approval and launched its generic product by March or April of 1999.

I.    **Factual Background**

This Court previously set forth the undisputed facts relevant to this antitrust litigation in Orders dated August 31, 2004, October 1, 2004, October 14, 2004, and January 5, 2005. In particular, in the October 14, 2004, Order, the Court denied Defendants' Alternative Motion for Partial Summary Judgment as to the Earliest Possible Date for Generic Competition ("Mylan Order"), finding that genuine issues of material fact exist for trial on the issue of the earliest date that Mylan could have launched its generic terazosin capsules product in competition with Geneva. Accordingly, the Court will only repeat those facts which are pertinent to the instant motion.

A.    The Hatch-Waxman Regulatory Framework

By passing the Hatch-Waxman in 1984, Congress established an abbreviated process that shortened the time and effort needed to obtain approval for generic copies of previously-approved "brand-name" or "pioneer" drug products from the Food and Drug Administration ("FDA"). *See* Mylan Order at 2. At the same time, Congress sought to guard against infringement of patents relating to pioneer drugs. *Id.* Hatch-Waxman thus provided that five years after the FDA has approved a "pioneer" drug, a generic pharmaceutical company may seek approval to sell a generic version of the drug by filing an Abbreviated New Drug Application ("ANDA"). *Id.* at 3. A generic pharmaceutical manufacturer, however, may not market the generic drug until it completes a validation process and the FDA approves the ANDA for that company's generic drug. *See id.*

B.    30-Month Stay and 180-Day Exclusivity Period Provisions

During the time period at issue in this case, if a generic manufacturer certified that the listed patent is invalid or will not be infringed by the generic manufacturer (a "Paragraph IV Certification"), and the innovator company timely sued the generic company for patent infringement in federal court, such a lawsuit would trigger a "30 month stay" provision. *Id.* Under this provision, the FDA was prohibited from granting final approval to the generic company's ANDA until (1) thirty (30) months had elapsed; or (2) a "court decision" relating to the specific ANDA held the patent invalid or infringed,

Page 2 of 7

whichever occurred first. *Id.* During the 30-month stay period, the FDA may grant "tentative approval" to an ANDA applicant if the FDA determines that the ANDA would otherwise receive final approval but for the 30-month stay. *Id.* at 4.

Hatch-Waxman also provides that the first generic applicant to file a Paragraph IV Certification is entitled to 180 days of marketing exclusivity before any later filed ANDAs pertaining to the same brand name drug can receive final approval. *Id.* Accordingly, the first ANDA applicant to file a Paragraph IV Certification has the advantage of being the only generic on the market for six months if it is able and willing to go to market upon receipt of final approval. *Id.* During the time period at issue, the 180-day exclusivity period was triggered by actual marketing by the first ANDA filer or by a "court decision" holding the patent invalid or not infringed by the particular generic drug at issue. *Id.*

Until July 2000, FDA regulations provided that a "court decision" in the context of both the 30-month stay and the 180-day exclusivity provisions meant a decision of an appellate court or a decision of a district court from which no appeal was taken. *Id.* In September 1997, the court in *TorPharm, Inc. v. Shalala*, No. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997), *remanded*, 1998 WL 135491 (D.C. Cir. Feb. 5, 1998), *vacated on other grounds* (D.D.C. April 9, 1998), held that the 30-month stay provision terminates upon the issuance of a "district court" decision in the relevant patent litigation in favor of the ANDA filer, as opposed to an "appellate court" decision. The FDA appealed this decision, but the parties later settled and dismissed the appeal. *Id.* At the request of the FDA, the district court vacated its decision. *Id.* at 4-5.

On January 4, 2000, the district court in *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000), held that the term "court decision" as applied to the 180-day exclusivity period refers to a decision of a "district court," not an "appellate court." Mylan commenced the *Mylan v. Shalala* lawsuit on November 10, 1999, after Geneva had come to market with terazosin in August 1999 and had been awarded 180 days of exclusivity. *Id.* at 5. In July 2000, the FDA changed its regulations so that a district court decision in favor of an ANDA filer constituted a "court decision," which terminated a 30-

Page 3 of 7

month stay or started a 180-day period of exclusivity.

    C.    <u>The Expert Report of Jill B. Deal</u>

    Deal is a principal in the law firm of Fish & Richardson P.C., with a J.D. from Columbus School of Law, Catholic University of America (1978), and a B.A. from the University of California, Berkeley in Political Science (1964). Deal has over fifteen years of experience in advising clients on issues within the jurisdiction of the FDA and Hatch-Waxman. In this capacity, Deal has worked on patent and FDA opinions for both pioneer and generic pharmaceutical companies, served as an advisor on FDA issues in patent cases, and written and spoken on Hatch-Waxman issues. *See* Expert Report of Jill B. Deal ("Deal Report") at 2-3.

    At trial, Plaintiffs expect that Deal will explain when Mylan could and would have entered the market but for the April 1, 1998, agreement. Specifically, Deal anticipates explaining the following: (1) that Mylan would have been ready to manufacture its generic product shortly after receiving final approval; (2) that Mylan could and would have brought the *Mylan v. Shalala* lawsuit challenging the FDA's "court decision" regulations earlier than it actually did; (3) that Mylan could and would have sought emergency relief in the *Abbott v. Mylan* lawsuit seeking a favorable patent decision in the '207 patent case earlier than it actually did; (4) that Mylan could and would have received final approval and launched its generic product by March or April of 1999; (5) the mechanics of the Hatch-Waxman scheme, including the regulatory options available to Mylan in the "but for" world; and (6) that the FDA would have adopted its current definition of a "court decision" earlier than it actually did.

**Discussion**

**I.    Standard of Review**

    When faced with a proffer of expert testimony under Rule 702, the party offering the expert testimony carries the burden of laying the proper foundation, and admissibility must be shown by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, the trial court must function as a gatekeeper and engage in a rigorous three-part inquiry to

determine whether (1) the expert is qualified to testify competently regarding the matters she intends to

address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable as

determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact,

through the application of scientific, technical, or specialized expertise, to understand the evidence or to

determine a fact in issue. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (citing *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993)). The Eleventh Circuit has referred to

these requirements as the "qualification," "reliability," and "helpfulness" prongs, and although there is

inevitably some overlap, they remain distinct concepts that must be individually analyzed. *United States*

*v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

## II.    Analysis

Defendants seek to exclude Deal's testimony by arguing that her speculations about Mylan's

actions in the "but for" world fall outside her expertise. According to Defendants, although Deal has a

background in Hatch-Waxman regulations and procedures, Mylan's ability to enter the market earlier in

the "but for" world turns almost exclusively on business issues and the state of mind of Mylan's decision

makers. *See* Defs.' Mot. Exclude. at 10. Thus, Defendants maintain that Deal is not qualified, and that

her opinions are unreliable.

The Court agrees that Deal should be precluded from offering the following four opinions at

trial: (1) that Mylan *would* have been ready to manufacture its generic product shortly after receiving

final approval; (2) that Mylan *would* have brought the *Mylan v. Shalala* lawsuit challenging the FDA's

"court decision" regulations earlier than it actually did; (3) that Mylan *would* have sought emergency

relief in the *Abbott v. Mylan* lawsuit seeking a favorable patent decision in the '207 patent case earlier

than it actually did; and (4) that Mylan *would* have received final approval and launched its generic

product by March or April of 1999. Although Deal is an expert in the Hatch-Waxman arena, such

expertise does not translate into an ability to predict the business practices of a generic pharmaceutical

company in the "but for" world; rather, the Court finds that these opinions necessarily depend on the

state of mind of Mylan's decision makers, and that such testimony is more appropriately given by a fact witness, rather than an expert.

Nevertheless, Deal's proposed testimony should not be excluded *in toto*. As discussed in this Court's *Mylan Order*, based on events as they actually occurred in the real world, and other evidence in the record, issues of fact exist as to the date Mylan could have entered the market with generic terazosin capsules. *See Mylan Order* at 12. Thus, to assist the trier of fact in determining these issues, Deal may offer the following testimony at trial: (1) the mechanics of the Hatch-Waxman scheme, including the regulatory options available to Mylan in the "but for" world;[2] (2) that the FDA *would* have adopted its current definition of a "court decision" earlier than it actually did; (3) that Mylan *could* have brought the *Mylan v. Shalala* lawsuit challenging the FDA's "court decision" regulations earlier than it actually did; (4) that Mylan *could* have sought emergency relief in the *Abbott v. Mylan* lawsuit seeking a favorable patent decision in the '207 patent case earlier than it actually did; and (5) that Mylan *could* have received final approval and launched its generic product by March or April of 1999.

Defendants contest Deal's expected testimony that the FDA would have adopted its current definition of "court decision" earlier than it did in the "but for" world. According to Defendants, such testimony is unreliable because it involves pure speculation. The Court disagrees, however, because Deal simply expects to opine that Mylan would have obtained the exact same outcome in the "but for" world that it eventually obtained in the real world.[3] Moreover, the "but for" world necessarily lends itself to a certain amount of logical extrapolation, and the Court will not exclude all such expert testimony as unreliable. Accordingly, Deal may opine that the FDA would have adopted its current definition of "court decision" earlier in the "but for" world.

---

[2] Although Defendants do not seriously contest Deal's expected testimony regarding the Hatch-Waxman scheme, the Court briefly notes that Deal is qualified to testify on such issues, and that given her experience, such testimony will be both reliable and helpful to the trier of fact.

[3] In the real world, the FDA adopted Mylan's interpretation of "court" in the *Mylan v. Shalala* lawsuit.

Page 6 of 7

Finally, Deal may opine that Mylan *could* have challenged the definition of "court decision" earlier, sought emergency relief earlier in the *Abbott v. Mylan* lawsuit earlier, and received final approval and launched its generic product by March or April of 1999, including her reasons for reaching such opinions. Because Deal is an expert in Hatch-Waxman, her testimony will assist the trier of fact in understanding what actions Mylan could have taken under the Hatch-Waxman scheme in the "but for" world. Although Defendants correctly point out that the Court will explain the pharmaceutical industry, the patent process, the ANDA process, and the litigation process to the trier of fact, this general explanation from the Court does not preclude Plaintiffs from offering an expert to testify as to the actions Mylan might have taken absent the April 1, 1998 agreement. Accordingly, Deal my testify as to the actions Mylan *could* have taken in the "but for" world.[4]

For the reasons stated above it is hereby

ORDERED that Defendant's Motion to Exclude the Testimony of Jill B. Deal is GRANTED IN PART AND DENIED IN PART.

DONE and ORDERED in Miami, Florida this _1st_ day of ~~January~~ February, 2005.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:
Magistrate Judge Klein
Counsel of Record

---

[4] The Court notes that Defendants also claim that Deal's testimony should be excluded for the following reasons: (1) her prediction of when Mylan would have entered the market is at odds with the then-existing regulatory scheme and the undisputed evidence in the record; (2) Deal does not have any experience in the generic drug manufacturing business; (3) Deal's testimony will be duplicative of the argument of Plaintiffs' counsel. As to Defendants' first two objections, the Court finds that these arguments go the weight, not admissibility, of Deal's testimony. In addition, the Court finds that Defendant's third objection is unpersuasive.

# EXHIBIT C



United States Department of
Health & Human Services

# Testimony

Statement by
**Gary Buehler, R.Ph.**
**Director of the Office of Generic Drugs**
**Center for Drug Evaluation and Research**
**Food and Drug Administration**
**U.S. Department of Health and Human Services**

on
**Improving Access to Generic Drugs**

before
**Special Committee on Aging**
**United States Senate**

**Thursday, July 20, 2006**

**INTRODUCTION**
Mr. Chairman and Members of the Committee, I am Gary Buehler, R.Ph, Director of the Office of Generic Drugs (OGD), in the Center for Drug Evaluation and Research (CDER), at the U.S. Food and Drug Administration (FDA or the Agency). Thank you for the opportunity to testify about FDA's efforts to expedite the approval of generic drug products.

FDA understands that Congress and the public are concerned about the high cost of prescription drugs. Generic drugs play an important role in granting access to affordable products that will benefit the health of consumers, especially seniors - who often are on a fixed income. Prompt approval of generic drug product applications, also known as abbreviated new drug applications (ANDA), is imperative to making generic products available to American consumers at the earliest possible date.

**Statutory Provisions**
Prior to the passage of the Drug Price Competition and Patent Term Restoration Act (Hatch-Waxman Amendments) of 1984, FDA's primary statute, the Federal Food, Drug, and Cosmetic (FD&C) Act, did not provide for the approval of generic drugs. The Hatch-Waxman Amendments established the ANDA approval process, which permits FDA to approve generic versions of previously approved innovator drugs without the submission of clinical studies and other kinds of data that are required in a full new drug application (NDA). An ANDA refers to the previously approved NDA of the innovator drug and relies upon the Agency's finding of safety and effectiveness for that drug. Also, with respect to each unexpired patent submitted to FDA by the owner of the innovator drug and published by FDA in the Orange Book[1], an ANDA contains a certification that the ANDA applicant either will wait for the patent to expire before marketing the drug or that the applicant challenges the patent as invalid or not infringed.

The Hatch-Waxman Amendments have been very successful and have provided for the approval of over 8,000 generic drug products. These products are lower cost, high quality products that have saved the American public and the government billions of dollars.

FDA has taken a number of significant steps to provide greater access to affordable prescription medications, including unprecedented steps to lower drug costs by helping to speed the development and approval of low-cost generic drugs after legitimate patents have expired on branded drugs. Generic drugs typically cost 50 to 70 percent less than their brand-name counterparts. In 2003, FDA published a final rule to improve access to generic drugs and lower prescription drug costs for millions of Americans. This rule was first proposed in response, in part, to Federal Trade Commission recommendations and other changes the Agency identified as being useful in improving generic competition. The rule limits an innovator drug company to only one 30-month stay of a generic drug applicant's entry into the market for resolution of a patent challenge. These changes will save Americans over $35 billion in drug costs over the next 10 years, and will also provide billions in savings for the Medicare and Medicaid programs. We were pleased that elements of this rule were codified as part of the Medicare law and that, with FDA's technical assistance, the law added additional mechanisms to enhance generic competition in the marketplace.

In addition, since FY2001, the Administration and Congress have increased funding for FDA's generic drug program by 66 percent, a clear sign of the important role played by OGD. These increases have enabled FDA to hire additional expert staff to review generic drug applications more quickly and initiate targeted research to expand the range of generic drugs available to consumers. While there remains work to be done, as I will discuss, we have been able to produce significant reductions in approval times for generic drugs since 2002 that consequently will save consumers billions by generally reducing the time for developing generic drugs and making them available.

**The Office of Generic Drugs' Workload**
Much concern has been raised from the public and Congress about a "backlog" of pending ANDAs, currently under OGD review. FDA has received an increased number of ANDAs in the last few years. OGD generally maintains a "first-in, first-reviewed" policy for ANDAs. FDA instituted this generic drug review priority to ensure the integrity of the approval process. A number of factors govern the timing of generic drug approvals, including: whether the application is of high quality, meets inspection standards and the scientific and technical requirements for approval, and whether patent protection and exclusivity periods have expired on the innovator drug.

There are several contributing causes to the increased number of generic applications FDA is receiving. Among these are the approvals of many new innovator drugs in the 1990s with patents that are now expiring, as well as the burgeoning number of new generic firms entering the market. Over the last five years, the number of applications submitted to OGD has increased by 150 percent. In fiscal year (FY) 2001, OGD received 307 ANDAs. In FY 2002 submissions increased 17.6 percent to 361. In FY 2003, they increased 24.3 percent to 449. In FY 2004, they increased 25.3 percent to 563. And, in FY 2005, they increased 36 percent to 766 applications submitted for review (see figure 1). Just last month, June 2006, we approved (or tentatively approved, meaning an application is technically ready for approval, but patent or exclusivity prevents immediate approval) 45 applications, however, the number of pending applications grew substantially because we received 92 applications. Clearly, this rate of increase in applications results in a dramatic increase in the workload for the review staff in OGD.

Figure 1



Although OGD still has a backlog, figure 1 also demonstrates that we have managed to increase the number of approvals each year. In FY 2001, OGD approved (or tentatively approved) 310 ANDAs and increased the annual number of approvals to 467 (or tentative approvals) in FY 2005. OGD's efforts are also evident when looking at the median approval time. The median approval times have decreased from 18.4 months in FY 2001 to 16.3 months in FY 2005. In FY 2003, OGD approved (or tentatively approved) 132 applications in less than 15 months after receipt. In FY 2004, that number increased to 146 in less than 15 months and increased further to 174 in FY 2005 (102 of which were approved in less than 12 months). Despite these challenges, FDA has managed to maintain its rate of approval of more than one generic drug application a day.

It is important to understand that a pending ANDA has not been reviewed. When a pending ANDA is initially reviewed and deficiencies are communicated to the company, the application is no longer considered pending. However, when the company submits an amendment to its ANDA to address the identified deficiencies, the application is again considered pending. Therefore, the ANDAs in the backlog are not all unreviewed, but may be applications that have had an initial review and are now awaiting a second or subsequent review of the company's attempts to satisfy approval requirements.

FDA has taken significant steps to improve our resources. Total spending on the Generic Drug Program is $64.6 million, which is more than a 66 percent increase from the comparable FY 2001 amount. FDA has increased its generic drugs full-time equivalent (FTE) positions from 134 in FY 2001 to 201 in FY 2006. Last year, FDA added 12 new FTE positions to OGD's staff. These individuals, now fully trained, have recently reached the point in their learning curve where they are now full contributors to the efforts of OGD. In addition, OGD has taken actions to streamline the ANDA review process. These actions include adding a third chemistry review division and a fifth team in OGD's Division of Bioequivalence. Also, a number of new review practices have been implemented to improve interactions with generic drug companies. We have begun utilizing non-reviewer Project Management staff to take certain actions not requiring scientific expertise, thus alleviating the burden of these activities on the review staff. OGD has instituted other efficiencies to application review. These include:

- reviewing Drug Master Files (DMFs) prior to the time the related ANDAs are assigned, because the DMF evaluation is often the limiting factor in completing the ANDA review; (Experience with expedited review in the President's Emergency Plan for AIDS Relief program has shown that early DMF review generally shortens overall time to approval.)
- relying upon telephone discussions with ANDA sponsors when appropriate, as opposed to written correspondence, to resolve deficiencies more efficiently and expeditiously early in the review process;
- assigning applications to reviewers with relevant expertise or experience with a particular drug class to enable more efficient and timely reviews; and
- utilizing a new review format for the chemistry review. It is based on the structure of

applications in the International Conference on Harmonization Common Technical Document. This format also is in keeping with CDER's quality-by-design initiatives and should eventually decrease review times and the need for submission of some supplements to approved ANDAs.

Because of these efforts, on the very day that the last patents or exclusivities expire on the innovator product, OGD has been able to approve at least one generic drug application in most cases. And, if there are no products eligible for 180-day exclusivity, we have usually been able to approve two or more applications for the same products. In fact, very recently, FDA approved generic applications for pravastatin (Pravachol), sertraline (Zoloft), and simvastatin (Zocor) when the innovator protections expired. Many Americans use one of these drugs. The availability of generic versions of these three drugs should produce savings measured in the billions of dollars per year. We will work to continue our success so far in staying ahead of the curve on first-time generics and responding to pending applications.

**Citizen Petitions**

FDA regulations permit any interested person to file a citizen petition requesting FDA "to issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action" (Title 21, *Code of Federal Regulations* 10.25 and 10.30). Citizen petitions may be submitted at any time, requesting that FDA impose new criteria for approval of ANDAs. The petitions often make serious challenges to whether or not a generic product can be approved; that is, whether a specific application or a group of applications would meet the statutory requirements for approval.

It is incumbent upon FDA to consider and address the merits of petitions. The data and information submitted with these petitions require detailed analysis and precise scientific documentation, often involving multiple disciplines within CDER. Because the same issues sometimes are raised in a subsequent court challenge to an ANDA approval and because petitioners sometimes submit non-scientific petitions that raise purely legal questions related to ANDA approvals, a thorough legal review is also necessary. Although it is not required that a citizen petition response be issued before approval of a related ANDA, it is important that FDA comprehensively assess the scientific issues prior to approval of the ANDA. It is very rare that petitions present new issues that CDER has not fully considered, but the Agency must nevertheless assure itself of that fact by reviewing the citizen petitions.

A high percentage of the petitions OGD reviews are denied. An analysis of petitions answered between calendar years 2001 and 2005, raising issues about the approvability of generic products (42 total responses), showed that FDA denied 33, denied three in part, and granted six. It should be noted that when petitions are granted, wholly or in part, it is often because FDA already has the proposed scientific or legal standard in place or is already planning to take the action that the petition requests. While the citizen petition process is a valuable mechanism for the Agency to receive information from the public, it is noteworthy that very few of these petitions on generic drug matters have presented data or analysis that significantly altered FDA's policies. Of the 42 citizen petition responses examined, only three petitions led to a change in Agency policy on the basis of data or information submitted in the petition.

CDER has made considerable efforts in the last year-and-a-half to improve the process for responding to citizen petitions. As part of this process, OGD constituted a group of highly qualified and skilled scientists dedicated to assessing the citizen petitions related to generic drugs and formulating FDA's responses to them. Other improvements include: increased prospective management of the petition response process; development of clear timelines for completing actions; and improved communication among the CDER components involved in responding to citizen petitions.

**Authorized Generics**

The term "authorized generic" is generally used to describe an instance when an innovator company, in the face of pending generic competition, repackages its own product and markets it as a "generic." Prior FDA approval is not needed for the innovator company to do this, as review and approval occur under the auspices of the innovator's approved NDA. Generic drug companies, through citizen petitions and lawsuits, have sought FDA's intervention to halt the marketing of

authorized generics. FDA determined, and the courts upheld, that the FD&C Act does not give FDA authority to intervene in the matter.

## CONCLUSION

FDA appreciates the Committee's interest and concern about expediting the approval of generic drug products and the opportunity to discuss these important issues. I am constantly impressed by the dedication, skills and effectiveness of FDA staff responsible for reviewing generic drugs. In spite of a tremendous workload, be assured that there is a sense of purpose and knowledge, among my staff and this Administration that they are working towards an important public health mission. FDA will continue to work towards greater efficiency in ANDA review and attempt to deal with the issues discussed today and the many emerging challenges ahead. We are committed to continue to make additional generic products available to the American public as soon as legally possible. I would be pleased to respond to questions.

## Footnotes:

[1]The publication, "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly known as the Orange Book) identifies drug products approved on the basis of safety and effectiveness.

Last Revised: July 20, 2006

HHS Home | Questions? | Contact HHS | Site Feedback | Site Map | Accessibility | Privacy Policy | Freedom of Information Act | Disclaimers

The White House | FirstGov

U.S. Department of Health & Human Services · 200 Independence Avenue, S.W. · Washington, D.C. 20201

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2006, I electronically filed the ANSWERING

BRIEF OF DIRECT PURCHASER CLASS PLAINTIFFS IN OPPOSITION TO

DEFENDANTS' MOTION TO DISMISS using CM/ECF, which will send notification of

such filing to all registered participants, including:

> Jack B. Blumenfeld, Esquire
> Karen Jacobs Louden, Esquire
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P. O. Box 1347
> Wilmington, DE 19899

Jeffrey S. Goddess (Del. Bar No. 630)
Rosenthal, Monhait & Goddess, P.A.
Suite 1401, 919 Market Street
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com