IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

| | | |
|---|---|---|
| IN RE:  METOPROLOL SUCCINATE | ) | |
| DIRECT PURCHASER | ) | |
| ANTITRUST LITIGATION | ) | C.A. No.  06-52 (GMS) |
| _____ | ) | |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | |
| ALL ACTIONS | ) | |
| _____ | ) | |

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT OR, IF
<u>THAT MOTION IS DENIED, TO STAY THIS ACTION</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
   Attorneys for Defendants

OF COUNSEL:
Arthur F. Golden
Ronan P. Harty
Joshua D. Liston
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY  10017
(212) 450-4000

October 10, 2006

# TABLE OF CONTENTS

<u>PAGE</u>

TABLE OF AUTHORITIES ............................................................................. ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 4

I.    PLAINTIFFS ARE UNABLE TO ESTABLISH ANTITRUST STANDING ....... 4

    A.    Plaintiffs Cannot Establish That the Alleged Conduct Delayed
        Tentative FDA Approval ........................................................... 4

        1.    The Resources of the FDA ............................................ 6

        2.    The Generic Manufacturers' Resources ........................... 9

        3.    Hypothetical Competitors Should Not Be Considered ................. 11

    B.    Plaintiffs Misperceive the Causation Requirement ................................. 12

    C.    The Case Law Favors Dismissal ................................................. 14

    D.    Plaintiffs' "Prudential" Argument Is Misplaced ...................................... 16

II.   IF THE MOTION TO DISMISS IS DENIED, THE COURT SHOULD STAY
    THIS ACTION ................................................................................. 17

CONCLUSION ............................................................................................... 19

# TABLE OF AUTHORITIES

PAGE

## Cases

*Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002)..............................7

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)................................................................................13

*Axis v. Micafil*, 870 F.2d 1105 (6th Cir. 1989) ..................................................14

*Barton & Pittinos, Inc., v. SmithKline Beecham Corp.*, 118 F.3d 178 (3d Cir. 1997) ...........................................................................11

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ................................. 12-13

*Bristol-Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp. 2d 21 (D. Mass. 2000) ...............................................................................16

*Bristol-Myers Squibb v. Ben Venue Labs.*, 90 F. Supp. 2d 540 (D.N.J. 2000)......... 9-10,14

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)............... *passim*

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)...............................11

*Elan Corp., PLC v. Andrx Pharms., Inc.*, 272 F. Supp. 2d 1325 (S.D. Fla. 2002).............7

*Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1043 (2006) ...........................................................13

*In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) ....................................7

*In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56 (D. Mass. 2003).....................................7

*In re Pharmastem Therapeutics, Inc. Patent Litig.,* No. 05-md-1660 GMS (D. Del. Oct. 6, 2005)...........................................................................4,17

*In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121 (E.D.N.Y. 2003), *aff'd*, 429 F.3d 370 (2d Cir. 2005) ...........................................................16

*In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395 (3d Cir. 2000)...............................16

*In re Wellbutrin SR/Zyban Antitrust Litigation*, 281 F. Supp. 2d 751 (E.D. Pa. 2003) ...........................................................................9-10,14

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557 (1981)................................12

*Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997) ..................................................................................................2,5,6

*Vinci v. Waste Mgmt. Inc.*, 80 F.3d 1372 (9th Cir. 1996) ..................................11

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004) ........11

*Xerox Corp. v. 3 Comm Corp.*, 69 F. Supp. 2d 404 (W.D.N.Y. 1999)............................17

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)..............12

## <u>Statutes and Rules</u>

Fed. R. Civ. P. 12(b)(6)...............................................................................................5

21 U.S.C. § 355(j)(5)(B)(iv) .......................................................................................8

## <u>Other Authorities</u>

FDA, Center for Drug Evaluation & Research, Drugs@FDA – Glossary of Terms, http://www.fda.gov/cder/drugsatfda/glossary.htm.........................................6

*Improving Access to Generic Drugs: Hearing Before the Senate Special Comm. on Aging*, 109th Congress (July 20, 2006)................................................. 6-7

2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b (2d ed. 2000) ..................................................................................... 13-14,16

## **INTRODUCTION**

Plaintiffs, in their brief in opposition to AstraZeneca's motion to dismiss, fail to come to terms with the fundamental principle that an independent bar to competition in the relevant market breaks the causal connection between an alleged antitrust violation and plaintiffs' alleged injuries.

In its opening brief, AstraZeneca showed that such an "independent bar" exists in this case – the lack of Food and Drug Administration ("FDA") tentative approval of an Abbreviated New Drug Application ("ANDA") from any generic manufacturer while the automatic 30-month stay was in effect. That lack of tentative approval – which plaintiffs admit – means that the 30-month stay triggered by the filing by AstraZeneca of the patent litigation against the generic pharmaceutical companies did not adversely affect competition in the alleged relevant market. That is so because the FDA is unrestricted in its ability to grant tentative approval while the stay is in effect. If an ANDA actually met the requirements for FDA approval during the pendency of the stay, the FDA could have granted it tentative approval. Had any of the generic filers in this case received tentative approval while the stay was in effect, plaintiffs would have an argument that AstraZeneca's lawsuit caused their alleged injuries. However, the lack of tentative FDA approval created an independent bar to competition in the market, regardless of AstraZeneca's alleged conduct. The principle that an independent bar breaks the causal connection has been squarely recognized by the Third Circuit, and it governs this case. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998).

In response, plaintiffs argue that the difference here is that AstraZeneca's conduct delayed the possibility of FDA tentative approval. Under plaintiffs' theory, both the

generic manufacturers who filed ANDAs and the FDA itself effectively take a "time-out" when patent litigation is filed by a brand-name manufacturer and direct their resources away from the ANDA approval process.  As AstraZeneca showed in its opening brief, this allegation is unsupportable and belied by case law showing that generic manufacturers do receive tentative approval while the automatic stay is in effect.  Although plaintiffs fall back on the refrain that this Court must accept their allegations as true, the Court need not credit unsupportable allegations.  *See, e.g.*, *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) (court need not credit "unsupported conclusions and unwarranted inferences" or allegations that are belied by other factual allegations and the law).

Plaintiffs' allegations are unsupportable for several reasons.  First, the FDA has stated that the tentative approval process contemplates approval irrespective of whether a stay is in effect.  Second, the FDA generally prioritizes ANDAs based on the timing they are submitted by generic manufacturers.  Third, there are numerous examples of the FDA granting tentative approval of an ANDA while a 30-month stay is in effect.  Fourth, the 2003 amendments to the Hatch-Waxman Act compel ANDA filers to pursue tentative approval and the FDA to consider and grant tentative approval to qualifying ANDAs even when a stay is in effect.  Finally, plaintiffs submit a document, as Exhibit A to their opposition brief, showing that on July 31, 2006, well after the stay had been lifted and the district court patent litigation completed, the FDA granted final approval to the ANDA of Sandoz, Inc. (the successor of Eon Labs, Inc.), which sought to market generic

metoprolol succinate at the 25 mg dosage level.[1]  That document suggests that, in this case, at least one of the generic manufacturers did pursue tentative FDA approval during the stay.

Plaintiffs also float the notion that unknown generic manufacturers were dissuaded from developing and seeking approval of generic metoprolol succinate.  Of course, these hypothetical manufacturers would also need FDA approval for their hypothetical ANDAs.  This highly speculative allegation – which would apply equally to any Hatch-Waxman case – is precluded by *West Penn Power*, which held that "the appellants cannot foist their version of what might have been on the court under the rubric of antitrust injury.  The presence of the regulatory scheme and need for approval . . . cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise."  147 F.3d at 267-68.

Plaintiffs admit that, if their allegations that AstraZeneca's conduct actually delayed the possibility of FDA tentative approval are not credited, then the FDA's failure to provide tentative approval is an independent cause that fully accounts for the absence of a generic version of metoprolol succinate from the market.  (Pls. Br., D.I. 20, at 20.) Because those allegations are contradicted by plaintiffs' own evidence and are otherwise insufficient as a matter of law, the Complaint should be dismissed.

---

[1] Despite having final FDA approval at the 25 mg dosage level, Sandoz has still not launched its generic version.  Thus, it is Sandoz's decision not to enter the market that currently prevents plaintiffs from purchasing generic metoprolol succinate.  Moreover, in the same July 31, 2006 FDA letter, the FDA granted tentative approval to Sandoz at other dosage levels, but those approvals cannot become final because the first ANDA filers at those dosage levels, Andrx and KV, still have not obtained FDA approval. Andrx's and KV's continuing failure to receive FDA approval prevents Sandoz from entering those markets.

3

If it is not dismissed, this action certainly should be stayed until the entry of a final decision in the patent litigation.  AstraZeneca demonstrated in its opening brief that there are compelling reasons for a stay under the criteria this Court employed in *In re Pharmastem Therapeutics, Inc. Patent Litigation*, No. 05-md-1660 GMS (D. Del. Oct. 6, 2005).  Plaintiffs do not argue that they would suffer undue prejudice from a stay and do not challenge the fact that a stay is favored where, as here, the litigation is at an early stage.  Instead, they claim that AstraZeneca has not established its chances of success on the patent litigation appeal.  The merits of the case will be fully addressed on appeal.  Here, as in *Pharmastem*, the outcome of the appeal – which has been fully briefed and awaits only oral argument and a decision – may resolve or simplify the issues in this case, and thus the action should be stayed if the motion to dismiss is denied.

<u>**ARGUMENT**</u>

**I.    <u>PLAINTIFFS ARE UNABLE TO ESTABLISH ANTITRUST STANDING</u>**

**A.    Plaintiffs Cannot Establish That the Alleged <u>Conduct Delayed Tentative FDA Approval</u>**

Plaintiffs' Complaint acknowledges that a company may not begin selling a drug without FDA approval.  (Compl., D.I. 15, ¶¶ 35, 43.)  Plaintiffs also agree that the FDA was empowered to grant tentative FDA approval during the pendency of the 30-month stay.  (D.I. 20 at 10.)  The question on this motion to dismiss is:  does the Complaint reasonably allege facts that could support allegations that AstraZeneca is responsible for the lack of tentative FDA approval of any generic drug application while the 30-month stay was in effect?  If not, then the lack of tentative FDA approval is an independent and absolute bar on competition in the alleged relevant market which "cuts the causal chain"

between AstraZeneca's alleged antitrust violations and plaintiffs' alleged injuries. *See West Penn Power*, 147 F.3d at 268. Plaintiffs' attempts to hold AstraZeneca responsible are without foundation, legally insufficient, and contradicted by plaintiffs' own documents.

Plaintiffs point to three allegations that supposedly describe the ways in which AstraZeneca specifically delayed the FDA approval process. First, as a result of the 30-month stay, the FDA allegedly shifted its limited resources away from the pending ANDAs for metoprolol succinate. Second, also because of the stay, the generic manufacturers allegedly redirected their attention and resources away from their ANDAs. Finally, other unknown generic competitors were allegedly dissuaded from filing ANDAs. This Court should not accept as true "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res.*, 113 F.3d at 417, and all of the plaintiffs' allegations are unsupportable.[2] Moreover, where plaintiffs' antitrust standing is at issue, the Third Circuit has said that the "courts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *West Penn Power*, 147 F.3d at 263.

---

[2] Contrary to plaintiffs' repeated complaints, AstraZeneca is not asking this Court to accept its own facts. (*See, e.g.*, D.I. 20, at 16.) As plaintiffs are no doubt aware, the Court must determine whether the alleged facts include unsupported conclusions or unwarranted inferences and also whether the allegations are contradicted by other allegations in the Complaint or documents on which plaintiffs rely. Where, as here, the allegations are not supported or contradicted, the Complaint is not legally sufficient and should be dismissed under Rule 12(b)(6).

1.     The Resources of the FDA

Plaintiffs contend that AstraZeneca's prosecution of the patent litigation, and the ensuing automatic 30-month stay, caused the FDA to divert its attention and resources away from the ANDAs for generic metoprolol succinate.  (D.I. 20 at 21-22.)  Perhaps realizing that this bald allegation is without any support, plaintiffs assert that the Court must accept it as true.  But it is well-recognized that the Court need not accept baseless allegations, *Schuylkill Energy Res.*, 113 F.3d at 417, or ones contradicted by information the Court can consider on a motion to dismiss, *see* D.I. 20 at 6 n.9.

There are several reasons why this allegation cannot be credited.  First, the FDA's own explanation of the tentative approval process contemplates approval irrespective of whether a stay is in effect.  As the FDA has stated publicly, "If a generic drug product is ready for approval before the expiration of any patents or exclusivities accorded to the reference listed drug product, FDA issues a tentative approval letter to the applicant.  The tentative approval letter details the circumstances associated with the tentative approval.  FDA delays final approval of the generic drug product until all patent or exclusivity issues have been resolved."  *See* FDA, Center for Drug Evaluation & Research, Drugs@FDA – Glossary of Terms, http://www.fda.gov/cder/drugsatfda/glossary.htm. (Ex. A.)

Second, a document plaintiffs cite reveals that the FDA generally prioritizes ANDAs based on the timing they are submitted by generic manufacturers.  Gary Buehler, the Director of the Office of Generic Drugs ("OGD") for the FDA, testified before Congress that "*OGD generally maintains a 'first-in, first-reviewed' policy for ANDAs.*

6

FDA instituted this generic drug review priority to ensure the integrity of the approval process." *Improving Access to Generic Drugs: Hearing Before the Senate Special Comm. on Aging*, 109th Congress (July 20, 2006) (emphasis added), *available at* http://www.hhs.gov.asl/testify/t060720.html (D.I. 20, Ex. C).

Third, consistent with the FDA's statements, and as AstraZeneca demonstrated in its opening brief (D.I. 18 at 19-20), there are numerous examples of the FDA granting tentative approval of an ANDA while a 30-month stay is in effect. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 902 (6th Cir. 2003) ("On September 15, 1997, the FDA tentatively approved Andrx's ANDA, indicating that it would be finally approved as soon as it was eligible, either upon expiration of the thirty-month waiting period in early July 1998, or earlier if the court in the patent infringement action ruled that the '584 patent was not infringed."); *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1372 & n.2 (Fed. Cir. 2002) ("In September 2000 Andrx had received tentative approval of its ANDA from the FDA" pending the February 25, 2001 expiration of the stay.); *Elan Corp., PLC v. Andrx Pharms., Inc.*, 272 F. Supp. 2d 1325, 1330 (S.D. Fla. 2003) ("The FDA granted the Andrx ANDA tentative approval on March 17, 2000" while patent litigation continued.); *In re Relafen Antitrust Litig.*, 286 F. Supp. 2d 56, 60 (D. Mass. 2003) ("On August 8, . . . the FDA issued tentative approval to Eon's . . . generic nabumetone product[], but the FDA withheld final approval until the conclusion of the thirty-month stay period."). Plaintiffs do not even attempt to explain how the FDA tentatively approved ANDAs in these (and other) cases if it is distracted or otherwise delays the approval process while the 30-month stay is in effect.

Fourth, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 compels the FDA to consider and grant tentative approval to qualifying ANDAs even when a stay is in effect. Among other provisions, the 2003 Act amended the Hatch-Waxman Act to provide that a first ANDA filer will forfeit the 180-day exclusivity period if the ANDA filer fails to receive tentative approval within 30 months of filing its ANDA. *See* 21 U.S.C. § 355(j)(5)(B)(iv). This is a substantial penalty for a generic company, and the possibility of such penalty compels the FDA to give consideration to ANDAs during this period. In this case, Sandoz's ANDA filing was subject to the 2003 amendments,[3] and the FDA recognizes that Sandoz is subject to the forfeiture provision. According to the FDA, although Sandoz was the first ANDA filer at the 25 mg dosage level, "Sandoz failed to obtain tentative approval of this ANDA within 30 months after the date on which the ANDA was filed." (D.I. 20, Ex. A, at 3.) Therefore, as explained by the FDA in its letter to Sandoz, if another generic receives FDA approval at the 25 mg dosage level, Sandoz may not enjoy the 180-day period of exclusivity (assuming Sandoz ever actually launches a generic version of metoprolol succinate). (*Id.*) Because the law penalizes ANDA filers who do not obtain tentative approval during the 30 months, it is illogical to assume, as plaintiffs do, that the FDA will not give appropriate consideration to ANDAs while a stay is in effect.

---

[3] Plaintiffs agree that the 2003 amendments apply to the Sandoz ANDA. (D.I. 20 at 26 n.18.)

Finally, the FDA approval letter to Sandoz further suggests that AstraZeneca did not delay FDA approval.[4]  That letter reveals that Sandoz made four amendments to its original ANDA and sent the FDA five letters prior to final FDA approval.  (D.I. 20, Ex. A, at 1.)  One amendment and four letters were submitted well before the stay was lifted, which suggests that both the FDA and Sandoz were devoting resources and attention to the approval process while the stay was in effect.

2.     The Generic Manufacturers' Resources

Plaintiffs next allege that the generic manufacturers who filed ANDAs shifted resources away from the FDA approval process as a result of the 30-month stay.  (D.I. 20 at 23-27.)  However, as described above, there are several reasons that this allegation is unsupportable.  First, ANDA filers actually do pursue – and receive – tentative approval while a stay is in effect.  *See supra* p. 7.  Second, generic filers such as Sandoz that are subject to the 2003 amendments to Hatch-Waxman must receive tentative approval to secure a 180-day period of generic exclusivity.  *See supra* p. 8.  Third, the FDA approval letter sent to Sandoz suggests that, in this case, Sandoz did pursue FDA approval during the 30-month stay period.  *See supra* p. 9.  AstraZeneca's opening brief contains additional reasons this allegation should not be credited.  (D.I. 18 at 20-22.)

Plaintiffs point to two cases which they argue adopted their view of the implications of patent litigation on generic manufacturer incentives.  (D.I. 20 at 24 (citing *Bristol-Myers Squibb v. Ben Venue Labs.*, 90 F. Supp. 2d 540, 545 (D.N.J. 2000); *In re*

---

[4] AstraZeneca explained in its opening brief that FDA approval subsequent to lifting of the stay has no impact on the analysis because post-stay approval means that something other than the alleged conduct caused the lack of approval in the interim.  (D.I. 18 at 8.)

*Wellbutrin SR/Zyban Antitrust Litig.*, 281 F. Supp. 2d 751, 757 (E.D. Pa. 2003)).)  In *Wellbutrin*, the court did not refer to or discuss the incentives of generic manufacturers to obtain tentative approval during the 30-month stay.  In *Ben Venue*, the court credited the generic company's representation at oral argument that "generic manufacturers have had little practical incentive to pursue even conditional [FDA] approval."  90 F. Supp. 2d at 545.  As AstraZeneca explained in its opening brief, there are several reasons why generic manufacturers have every incentive to pursue tentative FDA approval during the litigation.  (D.I. 18 at 19-21.)[5]  In addition, *Ben Venue* was decided before the enactment of the 2003 amendments to the Hatch-Waxman Act, which, among other things, provide for the forfeiture of the 180-day exclusivity period in the event the ANDA filer does not receive tentative approval during the 30-month stay.  That is the provision the FDA refers to in the Sandoz approval letter and explains why Sandoz was highly motivated to obtain tentative FDA approval.  *See supra* p. 8.  Because *Ben Venue* pre-dated this change to the law, the reference to the lack of incentives for generic manufacturers is, at best, outdated.  And because the Sandoz letter contradicts plaintiffs' allegations that the generic companies do not pursue tentative FDA approval while a stay is in effect, those allegations should not be credited.

---

[5] Plaintiffs take issue with AstraZeneca's argument that generic ANDA applicants would prefer to obtain tentative FDA approval expeditiously so they will not potentially lose any portion of the 180-day period of generic exclusivity.  (D.I. 20 at 25-26.)  AstraZeneca's original argument is correct.  Each of the three ANDA applicants in this case are the first ANDA filers at different dosage levels, so all are in line to obtain exclusivity if FDA approval is secured.  That does not mean that the 180 days would be free from competition.  For Sandoz, which is subject to the 2003 amendments, the exclusivity period may be forfeited because it did not receive tentative approval during the 30-month stay period.  *See supra* p. 8.  That is a tremendous incentive to obtain tentative approval as expeditiously as possible.  If the exclusivity period is forfeited, Sandoz will have "exclusivity" only to the extent no other generics are approved at that dosage level.  Thus, Sandoz was further incentivized to obtain approval as soon as possible, to enter the market before other potential competitors could, even though it was the first filer.

3.    <u>Hypothetical Competitors Should Not Be Considered</u>

Plaintiffs also allege that certain unknown generic manufacturers might have been dissuaded from developing and seeking approval of generic metoprolol succinate. (D.I. 20 at 28-29.) As established in AstraZeneca's opening brief, this allegation is far too speculative to support antitrust standing. (D.I. 18 at 22 (citing *West Penn Power*, 147 F.3d at 267-68; *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997); *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1375 (9th Cir. 1996)).) Of course, these hypothetical manufacturers would need FDA approval for their hypothetical ANDAs, and because there is no allegation that these "filers" ever received FDA approval (nor could there be), plaintiffs' allegation is unsupportable.

Plaintiffs cite *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899 (7th Cir. 2004), for support. (D.I. 20 at 29.) But this Court is bound to follow *West Penn Power*, a case in which the Third Circuit held that if the court can "determine from the face of the complaint" that the potential competitor did not have regulatory approval to enter the market, then the claimed antitrust violation is not actionable. 147 F.3d at 266. *West Penn Power* also held that "the appellants cannot foist their version of what might have been on the court under the rubric of antitrust injury. The presence of the regulatory scheme and need for approval . . . cuts the causal chain and converts what might have been deemed antitrust injury in a free market into only a speculative exercise." 147 F.3d at 267-68.

**B.     Plaintiffs Misperceive the Causation Requirement**

Although plaintiffs essentially concede that lack of FDA approval can be a independent cause of the alleged injuries (which it is, for the reasons discussed above), they misstate the relevant law on antitrust causation. Although the law permits plaintiffs to plead a minimum amount of damage to survive a motion to dismiss, that damage must be caused by the conduct that violates the Sherman Act.

Plaintiffs cite a footnote from *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (D.I. 20 at 15), which states that "Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." Thus, the "some damage" threshold speaks to whether a plaintiff has satisfied the requirement that damages exist.

Plaintiffs cite passages from other cases to support their view on causation, but the passages quoted concern the calculation of damages, not causation. (D.I. 20 at 17) (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946)).). In *J. Truett Payne*, the Court reviewed several previous cases related to damages, but concluded that these precedents were irrelevant because the plaintiff had not yet shown the defendant had violated the antitrust laws. 451 U.S. at 568 ("In this case . . . , we cannot say with assurance that respondent is a 'wrongdoer.' Because the court below bypassed the issue of liability and went directly to the issue of damages, we simply do not have the benefit of its views as to whether respondent in fact violated § 2(a) [of the Clayton Act].").

12

Similarly, in *Bigelow*, the language quoted by plaintiffs concerns the calculation of damages. 327 U.S. at 264. As the Court said, "[E]ven where the defendant by his own wrong has prevented a more precise computation [of damages], the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly." *Id.* at 264. The passages quoted by plaintiffs do not alter the rule that causation must be adequately alleged.

In contrast, here, separate and apart from the need to quantify damages, plaintiffs must adequately allege causation – *i.e.*, whether the alleged anticompetitive acts caused the alleged damage. Plaintiffs must sufficiently allege causation, which in the antitrust context, calls for an analysis akin to determining whether the alleged harm is proximately caused by the alleged injury. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-46 (1983); *cf. Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1270-71 (D.C. Cir. 2005), *cert. denied*, 126 S. Ct. 1043 (2006). Even assuming there is a "but for" link between the injury and the alleged violation, the court must analyze other factors, including the directness of the injury, before determining whether a complaint can withstand a motion to dismiss. *Associated Gen. Contractors*, 459 U.S. at 540-41.

In this case, AstraZeneca's alleged conduct is not even the "but-for" cause of the alleged injury. The lack of tentative FDA approval while the stay was in place is an independent cause that fully accounts for the claimed injury. *See, e.g.*, *West Penn Power*, 147 F.3d at 256. As the leading treatise says, "[A] plaintiff cannot be injured in fact by

private conduct excluding it from the market when a statute prevents the plaintiff from entering that market in any event."  2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 338b, at 320 (2d ed. 2000); *see also Axis v. Micafil*, 870 F.2d 1105 (6th Cir. 1989) (no standing for plaintiff unable to obtain government-required license to enter market from which defendant allegedly excluded him).

### C.     The Case Law Favors Dismissal

Plaintiffs place significant reliance on two district court cases from other courts in the Third Circuit, *Ben Venue* and *In re Wellbutrin*.  As discussed earlier, *supra* pp. 9-10, those cases are inapposite.  *Wellbutrin* does not even discuss tentative FDA approval and *Ben Venue* predates the 2003 amendments to the Hatch-Waxman Act, which provide significant incentives for generic manufacturers to obtain, and potential penalties for the failure to obtain, tentative FDA approval.  In addition, because the Sandoz approval letter demonstrates that a generic manufacturer in this case actively sought tentative FDA approval, the *Ben Venue* court's acceptance of a general allegation that generics are disincentivized from seeking such approval is irrelevant here.

Plaintiffs also attempt to distinguish *West Penn Power*, where the Third Circuit held that the plaintiff could not show antitrust injury because state regulations barred one of the defendant utility companies from competing in certain areas at that time without regulatory approval.  *Id.* at 263.  The lack of approval was an intervening cause, the court reasoned, which "cuts the causal chain" between the alleged injury and the alleged antitrust violation.  *Id.*

14

Plaintiffs do not and cannot successfully attack this core holding of the Third Circuit. Instead, they try to distinguish the case and limit it to its facts. For example, plaintiffs point out that the *West Penn Power* court noted that there were no allegations in the complaint which would permit it to speculate as to the likelihood of regulatory approval. (D.I. 20 at 6 (citing *West Penn Power*, 147 F.3d at 268); *id.* at 31.) Plaintiffs point to allegations in their Complaint which claim there would have been earlier regulatory approval here absent the alleged conduct. (*Id.*) Plaintiffs' argument does not work, however, because it is clear there would not have been earlier approval absent the challenged conduct, because there was no tentative FDA approval while the stay was in effect. The lack of tentative FDA approval during the stay is conclusive evidence that the alleged conduct had no bearing on the timing of the approval.

Plaintiffs also attempt to limit *West Penn Power*'s holding to heavily regulated electric utility monopolies. (D.I. 20 at 31.) The selective passages plaintiffs include distort the Third Circuit's holding. Rather than limiting the case to utilities, the Court made clear that if the utilities were deregulated as then planned, the antitrust standing analysis would be different. The difference between the two scenarios is that deregulated utilities would no longer need government approval to enter a market. As the court wrote, "Had the ability of the utilities to serve various customers in various regions not been subject to approval of the [regulatory commission], our standing analysis would be radically different." 147 F.3d at 269. Thus, the court did not limit its holding to utilities, but to industries in which government approval is required for market entry.

15

The Third Circuit has subsequently read *West Penn Power* to stand for the broader proposition that "because an intervening regulatory scheme precluded the companies from competing, . . . the [alleged conduct] was not the cause of the injury." *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 401 (3d Cir. 2000). Similarly, *West Penn Power* has been cited numerous times as support for the proposition that "[a]ntitrust injury . . . must be caused by something other than the regulatory action limiting entry to the market." *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121 (E.D.N.Y. 2003), *aff'd*, 429 F.3d 370 (2d Cir. 2005); *accord Bristol-Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp. 2d 21, 23-25 (D. Mass. 2000); 2 Areeda & Hovenkamp, Antitrust Law ¶ 338b, at 320.

*West Penn Power* cannot be distinguished or limited in the ways plaintiffs suggest. It controls this case and requires dismissal of the plaintiffs' Complaint.

### D.     Plaintiffs' "Prudential" Argument Is Misplaced

In a last-ditch effort to save their Complaint, plaintiffs raise the specter of brand-name manufacturers bribing FDA officials or making illicit payments to potential competitors to delay FDA approval of ANDAs. (D.I. 20 at 38.) Although there are no allegations in this case of bribery of government officials or payments to generic companies – nor could there be any – should those situations actually arise, the courts and the law can deal with them appropriately.

Plaintiffs also claim that dismissing the Complaint "would subvert the rationale of private antitrust litigation." (D.I. 20 at 38.) Hyperbole aside, AstraZeneca is simply asking the Court to dismiss a Complaint where the allegations and documents relied on

16

by plaintiffs demonstrate that the lack of tentative FDA approval during the pendency of the stay is a reason independent of any alleged conduct by AstraZeneca for the plaintiffs' alleged injuries. Such a decision is consistent with fundamental principles of antitrust law. Indeed, adopting plaintiffs' generic arguments about what could have happened differently in the FDA approval process would eviscerate the causation requirement in every Hatch-Waxman Act case.

## II.     IF THE MOTION TO DISMISS IS DENIED, THE COURT SHOULD STAY THIS ACTION

AstraZeneca has also asked this Court to stay the action if it is not dismissed. As AstraZeneca argued in its opening brief, this litigation will be costly and burdensome, which plaintiffs do not, and cannot, dispute. (D.I. 18 at 24-30.) AstraZeneca also demonstrated that a stay would be an appropriate exercise of this Court's discretion under the three-factor test on which this Court relied in *In re Pharmastem Therapeutics, Inc. Patent Litigation*, No. 05-md-1660 GMS (D. Del. Oct. 6, 2005) (D.I. 18 Ex. A.) That test looks to "'(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to a the non-moving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.'" *Id.* at 4 (quoting *Xerox Corp. v. 3 Comm Corp.*, 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999)).

Plaintiffs do not quarrel with AstraZeneca's argument that the first and third factors counsel in favor of a stay. Instead, they summarily contend that AstraZeneca has not established the second factor – that the pending appeal may simplify the issues in this case – because AstraZeneca has "made no showing that there is any real prospect that the

17

patent ruling against them will be overturned." (D.I. 20 at 39.) In essence, plaintiffs want AstraZeneca to argue the merits of the case on a motion for a stay. But this is exactly backwards. The very purpose of a stay is to postpone the merits argument until the appropriate time. As in *Pharmastem*, the appropriate question is whether the outcome of the pending appeal before the Federal Circuit has the potential to narrow or moot the issues in this case. There is no question that it does, and plaintiffs do not seriously contend otherwise.

Therefore, if the Court denies AstraZeneca's motion to dismiss, it should stay the action pending entry of a final decision in the patent litigation. The appeal of the patent case has been fully briefed and only awaits oral argument and a decision.

## **CONCLUSION**

For the reasons set forth above and in its opening brief, AstraZeneca respectfully requests that this Court enter an order dismissing plaintiffs' Complaint or, if the motion to dismiss is denied, an order staying all proceedings in this action, including any motions, pleadings, and discovery, pending the entry of a final decision in the patent litigation.

MORRIS, NICHOLS, ARSHT  & TUNNELL LLP

*/s/  Karen Jacobs Louden*

_____
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
klouden@mnat.com
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
Attorneys for defendants

OF COUNSEL:
Arthur F. Golden
Ronan P. Harty
Joshua D. Liston
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY  10017
(212) 450-4000

October 10, 2006

540852

19

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that on October 10, 2006 I electronically filed the foregoing with the Clerk of the Court using CM/ECF which will send notification of such filing to Jeffrey S. Goddess.

I further certify that on October 10, 2006 I caused that copies of the foregoing be served on the following counsel in the manner indicated:

<u>By Hand</u>

Jeffrey S. Goddess
Rosenthal, Monhait, Gross
 & Goddess, P.A.
919 Market Street, Ste. 1401
P.O. Box 1070
Wilmington, DE  19899

<u>By Federal Express</u>

Linda P. Nussbaum
Steig D. Olson
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY  10022

Michael D. Hausfeld
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Ave., N.W.
Washington, DC 20005

Daniel Berger
Eric L. Cramer
Peter Kohn
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103

Thomas M. Sobol
Edward Notargiacomo
Hagens Berman Sobol Shapiro, LLP
One Main Street, 4th Floor
Cambridge, MA  02142

*/s/ Karen Jacobs Louden*
_____
Karen Jacobs Louden (#2881)
klouden@mnat.com

EXHIBIT A

U.S. Food and Drug Administration • Center for Drug Evaluation and Research

**Drugs@FDA**
**Glossary of Terms**

A  B  C  D  E  F  G  H  I  J  K  L  **M**  N  O  P  Q  R  **S**  T  U  V  W  X  Y  Z

**Abbreviated New Drug Application (ANDA)**
An Abbreviated New Drug Application (ANDA) contains data that, when submitted to FDA's Center for Drug Evaluation and Research, Office of Generic Drugs, provides for the review and ultimate approval of a generic drug product. Generic drug applications are called "abbreviated" because they are generally not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness.  Instead, a generic applicant must scientifically demonstrate that its product is bioequivalent (i.e., performs in the same manner as the innovator drug). Once approved, an applicant may manufacture and market the generic drug product to provide a safe, effective, low cost alternative to the American public.

**Abbreviated New Drug Application (ANDA) Number**
This six digit number is assigned by FDA staff to each application for approval to market a generic drug in the United States.

**Active Ingredient**
An active ingredient is any component that provides pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of man or animals.

**Approval History**
The approval history is a chronological list of all FDA actions involving one drug product having a particular FDA Application number (NDA).  There are over 50 kinds of approval actions including changes in the labeling, a new route of administration, and a new patient population for a drug product.

**Application**
See New Drug Application (NDA), Abbreviated New Drug Application ANDA), or Biologic License Application (BLA)

**Approval Letter**
An official communication from FDA to a new drug application (NDA) sponsor that allows the commercial marketing of the product.

**Application Number**
See FDA Application Number

**Biologic License Application (BLA)**
Biological products are approved for marketing under the provisions of the Public Health Service (PHS) Act. The Act requires a firm who manufactures a biologic for sale in interstate commerce to hold a license for the product. A biologics license application is a submission that contains specific information on the manufacturing processes, chemistry, pharmacology, clinical pharmacology and the medical affects of the biologic product. If the information provided meets FDA requirements, the application is approved and a license is issued allowing the firm to market the product.

**Biologic Product**

A biologic product is any virus, serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product applicable to the prevention, treatment, or cure of diseases or injuries. Biologic products are a subset of "drug products" distinguished by their manufacturing processes (biological process vs. chemical process). In general, the term "drugs" includes biologic products.

## Brand Name Drug

A brand name drug is a drug marketed under a proprietary, trademark-protected name.

## Company

The company (also called applicant or sponsor) submits an application to FDA for approval to market a drug product in the United States.

## Discontinued Drug

A discontinued drug is a drug product that has been removed from the market in the United States for reasons other than safety or effectiveness.

## Dosage Form

A dosage form is the physical form in which a drug is produced and dispensed, such as a tablet, a capsule, or an injectable.

## Drug

A drug is defined as:

- A substance recognized by an official pharmacopoeia or formulary.
- A substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease.
- A substance (other than food) intended to affect the structure or any function of the body.
- A substance intended for use as a component of of a medicine but not a device or a component, part or accessory of a device.
- Biologic products are included within this definition and are generally covered by the same laws and regulations, but differences exist regarding their manufacturing processes (chemical process vs. biological process.)

## Drug Product

The finished dosage form that contains a drug substance, generally, but not necessarily in association with other active or inactive ingredients.

## FDA Action Date

The action date tells when any FDA regulatory action, such as an original or supplemental approval took place.

## FDA Application Number

This number, also known as the NDA (New Drug Application) number, is assigned by FDA staff to each application for approval to market a new drug in the United States. One drug can have more than one application number if it has different dosage forms or routes of administration

## Generic Drug

A generic drug is the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use. Before approving a generic drug product, FDA requires many rigorous tests and procedures to assure that the generic drug can be substituted for the brand name drug. The FDA bases evaluations of substitutability, or "therapeutic equivalence," of generic drugs on scientific evaluations. By law, a generic drug

product must contain the identical amounts of the same active ingredient(s) as the brand name product. Drug products evaluated as "therapeutically equivalent" can be expected to have equal effect and no difference when substituted for the brand name product.

## Label

The FDA approved label is the official description of a drug product which includes indication (what the drug is used for); who should take it; adverse events (side effects); instructions for uses in pregnancy, children, and other populations; and safety information for the patient. Labels are often found inside drug product packaging.

## Marketing Status

Marketing status indicates how a drug product is sold in the United States.   Drug products in Drugs@FDA are identified as:
• Prescription
• Over-the-counter
• Discontinued - Drug products that have been removed from the market for reasons other than safety or effectiveness
• None - Drug products that have been tentatively approved

## Medication Guide

A medication guide contains information for patients' understanding of how to safely use a drug product.

## NDA (see New Drug Application)

## New Drug Application (NDA)

When the sponsor of a new drug believes that enough evidence on the drug's safety and effectiveness has been obtained to meet FDA's requirements for marketing approval, the sponsor submits to FDA a new drug application (NDA). The application must contain data from specific technical viewpoints for review, including chemistry, pharmacology, medical, biopharmaceutics, and statistics. If the NDA is approved, the product may be marketed in the United States.  For internal tracking purposes, all NDA's are assigned an NDA number.

## New Drug Application (NDA) Number

This six digit number is assigned by FDA staff to each application for approval to market a new  drug in the United States. A drug can have more than one application number if it has different dosage forms or routes of administration. In Drugs@FDA, you can find the NDA number under the column named "FDA Application."

## Over-the-Counter Drugs (OTC)

FDA defines OTC drugs as safe and effective for use by the general public without a doctor's prescription.

## Patient Package Insert (PPI)

A patient package insert contains information for patients' understanding of how to safely use a drug product.

## Pharmaceutical Equivalents

FDA considers drug products to be pharmaceutical equivalents if they meet these three criteria:
- they contain the same active ingredient(s),
- they are of the same dosage form and route of administration
- they are identical in strength or concentration

Pharmaceutically equivalent drug products may differ in characteristics such as

- shape
- release mechanism
- labeling (to some extent)
- scoring
- excipients (including colors, flavors, preservatives)

**Prescription Drug Product**

A prescription drug product requires a doctor's authorization to purchase.

**Product Number**

A product number is assigned to each drug product associated with an NDA (New Drug Application).  If a drug product is available in multiple strengths, there are multiple product numbers.

**Reference Listed Drug (see RLD)**

**Review**

A review is the basis of FDA's decision to approve an application.  It is a comprehensive analysis of clinical trial data and other information prepared by FDA drug application reviewers.  A review is divided into sections on medical analysis, chemistry, clinical pharmacology, biopharmaceutics, pharmacology, statistics, and microbiology.

**RLD (Reference Listed Drug)**

A Reference Listed Drug is an approved drug product to which new generic versions are compared to show that they are bioequivalent. A drug company seeking approval to market a generic equivalent must refer to the Reference Listed Drug in its Abbreviated New Drug Application (ANDA).  By designating a single reference listed drug as the standard to which all generic versions must be shown to be bioequivalent, FDA hopes to avoid possible significant variations among generic drugs and their brand name counterpart.

**Route**

A route of administration is a way of administering a drug to a site in a patient. A comprehensive list of specific routes of administration appears in the CDER Data Standards Manual.

**Strength**

The strength of a drug product tells how much of the active ingredient is present in each dosage.

**Supplement**

A supplement is an application to allow a company to make changes in a product that already has an approved new drug application (NDA). CDER must approve all important NDA changes (in packaging or ingredients, for instance) to ensure the conditions originally set for the product are still met.

**Supplement Number**

A supplement number is associated with an existing FDA New Drug Application (NDA) number. Companies are allowed to make changes to drugs or their labels after they have been approved.  To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA). Each sNDA is assigned a number which is usually, but not always, sequential, starting with 001.

**Supplement Type**

Companies are allowed to make changes to drugs or their labels after they have been

approved. To change a label, market a new dosage or strength of a drug, or change the way it manufactures a drug, a company must submit a supplemental new drug application (sNDA). The supplement type refers to the kind of change that was approved by FDA. This includes changes in manufacturing, patient population, and formulation.

## Tentative Approval

If a generic drug product is ready for approval before the expiration of any patents or exclusivities accorded to the reference listed drug product, FDA issues a tentative approval letter to the applicant. The tentative approval letter details the circumstances associated with the tentative approval. FDA delays final approval of the generic drug product until all patent or exclusivity issues have been resolved. A tentative approval does not allow the applicant to market the generic drug product.

## Therapeutic Equivalence (TE)

Drug products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product. Drug products are considered to be therapeutically equivalent **only** if they meet these criteria:

- they are pharmaceutical equivalents (contain the same active ingredient(s); dosage form and route of administration; and strength.)
- they are assigned by FDA the same therapeutic equivalence codes starting with the letter "A ." To receive a letter "A", FDA
  - designates a brand name drug or a generic drug to be the Reference Listed Drug (RLD).
  - assigns therapeutic equivalence codes based on data that a drug sponsor submits in an ANDA to scientifically demonstrate that its product is bioequivalent (i.e., performs in the same manner as the Reference Listed Drug).

## Therapeutic Equivalence (TE) Codes

The coding system for therapeutic equivalence evaluations allows users to determine whether FDA has evaluated a particular approved product as therapeutically equivalent to other pharmaceutically equivalent products (first letter) and to provide additional information on the basis of FDA's evaluations (second letter). Sample TE codes: AA, AB, BC (More on TE Codes)

- FDA assigns therapeutic equivalence codes to pharmaceutical equivalent drug products. A drug product is deemed to be therapeutically equivalent ("**A**" rated) only if
  - a drug company's approved application contains adequate scientific evidence establishing through *in vivo* and/or *in vitro* studies the bioequivalence of the product to a selected reference listed drug.

  - those active ingredients or dosage forms for which no *in vivo* bioequivalence issue is known or suspected.

- Some drug products may have more than one TE Code. (More about multiple TE Codes)

- Those products which the FDA does not deem to be therapeutically equivalent are "**B**" rated. (More on TE Codes)

  Over-the-counter drugs are not assigned TE codes

FDA/Center for Drug Evaluation and Research
Division of Library and Information Services
Page Last Updated: September 10, 2004